UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 3 1 2026

TAMMY H DOWNS, CLERK
By_____ DEP CLERK

DR. GINNI MCDONALD                                              PLAINTIFF

                                    CASE NO. 3:26cv-223 JM

v.

BATESVILLE SCHOOL
DISTRICT, SCOTT                                                 DEFENDANTS
FREDERICKS, individually
and in official capacity as
School Board President for
Batesville School District


VERIFIED COMPLAINT


Plaintiff Dr. Ginni McDonald, by and through undersigned counsel, brings this action

under 42 U.S.C. § 1983 against Defendants Batesville School District and Scott Fredericks, as an

individual and in his official capacity as School Board President for Batesville School District

and for her Complaint states as follows:

I. NATURE OF THE ACTION

1.      Plaintiff, Dr. Ginni McDonald ("Dr. McDonald"), is an experienced educator and

school administrator who devoted her professional career to public education.

2.      On or about May 19, 2026, Defendant Batesville School District employed Dr.

McDonald pursuant to a written Superintendent Employment Agreement for a three-year term. Dr.

McDonald possessed a legitimate claim of entitlement to continued employment absent lawful

This case assigned to District Judge _____ Moody
and to Magistrate Judge _____ Kearney

termination under her contract and applicable Arkansas law.

3. As Superintendent, Dr. McDonald served as the district's chief executive officer and necessarily relied upon principals, directors, supervisors, and other administrators to accurately report significant events occurring throughout the district.

4. This is a civil-rights action under 42 U.S.C. § 1983 to remedy Defendants' deprivation of Dr. McDonald's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5. Dr. McDonald is the Superintendent of the Batesville School District, employed under a written, fixed-term contract that permits her removal only for cause.

6. Without adequate notice or any meaningful opportunity to be heard, Defendants suspended her without pay and set in motion her termination, while publicly disseminating false and stigmatizing accusations that she failed to investigate and report suspected child abuse and committed ethical violations.

7. Those accusations have circulated in local and national media.

8. Dr. McDonald made repeated requests for production of evidence.

9. School District representatives provided incomplete production, immediately prior to Dr. McDonald's termination hearing.

10. Dr. McDonald requested a short continuance to review the lately produced production, and to request missing items, which was denied.

11. The district failed to notify Dr. McDonald that one important witness, Ashely McAllister, an eyewitness to actions in the classroom at issue and actions taken by subordinate administrators was unable to attend the hearing, concealing a basis for a requested continuance, virtual attendance for Ms. McAllistor, or a bifurcated hearing request.

2

12. Video evidence produced shortly before the hearing indicated there was a concealed eyewitness to the classroom events in question, which Dr. McDonald discovered through questioning as being a "cafeteria person."

13. This witness heard and eyewitnesses' crucial events which were captured by footage in questions, in real time, and would be able to disclose if any further events occurred out of the cameras' view.

14. This witness may have material information regarding actins taken by subordinate administrators.

15. On July 30, 2027, The Batesville Independent School District held a hearing, and voted to terminate Dr. McDonald's contract.

16. Defendants' procedures failed to provide Plaintiff with a fair and impartial hearing. Among other procedural deficiencies, Defendants invited the Board to consider irrelevant and prejudicial matters, including Plaintiff's exercise of an authorized method of appearing at the hearing, while failing to ensure that the Board's decision was based solely upon competent evidence and the applicable standards governing her employment.

17. Defendants have deprived Dr. McDonald of two distinct constitutionally protected interests without the process the Constitution requires: (a) her liberty interest in her good name, reputation, honor, and professional integrity, entitling her to a name-clearing hearing; and (b) her property interest in continued employment under her contract, entitling her to notice and a meaningful opportunity to be heard before she is deprived of that interest.

18. Dr. McDonald seeks declaratory relief, injunctive relief (including a name-clearing hearing and an order preserving the status quo), compensatory and nominal damages, and attorneys' fees and costs.

## II. JURISDICTION AND VENUE

19.    This action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights).

20.    This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

21.    This Court has supplemental jurisdiction over Dr. McDonald's Arkansas state-law breach-of-contract claim under 28 U.S.C. § 1367(a) because that claim is so related to her federal claims that it forms part of the same case or controversy under Article III. See 28 USC § 1364.

22.    Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.' ... A plaintiff's claims derive from a common nucleus of operative fact if the 'claims are such that he would ordinarily be expected to try them all in one judicial proceeding. See *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 350 (8th Cir. 2007).

23.    Venue is proper in the Eastern District of Arkansas under 28 U.S.C. § 1391(b) because all Defendants reside in this District and a substantial part of the events and omissions giving rise to Dr. McDonald's claims occurred in this District.

24.    The Batesville School District is located in Independence County, Arkansas, which lies within the Eastern Division of this District.

4

## III. PARTIES

25.     Plaintiff Dr. Ginni McDonald, Ed.D., is a citizen of the United States and, at all relevant times, has served as Superintendent of the Batesville School District. She resides in Arkansas.

26.     Defendant Batesville School District (the "District") is a public school district organized and existing under the laws of the State of Arkansas, with its offices in Independence County, Arkansas. The district is a "person" subject to suit under 42 U.S.C. § 1983.

27.     Defendant Scott Fredericks is, at all relevant times, the President of the Batesville School District Board of Directors (the "Board"). He is sued in both his individual capacity and his official capacity as Board President.

28.     At all relevant times, Defendants acted under color of the statutes, ordinances, regulations, customs, and usages of the State of Arkansas.

29.     All conditions precedent has been met.

## III. FACTUAL BACKGROUND

### A.    Dr. McDonald's Employment

30.     Plaintiff, Dr. Ginni McDonald ("Dr. McDonald"), is an experienced educator and school administrator who devoted her professional career to public education.

31.     On or about May 19, 2025, Defendant Batesville School District employed Dr. McDonald pursuant to a written Superintendent Employment Agreement for a three-year term. *See Ginni McDonald's Statement, attached as "Exhibit A".*

32.     Arkansas law authorizes a school district to employ a superintendent by written contract for a term of up to three years. *See* Ark. Code Ann §6-17-301.

5

33.     Dr. McDonald possessed a legitimate claim of entitlement to continued employment absent lawful termination under her contract and applicable Arkansas law.

34.     As Superintendent, Dr. McDonald served as the district's chief executive officer and necessarily relied upon principals, directors, supervisors, and other administrators to accurately report significant events occurring throughout the district.

35.     Because no superintendent can personally observe every event occurring throughout a school district, the district's administrative structure depended upon subordinate administrators promptly communicating complete and accurate information regarding matters involving student safety, employee misconduct, and mandatory reporting obligations.

**B.     The Preschool Incident**

36.     On January 23, 2026, an incident occurred in a Batesville School District preschool classroom involving preschool teacher Donna Januchowski and several preschool students.

37.     Various District employees observed portions of the incident directly, reviewed surveillance video, or both, before Dr. McDonald personally reviewed any video footage.

38.     During the days and weeks following the incident, numerous District employees participated in reviewing video recordings, communicating internally concerning the incident, and making decisions regarding preservation, extraction, downloading, and distribution of surveillance footage. The investigation ultimately involved multiple versions of surveillance recordings, multiple camera angles, and differing lengths of recorded footage.

39.     Multiple District employees also participated in determining what information would be communicated to District leadership concerning the incident.

**C.     Information Available to Dr. McDonald**

*40.*     Dr. McDonald relied upon information provided by subordinate administrators who

6

had direct responsibility for supervising the preschool program and investigating the incident. *See Sworn Declaration of Dr. Ginni McDonald, Ed.D, July 30, 2026, Attached As Exhibit B containing Dr. McDonald's Agreement, Background and Credentials, Recommendation of Termination Letter, Investigative Reports, and Production Requests, Attached to Statement as Exhibits A-F.*

41.    At all relevant times, Dr. McDonald reasonably believed she was receiving complete and accurate information from District administrators concerning the nature of the incident, the available evidence, and the actions already taken by District personnel.

42.    Dr. McDonald was not responsible for independently extracting surveillance recordings, maintaining the district's video system, or preserving electronically stored surveillance evidence.

43.    Information later produced demonstrates that multiple versions of surveillance recordings existed, including recordings of varying duration and differing camera perspectives. Dr. McDonald contends that material evidence existed beyond the limited portions initially relied upon in evaluating her conduct.

44.    Following her termination proceedings, Plaintiff sought production of complete investigative files, electronically stored information, surveillance recordings, metadata, communications, and all versions of investigative reports in order to determine what evidence existed, who possessed it, and what information had been communicated to decision-makers.

**D.    Investigation and Board Proceedings**

45.    Before recommending Plaintiff's termination, the Board President retained private counsel to investigate concerning the events giving rise to the district's proposed termination of Plaintiff.

46.    The investigator was engaged to investigate matters relating to Plaintiff and to

7

prepare findings for the Board.

47.    By letter dated May 19, 2026, counsel for the Board confirmed that the Board had voted to recommend termination of Dr. McDonald's contract, that a hearing on the recommendation would be conducted before the Board, and that the Board declined Dr. McDonald's request that its members recuse themselves.

48.    Plaintiff alleges that the investigation was conducted in a manner that lacked neutrality and objectivity.

49.    During the course of the hearing proceedings, the investigator acknowledged that she was not acting as a neutral factfinder. Instead, the investigation was conducted as part of the district's efforts relating to Plaintiff's proposed termination.

50.    The investigation resulted in at least two separate investigative reports. Defendants later acknowledged that one report addressed other District personnel, while a separate report focused on Plaintiff and was the report reviewed by the Board before voting to recommend termination.

51.    Upon information and belief, the investigator prepared a more comprehensive report that was addressed to the Interim Superintendent rather than to the Board, while a separate report was prepared for presentation to the Board. Plaintiff alleges that the report provided to the Board omitted material facts relevant to Plaintiff's conduct, including evidence that Plaintiff investigated the allegations and acted based upon the information and surveillance footage that had been provided to her by District personnel.

52.    Plaintiff further alleges that material information concerning the actions, knowledge, and responsibilities of other District employees was omitted or minimized in the report presented to the Board, thereby creating an incomplete factual record upon which the Board

8

considered Plaintiff's termination.

53.     Further, when questioned, the report writer admitted that evidence may have been added to at least one report after it was submitted to the board, without disclosure to Plaintiff.

*54.*     Before the hearing, Plaintiff requested production of the investigator's engagement agreement, the identity of all clients represented, the scope of the investigator's engagement, communications concerning the investigation, and documents identifying who directed and supervised the investigation. *See Requests for Production Correspondence and Enclosure Emails, Attached as "Exhibit B."*

55.     Despite those requests, Plaintiff alleges that she was not provided complete information identifying the investigator's engagement, the full scope of the representation, or the identity of all persons who directed the investigation before the termination hearing.

56.     When questioned about the identity of the report writer's client and the scope of her representation of her client, the report writer answered that she could not remember who her client was or her scope of representation, and she could not remember what her engagement letter stated regarding the identity of her client and her scope of representation.

57.     Plaintiff further alleges that communications concerning the investigation were conducted, at least in part, through the Board President's private email account rather than official District communication systems, thereby limiting Plaintiff's ability to obtain those communications through ordinary public-records procedures before the hearing and impairing her ability to prepare a complete defense.

58.     Plaintiff alleges that the structure and conduct of the investigation, together with the selective presentation of investigative findings and the failure to timely disclose material information concerning the investigator's engagement and communications, deprived Plaintiff of

a meaningful opportunity to prepare for and defend against the charges considered by the Board.

59.    Separate investigative reports were prepared, including one concerning other District personnel and another concerning Dr. McDonald. The Board acknowledged that two separate investigative reports existed and that the report concerning Dr. McDonald was reviewed before the recommendation to terminate her employment.

60.    Before the hearing, Defendants represented that the proceedings would be conducted fairly and in accordance with applicable law.

61.    Before the commencement of the termination hearing, Plaintiff requested, and Defendants expressly approved, her participation by contemporaneous videoconference. Plaintiff appeared throughout the hearing in the manner authorized by Defendants and was present for all proceedings.

62.    During his opening presentation to the Board, counsel for the district commented that Plaintiff "couldn't even be bothered to come," or words to that effect, and further stated that he did not know where Plaintiff was located. Counsel urged the Board to view Plaintiff's authorized virtual appearance as reflecting negatively upon her commitment and credibility, notwithstanding that her participation had been expressly approved by the district.

63.    Plaintiff, through counsel, addressed these comments during closing argument and explained that Plaintiff's virtual appearance had been expressly authorized by the district and should not be considered adversely by the Board in evaluating the evidence or determining whether good cause existed for termination.

64.    The Chair of the Board took no corrective action, gave no curative instruction, and did not advise Board members to disregard counsel's comments or refrain from drawing any adverse inference from Plaintiff's authorized virtual participation.

65. The hearing was publicly televised and recorded, and Defendants' comments concerning Plaintiff's authorized virtual appearance were made in that public forum before the Board rendered its decision.

66. Plaintiff alleges that the procedures employed during the investigation and termination process failed to provide her a meaningful opportunity to fully respond to the allegations against her.

67. Among other things, Plaintiff alleges that material evidence was withheld or not timely disclosed, that relevant investigative materials were not fully produced before the hearing, and that the process did not permit a fair evaluation of the actions of all District personnel involved in the underlying events, and a fair hearing was prejudiced when permitted virtual attendance was commented on as being improper and comments were not corrected by board chair.

68. Plaintiff further alleges that Defendants focused responsibility upon Dr. McDonald while failing to fairly consider the conduct, knowledge, and decisions of other District officials who possessed material information regarding the incident.

D. Public Dissemination of Stigmatizing and False Charges

69. In connection with these adverse employment actions, Defendants publicly disseminated accusations that Dr. McDonald engaged in serious professional misconduct, including that she failed to investigate and report suspected child abuse and committed ethical violations.

70. Further, Dr. McDonald became a subject of a criminal investigation related to this incident, and upon information and belief, the School District may not have disclosed exculpatory evidence to authorities, including email correspondence documenting Dr. McDonald's discovery regarding partial footage made available to her, and her attempts to investigate the footage with

the district's IT employee, including seeking a log indicating who had access to the footage at all times, when the footage with downloaded and by whom, and when and how the footage was edited prior to downloading, and the selected footage that was not retained by the school district without Dr. McDonald's knowledge.

71.    These accusations were made public in an official or intentional manner and were reported by local and national media outlets, reaching an audience far beyond any Board proceeding.

72.    The accusations are false. They directly impugn Dr. McDonald's honesty, integrity, morality, competence, and fitness for her profession.

73.    The accusations are of a character that seriously damages Dr. McDonald's standing in the community and forecloses employment opportunities otherwise available to her in educational administration.

74.    Dr. McDonald has denied, and continues to deny, the charges, and has demanded an opportunity to clear her name.

**E.     The Absence of Constitutionally Adequate Process**

75.    Defendants suspended Dr. McDonald without pay and moved to terminate her without providing her constitutionally adequate notice of the charges, an explanation of the evidence against her, or a meaningful opportunity to respond before the deprivations took effect.

76.    Defendants have not afforded Dr. McDonald a name-clearing hearing adequate to address the false and stigmatizing charges they made public.

77.    Defendants' internal investigation is not a substitute for the process the Constitution requires. Dr. McDonald has not been given a meaningful opportunity to confront the evidence and witnesses against her or to present her own evidence.

12

**F.    Termination**

78.    Following the hearing, the Board voted to terminate Dr. McDonald's employment before expiration of her contractual term.

79.    As a direct result of Defendants' actions, Plaintiff lost her position, salary, benefits, retirement contributions, and other contractual rights.

80.    The termination has substantially damaged Plaintiff's professional reputation and standing within the educational community and has impaired her ability to obtain comparable employment as a superintendent.

81.    Plaintiff has suffered economic damages, loss of professional opportunities, emotional distress, attorney's fees where recoverable, and all other damages permitted by law.

## V. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
### Procedural Due Process
### Deprivation of a Property Interest in Continued Employment
### (All Defendants)

82.    Dr. McDonald incorporates the preceding paragraphs as if fully set forth herein.

83.    A public employee has a constitutionally protected property interest in continued employment where she has a legitimate claim of entitlement to it, determined with reference to state law and typically arising from contractual or statutory limits on the employer's ability to terminate her. See *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895 (8th Cir. 1994))

84.    Dr. McDonald's written, fixed-term Agreement — authorized by Arkansas law and terminable only for cause — gives her a legitimate claim of entitlement to continued employment and thus a protected property interest. See Ark. Code Ann. § 6-17-301 (West)) Under Arkansas

13

law, such a contract may create a property interest in the position. See *Jasper Sch. Dist. No. 1 of Newton Cnty. v. Cooper*, 2014 Ark. 390, 441 S.W.3d 11 (2014))

85.    Where such a property interest exists, the employee is entitled to notice and an opportunity to be heard before she is deprived of it. The root requirement of due process is an opportunity for a hearing before a significant property interest is taken. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)) At a minimum, the employee is entitled to oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity to present her side of the story. Id.

86.    An investigation, no matter how elaborate, does not replace a hearing. See *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895 (8th Cir. 1994).

87.    Defendants deprived Dr. McDonald of her property interest by suspending her without pay and moving to terminate her without providing constitutionally adequate notice and a meaningful opportunity to be heard before the deprivations took effect.

88.    As a direct and proximate result of Defendants' conduct, Dr. McDonald has suffered and continues to suffer loss of pay, loss of employment, and other damages.

COUNT II
42 U.S.C. § 1983
Procedural Due Process ("Stigma-Plus")
Deprivation of a Liberty Interest and Denial of a Name-Clearing Hearing
(All Defendants)

89.    Dr. McDonald incorporates the preceding paragraphs as if fully set forth herein.

14

90. The Fourteenth Amendment protects a public employee's liberty interest in her good name, reputation, honor, and integrity. When a public employer publicly makes false and stigmatizing charges against an employee in connection with an adverse employment action, due process entitles the employee to a name-clearing hearing. See *Putnam v. Keller, 332 F.3d 541 (8th Cir. 2003)*; *Speer v. City of Wynne, Arkansas*, 276 F.3d 980 (8th Cir. 2002).

91. To establish this deprivation, a plaintiff must show that: (1) the employer's stated reasons stigmatized her by seriously damaging her standing in the community or foreclosing other employment; (2) the employer made the reasons public; and (3) the employee denied the charges. See Speer; *Rush v. Perryman*, 579 F.3d 908 (8th Cir. 2009))

92. The requisite stigma exists where the employer accuses the employee of dishonesty, immorality, criminality, and the like. See *Putnam v. Keller*, 332 F.3d 541 (8th Cir. 2003). Allegations of unjustified child abuse leveled against an educator are sufficiently stigmatizing to a teacher's reputation, honor, and good name to implicate a protected liberty interest. See. *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895 (8th Cir. 1994))

93. Defendants publicly accused Dr. McDonald of failing to investigate and report suspected child abuse and of ethical violations — accusations that impugn her honesty, morality, and professional fitness and that seriously damage her standing and foreclose comparable employment. The requisite dissemination occurred: Defendants made the charges public in an official or intentional manner, and the charges were reported in the media. See *Speer*.

94. Dr. McDonald has denied the charges and requested an opportunity to clear her name. Defendants have refused to provide a constitutionally adequate name-clearing hearing. See Rush v. Perryman, 579 F.3d 908 (8th Cir. 2009).

15

95.   Dr. McDonald's right to a name-clearing hearing under these circumstances was clearly established. *See Rush.*

96.   As a direct and proximate result of Defendants' conduct, Dr. McDonald has suffered and continues to suffer injury to her reputation, loss of employment and employment opportunities, and other damages.

97.   Municipal and Official-Capacity Liability (Counts I and II)

98.   The district is liable under 42 U.S.C. § 1983 because the deprivations of Dr. McDonald's constitutional rights were caused by decisions of the district's final policymaker. A local government, including a school district, is subject to suit under § 1983 where the challenged action implements or executes a policy or decision officially adopted by those whose acts may fairly be said to represent official policy. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

99.   A single decision by a body possessing final policymaking authority over the subject matter constitutes official policy for purposes of § 1983 liability.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

100.   Under Arkansas law, the Board — not the Superintendent — holds ultimate responsibility for District personnel decisions, including suspension without pay and termination. *See Springdale Educ. Ass'n v. Springdale Sch. Dist., 133 F.3d 649 (8th Cir. 1998).*

101.   The Board's decisions to suspend Dr. McDonald without pay, to recommend and pursue her termination, and to publicize the charges against her therefore constitute official policy of the district. See Springdale.

102.    Defendant Fredericks is sued in his individual capacity for his personal participation in the deprivations described above, and in his official capacity as Board President, which is another way of pleading a claim against the district. See Kentucky v. Graham, 473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985))

COUNT III

Breach of Contract Under Arkansas Law
(Against the District)

103.    Dr. McDonald incorporates the preceding paragraphs as if fully set forth herein.

104.    Under Arkansas law, a claim for breach of contract requires: (1) the existence of a valid and enforceable contract between the plaintiff and the defendant; (2) the obligation of the defendant thereunder; (3) a violation by the defendant; and (4) damages resulting to the plaintiff from the breach.  See Arkansas Dev. Fin. Auth. v. Wiley, 2020 Ark. 395, 611 S.W.3d 493 (2020))

105.    The Agreement is a valid and enforceable contract between Dr. McDonald and the District, authorized by Ark. Code Ann. § 6-17-301(a).  See (Ark. Code Ann. § 6-17-301 (West)) It is a contract for a definite term — July 1, 2025 through June 30, 2028 — and under Arkansas law a contract of employment for a definite term may not be terminated before the end of the term except for cause or by mutual agreement, unless the right to do so is reserved in the contract. See Griffin v. Erickson, 277 Ark. 433, 642 S.W.2d 308 (1982).

106.    Under the Agreement, the District was obligated to employ Dr. McDonald and to pay her salary and provide her benefits through the contract term and could remove or suspend her without pay only for cause and in accordance with the Agreement's terms.

107.    The district breached the Agreement by suspending Dr. McDonald with pay on February 26,2026, without a hearing placed Dr. McDonald on unpaid leave on May 12, 2026, and

17

by moving to terminate her employment, without cause and without complying with the Agreement's terms.

108.    Dr. McDonald performed, and stood ready to perform, her obligations under the Agreement. As a direct and proximate result of the district's breach, she has been damaged, including through the loss of salary and benefits she was entitled to receive under the Agreement. An employee wrongfully discharged in breach of an employment contract may sue for damages for breach of contract. See *Griffin v. Erickson*, 277 Ark. 433, 642 S.W.2d 308 (1982))

## COUNT IV
### Defamation Under Arkansas Law
**(Against Defendant Fredericks Individually, and Against the District to the Extent of Liability Insurance)**

109.    Dr. McDonald incorporates the preceding paragraphs as if fully set forth herein.

110.    Under Arkansas law, a claim for defamation requires: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the falsity of the statement; and (6) damages.  See Superior Fed. Bank v. Mackey, 84 Ark. App. 1, 129 S.W.3d 324 (2003)

111.    Defendants published statements of fact asserting that Dr. McDonald failed to investigate and report suspected child abuse and committed ethical violations. The statements are of and concerning Dr. McDonald, were published to third parties including local and national media and are false.

112. The statements are defamatory because they tend to harm Dr. McDonald's reputation and impugn her honesty, morality, competence, and professional fitness. As a direct result, Dr. McDonald has suffered actual damage to her reputation. See Mackey.

113. Defendants published the statements with fault.

114. They knew or should have known the statements were false, including because the video footage on which the accusations rest was not available to Dr. McDonald and was not identified until the district's investigator located it on March 3, 2026 — after Dr. McDonald had been suspended.

115. To the extent any conditional privilege might otherwise apply to statements made in the course of a personnel matter, Defendants forfeited it by publishing the statements with malice, without grounds to believe them true, and by excessive publication to the media beyond any privileged occasion. See (Wal-Mart Stores, Inc. v. Lee, 348 Ark. 707, 74 S.W.3d 634 (2002); Wal-Mart Stores, Inc. v. Lee, 348 Ark. 707, 74 S.W.3d 634 (2002))

116. Defendant Fredericks is liable in his individual capacity because the statutory tort immunity of Ark. Code Ann. § 21-9-301 does not extend to the intentional torts of school board members. See Ark. Code Ann. § 21-9-301 (West); Deitsch v. Tillery, 309 Ark. 401, 833 S.W.2d 760 (1992); W. Memphis Sch. Dist. No. 4 of Crittenden Cnty. v. Cir. Ct. of Crittenden Cnty., 316 Ark. 290, 871 S.W.2d 368 (1994))

117. The district is liable for defamation to the extent it is covered by liability insurance. See Deitsch v. Tillery, 309 Ark. 401, 833 S.W.2d 760 (1992).

118. As a direct and proximate result of the defamatory statements, Dr. McDonald has suffered damages, including injury to her reputation, humiliation, and loss of professional and employment opportunities.

## VI. PRAYER FOR RELIEF

WHEREFORE, Dr. McDonald respectfully requests that this Court:

i. Declare that Defendants deprived Dr. McDonald of her rights under the Due Process Clause of the Fourteenth Amendment;

ii. Order Defendants to provide Dr. McDonald a prompt, constitutionally adequate name-clearing hearing and an opportunity to be heard on the charges against her;

iii. Enjoin Defendants, preliminarily and permanently, from further depriving Dr. McDonald of her protected liberty and property interests without due process, and preserve the status quo pending resolution of this action;

iv. Award Dr. McDonald compensatory damages on her federal claims in an amount to be proven at trial;

v. Award Dr. McDonald damages for the district's breach of the Agreement, including lost salary and benefits, in an amount to be proven at trial;

vi. Award Dr. McDonald compensatory damages for defamation against Defendant Fredericks, and against the district to the extent of its liability insurance coverage, together with punitive damages against Defendant Fredericks as permitted by law;

vii. Award Dr. McDonald nominal damages for the deprivation of her constitutional rights;

viii. Award Dr. McDonald her reasonable attorneys' fees and costs under 42 U.S.C. § 1988; (42 U.S.C.A. § 1988 (West);

ix. Waive any bond in connection with any injunctive relief; and

x. Grant such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

119.    Dr. McDonald demands a trial by jury on all issues so triable.


DATED this 31st day of June, 2026.        Respectfully submitted,



Jodi Cole, Esq


Jodi Cole, Esq
Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, TX 79830
Telephone:    432.837.4266
Facsimile:    512.692.2575
Email:    jcole@jodicole.com

## VERIFICATION

I, Dr. Ginni McDonald, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1. I am the Plaintiff in this action.
2. I have read the foregoing Verified Complaint.
3. I have personal knowledge of the facts set forth therein, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.
4. The factual allegations contained in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 31 day of July, 2026.

Dr. Ginni McDonald, PhD

22

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


DR. GINNI MCDONALD                                                    PLAINTIFF


v.                                   CASE NO. _____


BATESVILLE SCHOOL
DISTRICT, SCOTT                                                       DEFENDANTS
FREDERICKS, individually
and in official capacity as
School Board President for
Batesville School District Board


SWORN DECLARATION OF DR. GINNI MCDONALD, ED.D


I, Dr. Ginni McDonald, declare pursuant to 28 U.S.C. § 1746 as follows:

I. Background

1.      My name is Dr. Ginni McDonald, Ed.D.

2.      I am over eighteen years of age and competent to make this declaration.

3.      I have personal knowledge of the facts stated herein and, if called as a witness, could testify competently to them.

4.    I am the superintendent of the Batesville School District, ("BSD") and have been with the district since June 1, 2025. *See Superintendent Agreement, May 19, 2025, Attached as "Exhibit A."*

5.    I have dedicated most of my life to education, that is my calling. *See Resume and Achievements of Dr. Ginni McDonald, Ed. D, Attached as "Exhibits B and C."*

6.    I oversee certain operations of the entire school district, from Pre-K through High School.

7.    I oversee the directors, or principals, of the School District.

8.    The directors, or principals, oversee their School Campuses.

9.    Directors are responsible for disciplinary action with employees and student.

10.    I am responsible for the oversight of many departments, including all of the BSD Principals in the BSD.

11.    I must trust and be able to depend on Principals to be trustworthy, competent, and forthcoming with all material information, on which I can base my reasonable decisions.

12.    It is a given that no principal would misstate material facts to me, or obscure facts from me.

13.    At all relevant times, I served as Superintendent of the Batesville School District.

14.    I entered into a written Superintendent Employment Agreement with the Batesville School District for the period beginning July 1, 2025, and ending June 30, 2028. A true and correct copy of my employment agreement is included in my declaration. *See Exhibit A.*

2

## II. Events Giving Rise to this Action

15. I was personally unfamiliar with Ms. Donna Januchowski prior to January 23,2026.

16. Ms. Mindy Shaw, preschool director, was on FMLA leave, which is similar to being on medical leave, and it was my intent to do all I could to support that decision of hers.

17. I placed Kristi Cox and Lorrie McClure in the interim position of preschool director in Ms. Shaw's absence. She was expected to be gone from 4-6 weeks starting early to mid January.

18. I became aware of an incident in the preschool on January 23, 2026, involving Donna Januchowski. Ms. McClure called me around lunchtime and said that "Ms. McAllister had approached her outside of the office by the dryers and said that a teacher in that classroom had a leg over the throat of a student."

19. I asked Ms. McClure to look into it, because "the most bizarre things are often true."

20. I next heard from Ms. McClure and Ms. Cox prior to 5pm on January 23, and they said "they watched the video, and concluded no injuries, and what was reported did not match video," meaning others exaggerated.

21. The event was described as mild disorder.

22. Of note, I at the time believed there was only one video to see of Ms. Januchowski's room. It was concluded that actions should be taken because of the teacher's tone, holding child by clothing, and loss of classroom management.

23. I asked them to meet with Ms. Januchwoski before the end of the day, and to confirm with me that it was done.

3

24.     I then heard from them again at the end of the workday.

25.     They gave Ms. Januchowski expectations.

26.     Ms. Januchowski acknowledged what was observed. I asked them to write her up at this point, and to put the conversation in writing, and to document the expectations and plan of action, have Ms. Januchowski sign it, and return it to H.R.

27.     This was to be done on January 26 (Monday.)

28.     The following week it snowed. Students did not come to school.

29.     On January 28 , Ms. McClure received a text from Ms. Shaw who was on FMLA.

30.     Ms. Shaw did not contact me or tell me that she had seen any video.

31.     The text said that Ms. Januchowski should be let go and Ms. McClure may have shown me the text, if she recalls that she showed it to me, then she probably did.  Ms. Cox to determine the next action since the weather prevented them from meeting with Ms. Januchowski on the 26 th .

32.     On February 2, Ms. Cox and McClure met with Ms. Januchowski, gave her a letter, and she signed and accepted it.

33.     Ms. Januchowsk would never be left alone again with students.

34.     I agreed with this at the time based on the information I had, relying on Ms. Cox and Ms. McClure's professionalism and truthfulness.

35.     I had never seen the video on this date, or thought it was necessary based on Ms. Cox and Ms. McClures professionalism.

36.      On February 3, Mr. Milum a board member called because he received a call from an upset parent.

37.    It did not make sense that someone would call regarding the event described by the directs, so I felt further investigation was necessary.

38.    Therefore, I called Ms. McClure, Ms. Cox, and Ms. Jeffrey to look at the video, because the board member asked me if I had ever seen video.

39.    As a result, I took the initiative to look at the video myself.  Ms. Cox pulled up the video in her office on February 3. I had never seen the video before. I do not have the video software access to my knowledge.

40.    I do not know how to get into the video software at all.

41.    Superintendents do not historically have access or need to access videotapes of classrooms independently, from what I know.

42.    So, I watched what Ms. Cox pulled up for me on her computer.

43.    She showed an angle of the room that was far-off, and I watched 2-3 minutes of the video, to my recollection.

44.    That video included terrible classroom management; I didn't see child endangerment based on the footage I viewed.

45.    Ms. Cox was expected to show me the most relevant footage.

46.     While I had the video up, I was with Ms. Jeffrey, Ms. McClure, and Ms. Cox.

47.     I called Ms. Shaw on speaker phone.

48.    I asked her if there were any previous incidences involving Donna Januchowski documented. She said nothing was documented. I asked why she thought Ms. Januchowski should be let go.

49.    She said she had fired people for way less, but she did not describe anything serious or mention the word abuse.

5

50.    I explained to her due process. I asked if she had reported it to hotline or licensing, and she said "no because I'm on FMLA and you said I couldn't work."

51.    I said, "you've been feeding chickens, and FMLA doesn't negate your responsibility for mandatory reporting."

52.    I saw enough to know that there were policies that had been violated in the video I watched.

53.    I had Ms. Jeffrey begin a letter for termination and to verify that the policies that were violated could match our recommendation.

54.    Ms. Jeffrey brought me a termination letter.

55.    I concluded that termination was appropriate because I saw the video for the first time, and it was not consistent with what I had been told.

56.    And I thought it appropriate to recommend termination of Ms. Januchowski immediately based on the mild footage Ms. Cox showed me.

57.    The licensing official came on February 4. The secretaries in the preschool didn't notify administration about that.

58.    When I was told about the licensing official on the premises, and Ms. Cox had met with a licensing official at the preschool, I gathered a meeting of persons at the end of the workday including Ms. McClure, Ms. Cox, Mr. Campbell, and myself. We also called Ms. Shaw.

59.    I asked Ms. Shaw if she was aware of the licensing official's presence. She said she wasn't aware. I updated her regarding what I knew from what had been shared. Ms. Shaw then said she had reported online because I had told her to. That's accurate. I clarified and

6

reminded her that FMLA or anything else doesn't negative responsibilities for mandated reporting. It's important that you cannot delegate reporting.

60.    Ms. Cox hand delivered the termination letter to Ms. Januchowsk who indicated that she would retire immediately.

61.    I couldn't finalize the termination until March 16.

62.    On February 5, I learned through the preschool employees that allegedly law enforcement was interacting with preschool students.

63.    That could have been related to another event; I didn't know.

64.    On February 19, Investigator Bittle requested additional footage and audio on the video provided to her. I asked Mr. Baxter to comply with whatever Ms. Bittle needed. In a separate conversation, Ms. McClure told me that an attorney friend of hers had called to relay that there were rumors of pending charges to the teacher and possibly failure to report for Ms. Cox and Ms. McClure. I followed up with Mr. Baxter to verify he gave Investigator Bittle what she needed. Mr. Baxter said he could not save additional footage because it isn't kept after 14 days.

65.    I was aware that there was a limit in time, but I didn't know what the limit was.

66.    On February 19, Andy Wamsley called me and stated that he had spoken to Scott Fredricks about preschool staff rumors. Investigator Bittle told him that there may be a felony charge and two misdemeanor felony reports.  On February 20, I elected to show the district's attorney, Marshall Nye, the video of the event. I called Mr. Baxter who said there was a folder or drive. I had to get permission to share it. When I shared the video with

7

the attorney to make sure I had taken the correct steps, Ms. McClure received a warrant from Investigator Bittle for human resources records, and I opened up the video that was provided by Mr. Baxter.

67.    I watched the close-up video for the first time. The videos I watched were the videos provided by Mr. Baxter to the Batesville Police Department. I had seen 2-3 minutes of the far-off video. I did not know that the close-up video existed.

68.    I started following up on the history of Ms. Januchowski and found correspondences that were of interest to me related to her history in the classroom. Attached hereto is Exhibit A, which is a series of emails from May 15, 2025; and attached as Exhibit B is a screenshot from a text message between Candi Scribner's daughter Janell and Candi Scribner. This was provided by Candi Scribner to Jeremy Jeffrey on February 5, 2026.

69.    As a result of reviewing the close-up video I was thankful that the employee had resigned. I was also thankful that the child maltreatment hotline had already been notified.

70.    From review of the video on February 20, I determined that there would be need for additional training. Specifically, there should be additional district training on documentation, reporting, employee writeups. I gave express authority for Mr. Matt Baxter to provide to the Batesville Police Department and Investigator Bittle any documents or things they were requesting.  On or around February 23 or 24 I was interested in the audit trail of who had seen what video and when. Specifically, I was interested in whether Ms. McClure and Ms. Cox had seen or were otherwise aware of the video of the same date and time of Ms.

8

Januchowski's room at a closer-up angle that includes additional detail that I had not seen prior to Febuary 20. I was interested in whether information was withheld from me. Had I asked Ms. Baxter for the videos in the first place (which I did not do because Ms. Cox was handling) I would have asked to keep all angles for the full day. With regard to the BRIGHTWHEEL message of February 23, 2026, there was no intent to deceive or mislead any person. Rather, we had just learned that there was a police press release submitted to White River Now. As a result, we submitted this correspondence to the parents to keep them informed. I asked Ms. McClure and Ms. Cox, on February 24, if they had viewed both angles of the video. Ms. McClure quickly denied it - she said she watched a portion of one video and she did not witness intentional choking. She did see a shirt-pull. Ms. Cox never answered directly.

71.     I had planned to follow-up with Ms. Cox separately to determine what information she knew about the videos, their angles, etc. I did not have the opportunity to do that, because I was placed on leave.

72.     I have never expressly or indirectly advised anyone not to report as required by law.

73.      My entire approach to this matter was collegial and not threatening. I did not indicate any interest in retaliation at any point.

74.     I never threatened to fire Enelyn Hernandez or any preschool employee, although someone may have made a misrepresentation to her.

75.     When I became aware that there may be more to this incident than I was are of, I immediately began a much deeper investigation but did not have the opportunity to complete it.

9

76.     I took these matters seriously and cooperated fully with every investigation requested of me.

77.     I made myself available to District officials and investigators whenever requested and possible.

78.     I was placed on administrative leave.

79.     The District retained outside counsel to conduct an investigation.

80.     I cooperated throughout that investigation.

81.     I was placed on paid leave on January 23, 2026.

82.     I was later suspended without pay on February 26, 2026, after an unexpected board meeting, without any notice.

83.     I was thereafter informed that my termination would be recommended to the Batesville School Board.

84.     Copies of the District's recommendation and related documents are attached as exhibits.

85.     I am accused of having access to all relevant information regarding the video of having adequate time to review relevant video footage of the Teacher's misconduct and of not following up on information.

86.     The footage of videotapes I am accused of having access to were first discovered by Mary Carol Young, the investigator, on March 3, 2026, five days after I was placed on unpaid leave.

87.     I had realized that some information may have been misrepresented to me, and had asked Mr. Baxter to see if he could share information regarding who accessed video and how, and

he reported the programs were not set up to record this information and we were in the process of setting up the information when I was placed on leave.

## III. My Employment Contract

88.     My written employment agreement provides for a fixed contractual term.

89.     Under that agreement, I may only be terminated under specified circumstances.

90.     I relied upon that agreement in accepting and performing my employment.

91.     I expected that the District would honor both my contractual rights and my constitutional rights before depriving me of my employment.

## IV. Harm to My Reputation

92.     The allegations publicly made against me accuse me of serious professional misconduct.

93.     This information made the national and local media outlets.

94.     Those allegations directly affect my integrity, competence, honesty, and professional fitness.

95.     Since these allegations became public, my professional reputation has suffered significant damage.

96.     As Superintendent, my reputation is one of my most valuable professional assets.

97.     I reasonably believe these allegations will substantially impair my ability to obtain comparable employment in educational administration.

11

## V. Harm to My Career

98.    If I am terminated, I expect immediate and substantial professional harm.

99.    The termination of a sitting public-school superintendent for the reasons publicly asserted by Defendants carries extraordinary stigma.

100.    Such stigma cannot easily be removed, even if I ultimately prevail in litigation.

101.    Monetary damages alone cannot restore my professional reputation or the opportunities that may be permanently lost.

102.    I have devoted my professional career to public education and educational leadership.  began my career in education because someone believed in me before I believed in myself.

103.    I wanted to pay forward through advocacy, by creating safe, successful learning environments and strong systems that supported children and families while building a possibility of a higher quality of life for our future workers.

104.    I continued in different roles to ultimately impact communities by connecting education and business/industry.

105.    I had high hopes that my last chapter or the bookend of my career would be celebrated with confetti and cupcakes and reflection of positive impact.

106.    Instead, I find myself advocating for myself to ensure my reputation is intact and assure the families, schools, and communities who have entrusted me with their greatest treasures - children were in the best of hands during my time in their school/district.

107.    I did not know that this teacher had complaints the year before I arrived, as Ms. Shaw told me there had never been previous complaints similar, or that she had ever had to look at video footage related to this teacher's alleged actions.

## VI. Lack of Adequate Process

108.    I believe I have not received constitutionally adequate process before Defendants sought to deprive me of my protected employment interests.

109.    Production has not been fully produced, and my counsel is rushed into a hearing without adequate time to prepare.

110.    I respectfully seek the opportunity to receive the procedural protections guaranteed by the United States Constitution before any final deprivation occurs.

## VII. Immediate Need for Relief

111.    Defendants intend to proceed with termination unless restrained by this Court.

112.    Once terminated, I will immediately lose my position as Superintendent.

113.    I will suffer continuing injury to my professional reputation.

114.    I will suffer continuing loss of employment opportunities.

115.    Those injuries cannot be fully remedied by money damages.

116.    I respectfully request that this Court preserve the status quo until it can fully consider my constitutional claims.

## VIII. Exhibits

117.    Attached are true and correct copies of documents including, as applicable:

    a.    **Exhibit A–** Superintendent Employment Agreement

    b.    **Exhibit B –** Background

13

c. **Exhibit D**– Investigative Report first provided to me as the only report, dated April 8, 2026. Redacted.

f. **Exhibit E** – Second Investigative Report Dated April 2, 2026. Redacted.

g. **Exhibit F** – Lawyers requests for production.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of July 2026.

Dr. Ginni McDonald, Ed.D.

14

**Dr. Ginnie McDonald's Statement**

**Table of Contents**

**Exhibit A–**    Superintendent Employment Agreement

**Exhibit B -**    Background

**Exhibit C-**    Credentials

**Exhibit D –**    Recommendation for Termination

**Exhibit E**    Investigative Report first provided to me as the only report. dated April 8, 2026. Redacted.

**Exhibit C-**    Second Investigative Report Dated April 2, 2026. Redacted.

**Exhibit D--**    Unknown Important Information

**Exhibit D -**    Mr. Baxter's Response Email Replying to Dr. McDonald's

**Exhibit E-**    History of Integrity

**Exhibit F-**    Lawyer's Request for Productions

**Exhibit G –**    Search Warrant

**Exhibit A**
**Video Control Timeline**

1. **January 23, 2026**
   a. Viewers:                          Aspen Treadway and Halli Walls
   b. Location:                         Halli Walls Office
   c. Computer:                         Halli Walls'
   d. Server or Download:               Server
   e. Number of videos:                 One Cited
   f. Minutes:                          40
   g. Available to Dr. McDonald:        No
   h. Control:                          Halli Walls
   i. Abuse Description:                Severe
   j. Reported to Dr. McDonald:         No

2. **January 23, 2026**
   a. Viewers:                          Kristi Cox and Lorrie McClure
   b. Location:                         Ms. Cox's Office
   c. Computer:                         Ms. Cox's
   d. Server or Download:               Unknown
   e. Number of videos:                 One Cited
   f. Minutes:                          Unknown
   g. Available to Dr. McDonald:        No
   h. Control:                          Cox
   i. Abuse Description                 Mild
   j. Reported to Dr. McDonald:         No

3. **January 28, 2026**
   a. Viewers:                          Shaw
   b. Location:                         Unknown
   c. Computer:                         Unknown
   d. Server or Download:               Unknown
   e. Number of videos:                 One cited
   f. Minutes:                          Unknown
   g. Available to Dr. McDonald:        No
   h. Control:                          Shaw
   i. Abuse Description:                Severe
   j. Reported to Dr. McDonald:         No

4. **February 3, 2026**
   a. Viewers:                        Amanda McCullough and Treadway
   b. Location:                       Halli Walls Office
   c. Computer:                       Halli Walls' Computer
   d. Server or Download:             Unknown
   e. Number of videos:               One cited
   f. Minutes:                        40
   g. Available to Dr. McDonald:      No
   h. Control:                        Treadway
   i. Abuse Description:              Severe
   j. Reported to Dr. McDonald:       No

5. **February 23, 2026**
   a. Viewers:                        Dr. McDonald, Cox, McClure, Jeffry
   b. Location:                       Cox's Office
   c. Computer:                       Cox's Computer
   d. Server or Download:             Unknown
   e. Number of videos:               One cited
   f. Minutes:                        5-6 minutes
   g. Available to Dr. McDonald:      No
   h. Control:                        Cox
   i. Abuse Description:              Mild
   j. Reported to Dr. McDonald:       Shaw reported fire, no description
                                      Cox and McClure Mild, don't fire

6. **February 5, 2026**
   a. Viewers:                        Cox and Baxter
   b. Location:                       Baxter's Office
   c. Computer:                       Baxter
   d. Server or Download:             Originally on Server, Extract downloaded
   e. Number of videos:               Two
   f. Minutes:                        10
   g. Available to Dr. McDonald:      No
   h. Control:                        Baxter
   i. Abuse Description:              Troubling, not severe
   j. Reported to Dr. McDonald:       No

7. **February 20, 2026**
   a. Viewers:                            McDonald and Nye separately
   b. Location:                           Own homes
   c. Computer:                        Own
   d. Server or Download:        Downloaded onto google drive
   e. Number of videos:           One listed on folder, two inside
   f. Minutes:                           10 minutes
   g. Available to Dr. McDonald:  Yes
   h. Control:                          Baxter
   i. Abuse Description:          Troubling, not severe
   j. Reported to Dr. McDonald   Yes provided

8. **Unknown**
   a. Viewers:                            Campbell and Mary Carol Young
   b. Location:                           Unknown
   c. Computer:                        Unknown
   d. Server or Download:        Downloaded on Thumb Drive
   e. Number of videos:           Two
   f. Minutes:                             Under 12 minutes
   g. Available to Dr. McDonald:  No
   h. Control:                          David Campbell
   i. Abuse Description:          Troubling, not severe
   j. Reported to Dr. McDonald:  No

9. **March 3, 2026**
   a. Viewers:                            Mary Carol Young and Aspen Treadway
   b. Location:                           Unknown
   c. Computer:                        Obtained from Halli Wall's Computer
   d. Server or Download:        Download
   e. Number of Videos:           First time – two 40 minute
   f. Available to Dr. McDonald   No
   g. Control:                          Treadway or Hallis
   h. Abuse Description:          Mild
   i. Reported to Dr. McDonald:  No

4. **February 3, 2026**
    a. Viewers:                         Amanda McCullough and Treadway
    b. Location:                        Halli Walls Office
    c. Computer:                        Halli Walls' Computer
    d. Server or Download:              Unknown
    e. Number of videos:                One cited
    f. Minutes:                         40
    g. Available to Dr. McDonald:       No
    h. Control:                         Treadway
    i. Abuse Description:               Severe
    j. Reported to Dr. McDonald:        No


5. **February 23, 2026**
    a. Viewers:                         Dr. McDonald, Cox, McClure, Jeffry
    b. Location:                        Cox's Office
    c. Computer:                        Cox's Computer
    d. Server or Download:              Unknown
    e. Number of videos:                One cited
    f. Minutes:                         5-6 minutes
    g. Available to Dr. McDonald:       No
    h. Control:                         Cox
    i. Abuse Description:               Mild
    j. Reported to Dr. McDonald:        Shaw reported fire, no description
                                        Cox and McClure Mild, don't fire


6. **February 5, 2026**
    a. Viewers:                         Cox and Baxter
    b. Location:                        Baxter's Office
    c. Computer:                        Baxter
    d. Server or Download:              Originally on Server, Extract downloaded
    e. Number of videos:                Two
    f. Minutes:                         10
    g. Available to Dr. McDonald:       No
    h. Control:                         Baxter
    i. Abuse Description:               Troubling, not severe
    j. Reported to Dr. McDonald:        No



ATTORNEYS AT LAW

Licensed in AR, AL, MO, OK, TN, TX
——— Established 2005 ———
www.rmp.law

MARY CAROLE YOUNG | Attorney
mcyoung@rmp.law

**Little Rock Office**
17901 Chenal Parkway, Suite 200
PO Box 241370
Little Rock, AR 72223
D 501.243.0995 | T 501.954.9000 | F 501.954.9005

*Licensed to practice in Arkansas*

---

## CONFIDENTIAL

April 2, 2026

**VIA EMAIL/SHAREFILE**
dcampbell@gobsd1.org

Mr. David Campbell
Interim Superintendent
Batesville SD School District
Batesville, AR 72501

> RE:  RMP FILE # 110960
>      Investigation
>      Our File: Batesville SD; McDonald, Ginni

Dear Mr. Campbell:

### I.    Introduction

On February 25, 2026, President of the Batesville School District School Board Scott Fredricks contacted this counsel after a conference with the Arkansas School Boards Association. The Association suggested the district hire this counsel because of its recently having placed Superintendent Ginni McDonald on administrative leave. It was relayed that there was concern about a video-recorded inappropriate interaction between Donna Januchowski and preschool student(s). It had been brought to the board the possibility that the inappropriate interaction was known and not responded to appropriately.

On February 26, 2026, Mr. Fredricks contacted this counsel to indicate that, during a special session on February 25, 2026, the school board elected to hire this investigator's firm to make recommendations to it after an appropriate investigation. It was determined that this investigator would appear at the district for in-person interviews on March 3, 2026. This investigator returned on March 10. Due to scheduling issues, the interview of Ginni McDonald was completed on March 30.

The goal of the investigation is to determine whether an inappropriate action occurred between Ms. Januchowski and the student(s); what steps were taken as a result; and what steps were missed that should have been taken? Did any person associated with the district not follow the relevant laws, standards, or policies? This consideration should include Ginni McDonald, superintendent, and any other relevant employee.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **2** of **77**

---

With the knowledge that there are different employment requirements for the superintendent than the other employees of the district, this report does not include an analysis or findings related to the superintendent Ginni McDonald. This report is for submission to Mr. David Campbell so that he may make employment decisions that may lead to an appeal to the school board. A report related to findings associated with Dr. Ginni McDonald will be submitted separately to the board.

## II.   **Relevant Rules**

The rules that are relevant in this matter are abundant, so this investigator attaches them hereto as EXHIBIT 1, in effort to make the report less cumbersome. This investigator urges the reader to refer to these rules as the reader reads the evidence in this case. *This report will likely not make sense without having first reviewed the relevant rules.*

The rules included are The Child Maltreatment Act and its relevant definitions, including the definition of abuse; the Act that directs Student Restrains in Public Schools or Education Settings; the relevant portions of Minimum Licensing Requirements for Child Care Centers in Arkansas; Intra-district policies; and portions of the Code of Ethics for Arkansas Educators.

## III.   **Evidence**

### a.  **SOURCE OF VIDEO**

This investigator was given two videos from two angles from the Batesville School District prior to appearing at the district for the first time on March 3, 2026. Video 1, EXHIBIT 2, is from a close angle (over the center of the room), and starts at or around 12:20:20 pm. This screenshot is from 12:20:52pm in EXHIBIT 2, and shows Ms. Januchowski pulling ███ e ███ h up on a cot by the neck of his shirt. This video *was not requested to be saved by Kristy Cox*[1], the special programs director for the District, but it was unilaterally extracted and saved by I.T. director Matt Baxter[2].

---

[1] If a video is not saved from the server within 14 days, it is no longer available to be viewed.

[2] It was seen by Ms. Cox on the server, per her interview.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **3** of **77**



PHOTO 1

Video 1, EXHIBIT 2, continued to 12:30:20. Below is a screenshot of EXHIBIT 2, at the end of the video. This screenshot is taken at 12:30:04. The video shows Ms. Januchowski holding ██ █████ n in a physical restraint and/or a prone restraint as defined in Arkansas Code Annotated § 6-18-2403.[3] Note: Ms. Januchowski's left leg is over the child's torso, her right arm is holding down the child's head, and left arm is holding the child's right leg. ███ is in a face-down position.

---

[3] Physical restraint means a personal restriction that immobilizes or reduces the ability of a student to move his torso, arm, leg, or head freely. Prone restraint means restraining a student in a face-down position on the floor or other surface and applying physical pressure to the body of the student to keep the student in the prone position. **All kinds of restraints, including the above types, cannot be used in preschool**; in elementary school a supine restraint cannot be used unless the person restraining determines that the position is required to provide safety for the student or others _and_ the restrainer has specific training (Januchowski does not have this training.) Physical restraints of any kind may only be used for a limited amount of time _if there is imminent danger of serious physical harm_ to the student or others (danger of serious physical harm- causing a need to restrain - is not claimed by any witness in this investigation.)

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 4 of 77



PHOTO 2  (partial portion of screen, not zoomed)

The total amount of time on Video 1, EXHIBIT 2, is exactly 10 minutes, from 12:20 to 12:30.

Video 2, EXHIBIT 3, starts at 12:20 and is a further-out view of the classroom.  It lasts until 12:26:32PM and is 6 minutes 4 seconds long.  This video was requested by Kristi Cox[4]. The below screenshot, Photo 3, is of EXHIBIT 3.



PHOTO 3

_____

[4] Ms. Cox requested a longer video, as indicated.  She wanted a 17 ½ minute video; Matt Baxter appears to have mistakenly given her 6 minutes, 4 seconds.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **5** of **77**

---

Photo 3 of EXHIBIT 3 is at the exact same time as PHOTO 1 of EXHIBIT 2 above. As you can tell, the fact that the child was moved by pulling his shirt was not at the same visibility level in EXHIBIT 2 as 3.

A side-by-side of the ██████████ 's shirt being pulled at 12:20:20 is seen here:

 

PHOTO 3    (EXHIBIT 3)                    PHOTO 1   (EXHIBIT 2)

This investigator discussed the videos at issue with Aspen Treadwell, the secretary at the preschool, and it was determined during that conversation that this investigator did not have the entirety of the video[5]. Aspen advised that the entirety of the video from Ms. Januchowski's nap time on 1/23/26 was saved on Halli Walls' computer.   Aspen and Halli, who serves as the preschool's bookkeeper, had conferred in January and were of concern that the acts they deemed abusive would not being retained, because the video "rolls off" after 14 days.  Halli had access to videos of the preschool because Halli's office is a "safe room" for the preschool, so her office has locks, no windows, and access to video[6]. Halli had concern that the videos would be destroyed, so she saved them deeply in her school computer[7] as "Training Video".

EXHIBIT 4 is Halli's "Training Video" 1, and it starts at 12:18:15PM. This is the close-up video, and is the longer version of EXHIBIT 2.  This video lasts until 1:00:06 PM and is 41 minutes and 51 seconds long.  This is the only video that has the angle or the length to show the complaint made by Ms. Ashley

---

[5] Aspen did not know what was or was not kept of the video by school administration. This investigator and Aspen were discussing the video, and it was learned that this investigator had not seen the images to which Aspen was referring.

[6] The software for the video system in Walls' safe-room office was later removed at the request of Dr. McDonald, per Baxter.

[7] It is legal and appropriate to save school information/documents/videos on a school computer.  The location of these videos was confirmed by Matt Baxter, who extracted them.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 6 of 77

McAllister[8]. The below screenshot is from EXHIBIT 4, at 12:38:45. Ms. Donna Januchowski is at the top left-hand corner with her right leg on ▉▉▉▉▉▉▉ s neck. The second adult in the room is the initial complainant, Ashley McAllister, a preschool paraprofessional.



PHOTO 4

EXHIBIT 5 is Halli's "Training Video" 2, and it starts at 12:18:02. This is the far-off video, and is the longer version of EXHIBIT 3. This video lasts until 12:48 PM and is 30 minutes, 11 seconds long. This is the video that Ms. Cox requested but did not obtain from Matt Baxter (he mistakenly gave her a shorter version[9].)

---

[8] McAllister complained that Ms. Januchowski had her leg on a child's neck and was choking him, per Ms. Cox; she complained per Ms. Lorrie McClure that Ms. Januchowski was choking him.

[9] It was never asked of Baxter to extract the entirety of the video after the shorter version was given by him to administration. Baxter questions whether it was known by any person, prior to this investigator, that he made this error.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **7** of **77**



PHOTO 5

PHOTO 5 of EXHIBIT 5 is the exact same time as PHOTO 4 of EXHIBIT 4. Ms. Januchowski is on the right in the chair. As you can tell, the fact that the child was held down with Ms. Januchowski's foot, on or around his neck, cannot be seen. (This is the only video Ms. Cox requested to download of this incident; she had access to both videos as indicated in her screenshot in the text to Baxter, EXHIBIT 6.)

A side-by-side of Ms. Januchowski's foot on ████████ s neck at 12:38 from the two angles is seen below. The additional person in Photo 4 is Ashley McAllister.



PHOTO 4                    PHOTO 5

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 8 of 77

SUMMARY: *All persons with access to the server had access to all camera angles at all times for 14 days after January 23, 2026. On February 5, Ms. Cox asked Matt Baxter to keep only the far-away angle between 12:21:30 to 12:39[10]. Ms. Cox's requested angle does not show the detail of the close-up angle, and it does not show Ms. Januchowski's foot on* ███████████ *s neck as complained of by Ashley McAllister. Matt Baxter downloaded both angles, but he did not keep the length of time requested by Ms. Cox (he kept a shorter amount of time seemingly by accident). However, Halli Walls had access to the server, had concern the videos would be destroyed, and she saved them to a district computer. This investigator obtained the longer videos from Walls' computer and complied with the BPD subpoena accordingly. The additional camera footage from Walls' computer indicated the validity to Ashley McAllister's complaint to her superiors, and it showed additional concerning actions by Ms. Januchowski not on the shorter versions.*

### a. INTERVIEW[11] WITH ASHLEY McALLISTER

This investigator spoke with Ashley McAllister on March 3, 2026. Ms. McAllister is a pre-school paraprofessional who is known as a floater. She is classified.

Ms. McAllister recalls being asked to help in Ms. Donna Januchowski's room on January 23, 2026. It was around "the girls' lunch time." Another teacher, Ms. Annah, called and asked Ms. McAllister, "Can you go help in the other room; there's kids screaming?"

Ms. McAllister recalls walking in, and "the little ones up scattered and went to their cots." Ms. McAllister immediately went to student ██████████ ██ and began patting him on the back to calm him down and get him to sleep. She said that Ms. Januchowski was behind her back when she was patting ██ █ and Ms. McAllister heard student ██████ x ██████ h say, "I can't breathe" and Ms. McAllister turned around to see Ms. Januchowski with her foot on ███████ 's neck. Ms. McAllister immediately knew this was "not right," and she got up, and took ██████ x out of the Ms. Januchowski's classroom.[12] After Ms. McAllister

---

[10] EXHIBIT 6

[11] All interviews are summaries of the conversation in the words and thoughts of the interviewed party, even if those statements are inaccurate. This investigator acknowledges that there are discrepancies between the witnesses' memories, and this investigator incorporates these inconsistencies in the report as they are the interviewed person's memory. If an interviewed person makes a reference or opinion, then that reference is only that of the interviewed person and not of this investigator in this section. These interviews are not word-for-word accounts, but instead they are summaries in the tone provided by the interviewed party.

[12] Ms. McAllister often takes children out of their preschool classroom when they need to calm down. She is the person who is contacted when a student generally needs calming. She

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **9** of **77**

removed ▮▮▮▮▮▮ from the room, she removed ▮▮▮▮▮▮ from the room. She then went to the secretary's office, and Lorrie McClure, the District's community school director and home coordinator, was present. Ms. McAllister immediately told Lorrie McClure what occurred, and she recalls "Ms. Lorrie" stating, "Oh no, we can't do that." It was Ms. McAllister's understanding Ms. Lorrie was talking about Ms. Januchowski placing her foot on ▮▮▮▮ x ▮▮▮▮ s neck. Ms. Lorrie then told Ashley McAllister, "I'll handle it." Ms. McAllister took ▮▮▮▮▮▮ to the "calm down room" and patted his back until he fell asleep.

When the shift was over, Ms. McAllister was told they were speaking with "Ms. Donna."[13] Ms. Donna Januchowski received a hug and the persons at the front desk "thought nothing was done." At that point, Ms. McAllister decided, "well, I need to make a report about it." The persons at the front desk then indicated they had already reported the situation. When Ms. McAllister herself arrived back in the pre-school office, Kristi Cox and Lorrie McClure were present and advised, "they handled it." Ashley McAllister then elected not to call the DHS Hotline herself because she went to her supervisor - Lorrie McClure - and Ms. McClure "told me she would handle it. I trusted her because she's an administrator." Ms. McAllister was of the understanding that Ms. McClure was calling the Hotline, and therefore, she did not need to. Then, when Ms. McAllister heard that Lorrie McClure had not made the call, or "it wasn't handled," she noted that she planned to make the call, but she was told there were already calls in to the Hotline. Ms. McAllister was of the belief that Licensing and the Hotline were the same thing. "I called one and the other gets contacted."

Ms. McAllister did have concern that ▮▮▮▮ x ▮▮▮▮ was incapable of breathing. The minute he said, "I can't breathe," Ms. McAllister turned around, saw the student, and took him to another room. Ms. McAllister had never seen Donna Januchowski place her foot on someone previously. However, normally, Ms. Januchowski is "not a pleasant person to be around."

Ms. McAllister was of the belief that going up the chain of command was an appropriate way to "mandate report." In the past she has found a child unsupervised, and Mindy Shaw, pre-school leadership, handled it. Ms. Shaw called Licensing and took care of "the investigation for that situation."

---

may pat their back or take them on a walk, or take them to another calmer room. Removing ▮▮▮▮ x from the classroom was not an abnormal act in general.

[13] Donna Januchowski

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **10** of **77**

---

### b. INTERVIEW WITH ASPEN TREADWAY

On March 3, 2026, this investigator met with Aspen Treadway, secretary of the preschool. Ms. Treadway was working at the front desk on January 23, 2026, when the actions at issue occurred by Ms. Donna Januchowski, "Donna Jan." During nap time, she got a call from Ms. Annah who had the room next to Ms. Donna Jan. Ms. Annah heard screaming and it was waking up her kids, and so Treadway asked Ashley McAllister to check on Donna Jan's class.

Ashley was gone for 20-30 minutes, and Lorrie McClure was in the office when she came back. She asked to speak to Lorrie privately. They spoke, and Lorrie came back into the office and indicated she needed to look at the footage when Halli Walls gets back from lunch. However, Lorrie McClure needed to go to another office, so she asked Aspen to notify her when Halli returned. Around 1:00 Halli returned from lunch and they elected to watch the footage. Halli had access because she has a room that is important in the "crisis plan". They can lock themselves in Halli's office and watch an intruder on the cameras.

Treadway and Walls went to Walls' office and started watching beginning at 12:15. "We saw her (Januchowski) drag a child across the floor." Halli then called Lorrie again and said, "You need to watch this footage." A few minutes later, Kristi Cox called Halli's office and asked for direction of when to start watching. They indicated to "watch from 12:18 to 1:00."

Kristi Cox and Lorrie McClure then came to the preschool and removed Ms. Donna from class. They stayed with her for 20 minutes. Ms. Donna, surprisingly, then returned to the classroom. Aspen then asked Lorrie if they watched the footage, and she stated that if they were hiring a new employee, that would be "the footage of what not to do."

Halli, Aspen, and Enelyn Hernandez, a secretary at the preschool, were "in shock" because Ms. Donna was allowed back into the classroom. They wanted to discuss it with Ms. Mindy Shaw, but they were not allowed to call her because of FMLA, so they (Hernandez, Treadway, Walls) instead elected to make a hotline call.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **11** of **77**

---

Enelyn Hernandez dialed the number as displayed on the "Save the Children" poster. This poster is seen here. This number, as noted on the poster,



was believed by Treadway, Hernandez, and Walls to be the proper number to call per the child abuse hotline/mandatory reporting statute. The children hotline from this poster is unrelated to the Child Abuse Hotline as required by Arkansas Statute, and this was later learned by Aspen Treadway. It was Ms. Treadway's understanding that the event had been "called in," and she had done what was appropriate under the circumstances to contact per Arkansas mandatory reporting. The following week was "snow week," and every child and staff member was out of school: Monday, January 26-Friday, January 30, 2026. The next workday was February 2, 2026. On February 2, Ms. Treadway noticed that licensing was not coming into the school, and she had received no follow-up from Arkansas DHS, which was surprising. Ms. Treadway asked Enelyn Hernandez about the call, and Ms. Hernandez was capable of looking up her incident report to confirm a call was made. EXHIBIT 7.

The number of Amanda McCullough, who is the "licensing person" for preschool licensing for Independence County, was posted on the wall. It was Ms. Treadway's understanding that licensing should have visited the preschool by this point as a result of their hotline call, and she elected to personally call Amanda McCullough with licensing. It was relayed to Ms. Treadway by Ms. McCullough there was no DHS call-in as Ms. Treadway had previously believed, but Ms. McCullough advised she would be there shortly. Ms. McCullough arrived on February 3, 2026. At that time, Ms. McCullough reviewed the video in Halli Walls' office, and immediately relayed that Donna Januchowski to no longer be able to come to work. Donna Januchowski was then sent away, and Kristi Cox and Lorrie McClure later learned that Amanda McCullough had been present earlier in the day. It was relayed to Ms. Treadway by Mindy Shaw that Dr. Ginni

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **12** of **77**

---

McDonald (superintendent) wanted to write up Ms. Treadway and the others for contacting licensing without their authority. Further, it was relayed to her that Dr. McDonald was angry that Ms. Treadway, Hernandez, and Walls looked at the video in Walls' office. In essence, it was relayed to Ms. Treadway that her job was in danger because she had taken the steps she was trained to take, which included calling the hotline and notifying licensure. It was further relayed to Ms. Treadway that Mindy Shaw told Dr. McDonald that "if you're going to fire her, you need to fire me too, because I also turned it in."

The following morning the software system that allowed Ms. Walls to view the cameras was removed from her office. This was a detriment to the safety plan because it had been previously decided that Ms. Walls' office was a safe room, it could be bolted shut, it had no windows, and persons in the room could see the videos to see what was happening in real time. By removing the software from this location, it took away a safety aspect of Halli Walls' office and the preschool as a whole. *See* EXHIBIT 8. She does not know the reasoning behind the election of the district to remove the software system from Halli Walls' computer.

In the interview, Aspen Treadway was concerned about her job. She was concerned she would lose her job because of doing what was she was trained to do: call licensure, call DHS. She realized later there was error in the phone number called, but she spoke with Amanda McCullough (with preschool licensure) to ensure that DHS was being contacted. Ms. Treadway was afraid of retaliation from Dr. McDonald because Dr. McDonald was displeased that she and her co-workers reported the incident and ensured the children's safety. She does not know the motivation behind Dr. McDonald's actions in electing to handle the matter the way she did. She does not know the motivation behind Dr. McDonald electing to not call DHS and not call licensing. She was adamant from review of the video that Ms. Donna abused children: she restrained them, said she would spank them, put her hand over a child's mouth, tugged at their t-shirts, she threatened.

When this investigator and Ms. Treadway were discussing this matter on March 3, 2026, Ms. Treadway provided facts to the investigator that were not previously known. Specifically, this investigator was initially given a thumb drive with two videos. (This investigator was in possession of EXHIBITS 2 and 3.) Neither video showed an incident wherein Donna Januchowksi had her foot over a child's neck (an act of abuse per Treadway), and the child said out loud, "I can't breathe[14]." When this was made known by the investigator, Ms. Treadway advised there was a "secret" video hidden on Halli Walls' district computer. This video showed both camera angles and was longer in length, EXHIBITS 4 and 5.

---

[14] This investigator does not recall "I can't breathe" on the video but does recall hearing, "help," and "I can't talk."

<u>**CONFIDENTIAL**</u>

Mr. David Campbell
April 2, 2026
Page **13** of **77**

---

This investigator then obtained the video from Ms. Walls' computer, and she went over the video with Ms. Treadway. Ms. Treadway pointed out some of the concerning actions by Donna Januchowski. She also explained that Amanda McCullough saw the entirety of the equivalent of EXHIBITS 4 and 5. Ms. Treadway does not know why a shorter video was requested by administration. She explained that Halli Walls saved the video in a way that it would not be known by someone other than herself as to what the video was regarding, in effort to ensure it was not destroyed. Each video was saved as "training video."

At the time of this incident, Treadway was unaware of any parent having been contacted by the school about this incident on 1/23/26. The district later submitted to the school a "Brightwheel message" that was objectively untrue, per Treadway. EXHIBIT 9.

Aspen Treadway was certain she acted appropriately under the circumstances. She was certain she acted in the way she was trained. She was certain Donna Januchowski abused the children during naptime on January 23, 2026, and she explained she has lost many tears (cried often) as a result of these wrongful acts and her concerns over the students.

### c. INTERVIEW WITH ENELYN HERNANDEZ

On March 3, 2026, this investigator met with Enelyn Hernandez, secretary of the preschool for the 2025-2026 school year.

Prior to January 23, 2026. Enelyn Hernandez had no true concerns about child safety with relation to Donna Januchowski. Ms. Januchowski did not talk nicely to her, was mean to hear, would comment on the way she dressed, and would call her Hispanic mother the same name as another Hispanic teacher at the school (purposefully- presumably to indicate all Hispanics are the same), but despite these unkind things, it was never her belief that Ms. Januchowski was harmful to the children.

On January 23, 2026, Ms. Annah Campbell called the office because she was hearing a lot of screaming in the adjacent room which was Ms. Donna Januchowski's classroom. Ms. Ashley McAllister went in and checked the classroom and removed two children. "I guess she witnessed some things that were concerning." At that time Ms. Hernandez was on her lunch. Ms. Ashley McAllister had told Lorrie McClure that something was happening, and Ms. McClure was the acting preschool administrator. Ms. McClure then stepped out of the preschool, and Ms. Hernandez came back from lunch. At that time, around 1:00 PM, Ms. Hernandez watched the video with Halli Walls. Ms. Hernandez thought the video was remarkably "concerning." It caused her to cry and lose sleep. She recalls Ms. Januchowski "dragging a child by the collar through the

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **14** of **77**

---

floor." She recalls Ms. Januchowski putting her feet on top of one of the children's head. His face was down on the cot. "We cannot have him face down." Ms. Hernandez saw Ms. Januchowski put a hand through the child's shirt. "There was a point where she (Januchowski) kept putting a child's head between her legs."

Later that day, Lorrie McClure and Kristi Cox came to the preschool and asked Donna Januchowski to meet them in the office. They told Ms. Hernandez to cover for Ms. Januchowski while they spoke with her. They did not speak with Ms. Januchowski for long. "Whenever Donna left the office, I was the only one in the office and they were very friendly towards each other." "It's okay, we all have bad days ... hopefully you can reset over winter break ... through this week ... we appreciate you." Ms. McClure and Ms. Cox then let Ms. Januchowski go back to her classroom. This was upsetting to Ms. Hernandez because she saw the video and she saw that "what she [Januchowski] did was not okay. They only talked to her for maybe ten minutes, and then came out all giggly and smiley, saying it was going to be okay."

Ms. Hernandez was upset, and so at 4:40 PM on January 23, 2026, she "called the hotline." She made a 21 minute phone call on the speaker phone.[15] "I was really upset and crying."

Ms. Hernandez thought it was "unfair" that Ms. Januchowski was allowed to return to her classroom when she was "hurting children." Ms. Hernandez then re-watched the video that afternoon. At that time she took notes. Then, she elected to call the hotline back at 10:40 PM for 18 minutes and told them all the notes she wrote and wanted to add to the case.[16] Ms. Hernandez was given a reference number during the hotline call. They said it would be three days to investigate. However, the second time they asked Hernandez if it was reported to the police[17]. Then, the hotline told Ms. Hernandez they could not tell Ms. Hernandez to call the police, but they advised her to do so.[18]



---

[15] EXHIBIT 10 Phone call to hotline on speaker

[16] EXHIBIT 11 2nd call to hotline with notes

[17] This was confusing to Hernandez because it was unclear why the hotline would not contact the police itself.

[18] The number called by Ms. Hernandez was 844.287.1892 which is the "Save the Children" hotline.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 15 of 77

---

After Ms. Hernandez made the hotline call on January 23, 2026, she waited. The following week was snow and the children were out; the preschool was closed. On the Monday after the snow week, February 2, 2026, Lorrie McClure and Kristi Cox spoke with Ashley McAllister. Ms. Hernandez was sent to cover for Ms. McAllister during this time. That meeting was approximately 15 minutes. Then, Ms. McClure and Ms. Cox spoke with Ms. Hernandez and some others. They said they talked to Donna Januchowski, and she had been having a rough day. They said it was a "perfect storm of different variables." Then, Kristi Cox said, "All the kids in there are little turds, so it was bound to happen."

Ms. Hernandez continued to be upset. She did not tell Kristi Cox or Lorrie McClure that she had made a hotline call. Ms. Cox told Ms. Hernandez, "That was an example of what not to do in a classroom, and it was not okay to tell kids she would spank them or anything."

Ms. Hernandez later recalls, during the week of February 2, 2026, asking Ms. Lorrie McClure why did she not advise this situation needed to be reported. Ms. McClure responded, "I'm not in the business of telling my boss[19] 'No'." This was disappointing to Ms. Hernadez because only a week or so prior, Ms. McClure "got onto a parent saying, 'We are mandated reporters and we are supposed to report any incident. By law, that's what we are supposed to do'."

Licensing came on Wednesday, February 4, 2026. It was Amanda McCullough who appeared. Ms. McCullough learned of the matter because Mindy Shaw received an email[20] from one of the parents saying something had happened. She was not allowed to talk to Mindy Shaw because of FMLA. Ms. Hernandez believed there was something happening because of the hotline call, and the hotline called Amanda McCullough. However, they elected to call Amanda McCullough on February 4, 2026, who came to the preschool the same day. Ms. McCullough asked specifically for Enelyn Hernandez and Aspen Treadway. Ms. McCullough asked to see the video, and Ms. Hernandez took her to Halli Walls' office. Ms. Walls has access to the cameras as part of the Crisis Management Plan. Ms. McCullough was horrified to see the video. They downloaded the video on Halli Walls' desktop and sent it to licensure through Amanda McCullough.

Amanda McCullough left and said she was going to talk to some people and returned to the district that afternoon. She asked to speak with administration, and she spoke to Lorrie McClure and Kristi Cox. When these two spoke with Ms. McCullough, they also brought in Donna Januchowski. After that

---

[19] Boss – this is believed to be a reference to Dr. Ginni McDonald.
[20] EXHIBIT 12

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **16** of **77**

___

conversation, Ms. Januchowski checked out early and ceased coming to the preschool.

That same day, or close to that day, Ms. McClure and Ms. Cox asked Halli Walls to go to her office and asked her some questions. They then spoke to Aspen Treadway and Enelyn Hernandez. These conversations consisted of the administration asking why they were not called when licensure came that morning. "I said when DHS or licensing comes and asks for a specific person, we don't tell our supervisors." Ms. Hernandez felt retaliated against because "we reported it and didn't tell them." They were upset they did not know, especially after they decided "to keep Donna." She indicated, "we did not know until recently that the superintendent wanted to get Ms. Mindy Shaw and some of us fired for contacting them[21]." Ms. Hernandez took part in downloading the video at issue to Halli Walls' desktop and hiding it on the computer. This occurred after the ladies were told that "Ms. Donna was going to stay in the classroom."

Ms. Hernandez explained that videos delete after two weeks. They were worried those two weeks would run and the video would be lost, and, therefore, they wanted to have a copy. They saved the video "deep inside" Halli Walls' computer "just in case." They were afraid the remainder of the video would be lost, "or something would happen."

On February 5, 2026, Kyle Williford from Batesville Police Department came to her and asked for the relevant video footage. Kristi Cox and Lorrie McClure were not present. However, the preschool called administration and stated that Investigator Williford was there and "needs to talk about the footage." Messes. Cox and McClure said, "Wait on them to do or say anything." If the police obtained a copy of the video, it was not the copy from Halli Walls, instead it was the copy that would have been maintained by Kristi Cox or Lorrie McClure.

### d. INTERVIEW WITH KRISTI COX

On March 10, 2026, this investigator met in person with Kristi Cox who is the special programs director for the Batesville School District. She is certified and has been at the district since 2008. She has a history in preschool care, and she worked as preschool director for Williams Baptist College from 1993-2000. She was the administrative director for Kids First at Mountain View from 2004-2008. Ms. Cox keeps a copy of the Minimum Licensing Requirements for Child Care Centers on her desk in spiral notebook form.

___

[21] This statement is hearsay; Ms. Hernandez was not part of a conversation where these statements were made.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 17 of 77

_____

In mid-January 2026, Kristi Cox was asked to serve with Lorrie McClure at the preschool while Mindy Shaw, preschool director, was on FMLA leave. Therefore, she spent additional time at the preschool and would visit it regularly. She performed these duties in addition to her normal duties as special programs director.

On January 23, 2026, naptime at the preschool was Noon-2 PM. Ms. Cox received a phone call early afternoon with a complaint from a floater/assistant named Ashley McAllister. Ashley McAllister stated that she had gone into "Donna Jan's" room, and "Donna had her leg across a student's neck, choking him[22]." When Ms. Cox came into the preschool building, Aspen Treadway grabbed her and said, "Oh, girl, I've watched the video and it's bad." At that point in time, Ms. Cox was aware that someone in addition to her and Lorrie McClure had watched the video. She then learned they were viewing it on Halli Walls' computer.

This was Ms. McAllister's first time to make a complaint of this nature, as far as she knew. Ms. Cox received this information from Lorrie McClure, and Ms. Cox elected to pull up the video. She was already watching the video when Lorrie McClure came in. Ms. Cox recalls rewinding the video footage from the server and watching it with Lorrie McClure. She went back and forth between the two camera angles, but when she showed Lorrie McClure, they were mostly only looking at it from the door angle. After they together watched the video footage, Ms. Cox attempted to call Dr. McDonald, and "Lorrie and I relayed to her what I had seen on the camera footage."

_____

[22]     Ark. Code Ann. § 6-18-2405 (h)(5) : "School personnel shall not use the following on a student:  prone restraint or restraint that restricts the breathing of a student."
    Ark. Code Ann. § 6-18-2405 (k) :  The use of a technique that is abusive shall be reported to the Child Abuse Hotline and law enforcement.
    Minimum Licensing Requirements for Child Care Centers in Arkansas:  501(5)(c)  "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children.  These include, but are not limited to the following:  taping or obstructing a child's mouth".
    Ark. Code Ann. § 6-18-2405 (b)(2):  "The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by school personnel will not prevent imminent danger of serious physical harm to the student or others."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **18** of **77**

Ms. Cox recalls watching 10-16 minutes of the video footage, mostly of the further out version. She was looking for Donna Jan's leg on the student's neck, choking him[23]. What she saw when she watched the video footage was that, "some (students) slept through the whole thing. I recall her correcting Beckett Raiford. The little boy by her desk (███ k or ███ a) -- he normally didn't have issues at naptime from what I observed. I saw a 'monkey-see-monkey-do' where one would misbehave and the second one would follow." Ms. Cox pointed this investigator to the early part of the video footage where Ms. Januchowski was being sweet with ███ , rocking him, and generally being kind prior to lying the child down for nap.

This investigator then asked if Ms. Cox noticed anything else on the video. Ms. Cox advised that, yes, Ms. Januchowski's cell phone[24] "was out." That is not allowed because of "licensing and policy."

The above statement is what initially was told this investigator about what was on the video that Kristi Cox viewed. She did not state any other concerning acts or things that were of interest or concern until later in the conversation[25].

Later, January 23, Kristi Cox and Lorrie McClure went to visit Ms. Donna Januchowski in the afternoon. She had great concerns at that time about Ms. Januchowski threatening to video ███ ███ a. She had concerns about the "gruffness of her voice," and that was discussed with Donna Januchowski. She recalls that "the little guy ███ e started standing on his head, got wiggly, got loud. She covered him, she patted him. She repositioned him[26]." Ms. Januchowski then recalls there were two other boys "feeding off of ███ " She recalls Ms. Januchowski getting off the floor, and the children running around. Ms.



[23] EXHIBIT 4 shows Ms. Januchowski's leg on ███ k ███ s (5yo) neck, and the child states, "I can't talk" at 12:39:22 and 12:39:42.

[24] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 17. Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian."

[25] Recall that Ms. Cox was seemingly unaware that EXHIBIT 4 currently exists, because she only asked to retain the far-off video that is the equivalent of EXHIBIT 5. EXHIBIT 5 does not include the key image of the leg on the neck of ███ k as seen in the footnote image above.

[26] Ark. Code Ann. § 6-18-2405 (g)(2)(D)(ii) : "Physical restraint of a student shall not be used in the following manner: to coerce the student."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **19** of **77**

---

Januchowski moved the cots around. Ms. Januchowski placed one boy in her lap and she was yelling[27]. There was something about relaying to the parents that "you boys need to get spanked[28]," and that was "not allowed. It is not allowed to spank or to threaten to spank."

Eventually, Ms. Cox recalled that Ms. Januchowski held a kid by his shirt[29] to preclude him from running around the room[30].

This investigator specifically asked if Ms. Cox noticed that Ms. Januchowski ever had her leg on student[31]. Ms. Cox *explained that this is used as sensory input[32] so kids can de-pressure[33]*. This is similar to a weighted blanket, she claimed. However, Ms. Cox admitted if this was Ms. Januchowski's intent[34], it failed. Generally, sensory input includes squeezing of the shoulders or knees, and she admitted that was not what was happening in Ms. Januchowski's room during nap time.

---

[27] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(i) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: Yelling (this does not include a raised voice level to gain a child's attention to protect the child from risk of harm.)"

[28] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(n) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: shaming, humiliating, frightening, labeling, physically, or mentally harming children".

[29] Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iii) : "Physical restraint of a student shall not be used in the following manner: to force the student to comply."

[30] Ark. Code Ann. § 6-18-2405 (g)(2)(ix): "Physical restraint of a student shall not be used to prevent property damage unless the act of damaging property committed by the student poses an imminent danger or serious physical harm to the student and others."

[31] Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others."

Ark. Code Ann. § 6-18-2405 (b)(1): "School personnel shall use the least restrictive technique necessary to end imminent danger or serious physical harm to a student and others."

Ark. Code Ann. § 6-18-2405 (a)(1): "Physical restraint of a student shall be used only be a member of   school personnel who is appropriately trained to administer physical restraint except in the case of a clearly unavoidable emergency situation in which a trained member of school personnel is not immediately available due to the unforeseeable nature of the emergency situation."

[32] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(a) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury)"

[33] Ms. Cox never claimed Ms. Januchowski was trained in restraints.

[34] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 8 b. If children do not fall asleep, they shall be allowed to participate in a quiet activity either on their cots, in the area, or in another room under direct supervision."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **20** of **77**

---

Ms. Cox recalled speaking with Ms. Januchowski about Ms. Januchowski's sarcasm[35].

Ms. Cox discussed with Ms. Januchowski the reason she did not call for help. Ms. Januchowski had a phone in her room and on her person (albeit inappropriately). There were persons available to help her, as Ms. McAllister did on that date. Ms. Januchowski had no explanation as to why she did not call for help.

Kristi Cox advised she did not believe there was a need to self-report this incident to licensing[36]. She did not identify yelling as appropriate for self-reporting, and that would be the topic for which the preschool self-reported this incident[37]. Ms. Cox recalls looking at the relevant section of the Child Care Licensing Minimum Standards book with Lorrie McClure. Lorrie McClure certainly "knew about these licensing standards," as they looked at them together[38].

Lorrie McClure and Kristi Cox reported what they saw on video to Dr. Ginni McDonald. Additionally, they went back to Dr. McDonald's office, met with her, and devised a plan Messes. McClure and Cox would go back to the preschool to speak with Donna Januchowski, and that was done that afternoon at 3:45 PM.

---

[35]    Ark. Code Ann. § 6-18-2405(f)(3): "When using physical restraint on a student, school personnel shall not verbally abuse, ridicule, humiliate, taunt, or engage in any other similar action towards the student."
    Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(i) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: Yelling (this does not include a raised voice level to gain a child's attention to protect the child from risk of harm.)"

[36]    Minimum Licensing Requirements for Child Care Centers in Arkansas: 103(14) "Revocation of License -The Division may revoke a license when any of the following situations occur: a. The facility fails to maintain substantial compliance with licensing requirements;
b.    The facility fails or refuses to correct cited deficiencies in a timely manner; or
c. The facility fails to insure the health, safety, and welfare of children in care."

[37] Minimum Licensing Requirements for Child Care Centers in Arkansas: 103(10) "If a violation is of imminent threat to the health, safety, and welfare of the children attending the Child Care Center, corrective action or compliance shall be obtained within twenty-four (24) hours in order to ensure the health, safety, and welfare of the children in care. If a Child Care Center violates an administrative standard or standard that does not directly threaten the immediate health, safety, or welfare of the children in care, these violations shall be corrected within a reasonable time as mutually agreed upon by the Child Care Licensing Unit and the Child Care Center."

[38]    McClure in her interview disagreed with this statement.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 21 of 77

Importantly, snow was about to fall, and people were about to get snowed into their homes. This was in the back of everyone's mind as they were making decisions.

Kristi Cox did not believe that Dr. McDonald watched the video on January 23, 2026. "But she didn't ask me." Kristi Cox has seen both videos from all angles, and she was able to toggle between the two videos as she watched them from the server.

There was no discussion of terminating Donna Januchowski on January 23, 2026[39]. There was no discussion of calling the childcare abuse hotline on January 23, 2026.

Ms. Kristi Cox recalls going to Ms. Januchowski's room on January 23, 2026, and noting that no child was injured or harmed. Because of this, she did not deem it appropriate to call the hotline.

On January 23, 2026, around 3:45 PM, Kristi Cox, Lorrie McClure, and Donna Januchowski met at the preschool. Messes. Cox and McClure discussed with Ms. Januchowski the following topics: yelling and sarcasm; holding onto a student with clothing; using her leg to prevent a student from running around the classroom (Ms. Januchowski told Ms. Cox that other staff used that method[40]). Further, they discussed with Ms. Januchowski the need to rearrange her time so that she is not alone at naptime. Further, the aid to the room cannot leave until all students are settled and calm. The use of cell phone and video was discussed. (Ms. Januchowski claimed to Ms. Cox that she was pretending to take videos to make ▮▮▮ think that Ms. Januchowski would show the videos to ▮▮▮s mom[41].) Further, the cell phone was prohibited, and pretending to video was not important. When Ms. Cox was asked whether Ms. Januchowski was

---

[39]    McClure in her interview disagreed with this statement.
[40]    Ark. Code Ann. § 6-18-2405 (g)(2)(D)(viii) : "Physical restraint of a student shall not be used in the following manner: as a as a convenience for school personnel"
    Ark. Code Ann. § 6-18-2405 (g)(2)(D)(v) : "Physical restraint of a student shall not be used in the following manner: to replace the use of an appropriate educational or behavioral support."
    Ark. Code Ann. § 6-18-2405 (g)(2)(D)(vi) : "Physical restraint of a student shall not be used in the following manner: as a routine safety measure."
[41]    Minimum Licensing Requirements for Child Care Centers in Arkansas:  501(5)(k) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: associating punishment with rest..."
    Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 8 b. If children do not fall asleep, they shall be allowed to participate in a quiet activity either on their cots, in the area, or in another room under direct supervision."
    Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 17. Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **22** of **77**

_____

written up, or it was considered to write her up for using restraints, her response was that *she did not know.* The write-up that was made and referred to herein is attached as EXHIBIT 13.

Again, Ms. Cox was reassured that the students in Ms. Donna Januchowski's classroom appeared to be uninjured.

Ms. Kristi Cox physically worked the entirety of "snow week" beginning January 26, 2026. There were no students at the school during this week. At some point during that week, Mindy Shaw texted Lorrie McDonald to let her know there was a problem in "Ms. Donna Jan's" classroom. EXHIBIT 14. They asked her to email the concern to them. Lorrie McClure had previously been told not to "handle Shaw" over text, because they were in a precarious place because Ms. Shaw was on FMLA leave and legally should not be interacting with them. Ms. Cox responded to Mindy Shaw and Lorrie McClure that "we had viewed the footage, there was a plan of action for when we are back, and they moved a student." Ms. Shaw responded that Ms. Donna needed to be terminated. Ms. Cox and Ms. McClure told Ms. Shaw that it was not within their scope to remove Ms. Januchowski from her job without confirmation from Dr. McDonald to do so. All this information was submitted back and forth via emails. These emails are attached hereto as EXHIBIT 15.

At some point during this interaction during snow week, Ms. McClure and Ms. Cox went back to Dr. McDonald's office and relayed to Dr. McDonald the information. Most contacts back through Mindy Shaw were done by or through Dr. McDonald because of the FMLA leave.

Kristi Cox recalls being present when Dr. Ginni McDonald had a conversation over speaker phone[42] with Mindy Shaw. She did not recall the date. Mindy Shaw stated, "You should have terminated her." Dr. McDonald replied, "Did you self-report or hotline?" Ms. Shaw said she did not, and Dr. McDonald asked why. Ms. Shaw stated, "Because I'm on FMLA and you told me not to work." Dr. McDonald explained that her FMLA status did not preclude her from self-reporting.

At approximately the same point in time, and on January 28, 2026, Dr. McDonald was on her cell phone and communicating with "Save the Children[43]" in Washington, DC. Somebody from within the district or the school notified Save the Children in Washington, DC. Save the Children then elected, per Ms. Cox, to second-hand hotline information. Kristi Cox recalls Dr. McDonald on the phone

_____

[42]  Believed to be January 28 based on the information later given.
[43]  This is the entity Hernandez phoned believing she was calling the Arkansas Child Abuse Hotline.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **23** of **77**

with "Save the Children" giving her "a run for her money[44]" because Save the Children was indicating they were going to call the child maltreatment hotline, but Save the Children had no direct information, according to the belief of Dr. McDonald. Both Dr. McDonald and Ms. Cox "struggled with" this information. Ms. Cox opined that perhaps Jessica Angel turned in the information. All this occurred on January 28, 2026.

On Monday, February 2, 2026, after the snow, all returned to school, including Ms. Donna Januchowski at the preschool. Lorrie McClure, Kristi Cox, and Donna Januchowski met around 7:30 AM, and a written write-up was given to Ms. Januchowski. This write-up is attached hereto as EXHIBIT 13. This document was a direct result of the conversation they had the prior school day, which was January 23, 2026.

On February 3, 2026, which was a Tuesday, the preschool office staff called and indicated childcare licensing was at the preschool. This was around 2:15 PM, and Kristi Cox went to the preschool. A letter was provided to Ms. Cox that Ms. Donna Januchowski was being investigated due to a self-reporting to the licensure based on pre-kindergarten employees. They advised Ms. Januchowski could no longer work with children until the investigation was complete. Of importance to Ms. Cox, Ms. Januchowski did not have to be terminated, but she could not work alongside children. At that point in time, *Ms. Cox had not considered removing her from working with children.* The reason this was not concerning to her was "because there was a plan." Regardless, because of licensing, Ms. Januchowski was no longer going to be alone with children.

Ms. Cox did not know what to do with Ms. Januchowski, so she discussed the matter with her, and Ms. Januchowski indicated she had recently fallen on the ice at home, and she elected to take a sick day the rest of the day and the following day.

Ms. Cox and Ms. McClure were displeased that licensing had been at the preschool building the morning of February 3, 2026, and no administrator was told of their presence. That morning, licensing had interviewed Aspen Treadway and Enelyn Hernandez[45]. Ms. McClure and Ms. Cox were upset that they were not notified about this interaction, but there was not retaliation because of the discussion they had with licensure. Instead, Ms. Cox explained that any time

_____

[44] She was implying that McDonald was being difficult with Save the Children.

[45]    Minimum Licensing Requirements for Child Care Centers in Arkansas: 103(14) "Revocation of License -The Division may revoke a license when any of the following situations occur: a. The facility fails to maintain substantial compliance with licensing requirements; b. The facility fails or refuses to correct cited deficiencies in a timely manner; or c. The facility fails to insure the health, safety, and welfare of children in care."

**CONFIDENTIAL**

---

someone comes to the building, administration must be notified that an outside agency is present.

During the time between January 23 and February 3, 2026, they discussed the bookkeeper Halli Walls having the camera software on her computer. It was determined it would be best to remove this software from Ms. Walls' computer in preschool. It was Dr. McDonald's "philosophy is that the fewer people possible do not need" to see videos. Ms. Cox has no knowledge of safety rooms[46]. Dr. McDonald then elected to remove the software from the bookkeeper's office because, "the thought process is as few people as possible" should have access. Ms. Cox advised that all persons with video access should be trained, however, she is unaware of any training in this regard.

On February 3, 2026, Dr. McDonald stated to Ms. Cox, "Well, I guess I need to see the video[47]." Ms. Cox attempted to download it, but she could not do that, and she contacted Matt Baxter. That afternoon, Dr. McDonald, Jeramie Jeffrey, HR director for the District, Lorrie McClure, and Kristi Cox pulled up the camera footage from the server. Because they went to the very beginning of nap time and were on the server, they were able to watch the videos and toggle back and forth between the two angles. She recalls watching, during this time, Ashley McAllister entering and leaving the room[48].

Dr. McDonald instructed Ms. Cox to tell Matt Baxter to pull the footage. They felt like a subpoena was "going to come from someone." Matt Baxter needed to know the room for the video. Ms. Cox responded with a specific room, a specific camera, and a rough time frame. Kristi Cox reiterated that what she was told by Ashley McAllister was, "I think Donna had her leg across a kid's neck choking him."

On February 3, 2026, when Ms. McClure, Dr. McDonald, Ms. Jeffrey, and Ms. Cox met in Ms. Cox's office to review the footage, Dr. McDonald was no longer concerned about self-reporting. However, Dr. McDonald called Mindy Shaw again and Ms. Shaw reiterated that she believed Ms. Januchowski should be terminated. Dr. McDonald said to Ms. Shaw, "If you feel like she should have been terminated, why didn't you hotline it[49]?" Ms. Shaw responded, "Because I

---

[46]   Batesville Preschool Child Care Emergency and Crisis/ Risk Management Plan - Unwanted Intruder Policy, 2 "After notification from the office by intercom – Intruder in Building – Lock Down office 205 is utilized as a safe room for video surveillance." EXHIBIT 8. (Walls' office is 205.)

[47]   There are 11 days between January 23 and February 3.

[48]   The time Januchowski's foot was on the child's neck was when McAllister was in the room.

[49]   Ms. Cox may have the timing of this conference incorrect.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **25** of **77**

___

can't work from home." It was then asked whether Ms. Shaw had any history of writing Ms. Donna Januchowski up, and Ms. Shaw did not recall doing that.

At that time, Dr. McDonald pulled up the Regulations for Child Maltreatment. They were looking at the criteria to determine if they had seen anything that would require a hotline contact. She pulled up the criteria and came to the conclusion that, "no children were injured" -- they clearly read the criteria together. It was discussed that no one was punched, kicked, etc. They collectively came to the conclusion that, "I don't need to hotline this[50]."

At this point, Jeramie Jeffrey, produced two letters she created for Donna Januchowski.[51] One letter was to place Ms. Januchowski on paid administrative leave, and the other letter was to terminate her. Dr. McDonald was to make the final decision as to which letter would be used. "I assumed one of those would be done."

On February 4, 2026, Kristi Cox was summoned to go to Dr. Ginni McDonald's office. When she arrived, Dr. McDonald, Mr. David Campbell, Ms. Lorri McClure and Ms. Jeramie Jeffrey were there. It was then relayed that Dr. McDonald elected to recommend Donna Januchowski's termination to the School Board. Most of the effort after that statement, in the meeting, was then made to determine how to run the preschool without Ms. Januchowski present.

It was also determined during that February 4 meeting that Kristi Cox, who has a personal relationship with Donna Januchowski, would drive to Ms. Januchowski's house 10-12 minutes away. Ms. Cox and Ms. Januchowski go back many years, and they have met up for dinners socially. However, this was the first time Ms. Cox had been to Ms. Januchowski's house. She appeared around 6:30 PM on February 4, 2026. Ms. Cox read her the letter, and Ms. Januchowski wanted to know "Does this mean I'm losing my job?," and Ms. Cox replied, "Yes." [52] EXHIBIT 16 Ms. Januchowski signed the letter, acknowledging she had received it, and she cried and was remorseful. She asked if she could retire, and Ms. Cox relayed that was a Jeramie Jeffrey question.

___

[50]     No person in this conference has reported to the Mandatory Child Abuse Hotline, per Investigator Brenda Bittle.

[51]     This is consistent with Ms. Jeffrey only recalling being present during five minutes of the video, if she was creating the letters while the other persons were watching the video.

[52] Note this write-up was for raising her voice during nap-time, using words like being "bad" and "needing a spanking," holding a child "by their clothing to direct their movement" and cell phone use.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **26** of **77**

---

On February 9, 2026, Kristi Cox was at the preschool when Lorrie McClure called advising the police were present and needed to speak with the person in charge. Ms. Cox met with Batesville Police Investigator Brenda Bittle who had a search warrant for the video footage. Kristi Cox sent Officer Bittle to Matt Baxter. Officer Bittle procured the video directly from Mr. Baxter.

Ms. Cox drafted a statement in her own words of her memory of this situation. This formal statement is attached here to as EXHIBIT 17.

### e. INTERVIEW WITH LORRIE McCLURE

On March 10, 2026, this investigator met in person with Lorrie McClure. Also present was Ms. McClure's counsel, Barrett S. Moore, of Blair and Stroud, 500 E. Main Street, Suite 201, POB 135, Batesville, Arkansas 72501.

Ms. Lorrie McClure was with the Batesville School District almost 20 years as a community school director and home coordinator. She helps with grants and programming. However, preschool acquires their own grants.

Ms. McClure[53] had limited interaction with the preschool prior to Mindy Shaw leaving for FMLA. She would primarily help with parent engagement activities. Ms. McClure has a degree in history and is a classified employee at the Batesville School District. As an employee of the Batesville School District, she does undergo school district employee training. She understands that she is a mandatory reporter.

Dr. Ginni McDonald advised Ms. McClure in early January 2026 that Mindy Shaw would be out of work for a bit on FMLA leave. Kristi Cox was present in this meeting, and Dr. McDonald asked both Ms. McClure and Ms. Cox to help while Mindy Shaw was out. Ms. McClure indicated she had no administrative

---

[53] Per EXHIBIT 8, Batesville Preschool Child Care Emergency and Crisis/Risk Management Plan, Lorrie McClure is listed as the "secondary" under Mindy Shaw, Director "primary" for "individual emergency numbers.

07/25/2025

INDIVIDUAL EMERGENCY NUMBERS

| Name of Staff | Cell | Office |
|---|---|---|
| Mindy Shaw – Director (Primary) | 870 621 2215 | 870 793 0630 |
| Lorie McClure (secondary) | 870-615-6931 | 870 793-0630 |
| Kim Walls | 870-613-3737 | 870-799-0630 |
| Aspen Treadway | 870-613-1710 | 870-741-0630 |
| Evelyn Hernandez | 870-805-1142 | 870-793-0630 |

EMERGENCY COMMUNICATIONS

**CONFIDENTIAL**

history and does not care to help at the preschool. However, Dr. McDonald wanted an administrator present and she was not required to help in that position on her own, but she would have Kristi Cox available to help because she has a history in preschool. Ms. McClure again indicated she had "much to do," but Dr. McDonald indicated, "Between the two of you, you can work it out." It was the indication by Dr. McDonald that Ms. McClure and Ms. Cox were to "just keep the preschool going until Ms. Shaw comes back." Ms. McClure was also told, "Don't change anything." Ms. McClure explained there was a history of disagreements between Ms. Cox and Ms. Shaw.

During the time Mindy Shaw was on leave, Ms. McClure maintained her regular job and job duties. (After Christmas is a very busy time with social work.) She would typically visit the preschool front office and ask if things were okay.

It was Ms. McClure's understanding that Mindy Shaw and Kristi Cox were close to Donna Januchowski. Ms. McClure was not especially close to Ms. Januchowski but would have said "hi" to her in the Walmart.

On January 23, 2026, it was the day before snow was expected. Therefore, her social work office was very busy because they wanted to get food to families who were about to be snowed in. Ms. McClure checked in with the preschool during naptime. She recalls Ashley McAllister saying, "Hey, Ms. Lorrie." It was an office full of people. Ms. McAllister stated, "I need to tell you something. I think I saw Ms. Donna Jan choke someone." Ms. McClure asked, "Is everything okay?" Ms. McAllister responded that she believed "everything is fine now." At that point someone in the office asked, "Do you want to watch the video?" Ms. McClure was disinterested in watching the video "in front of everyone." She preferred to watch it with Kristi Cox, and Kristi Cox was in the district office. Ms. McClure told Ms. Cox that Ashley McAllister had said, "I think I saw Donna Jan choke someone," and they needed to look into this. Kristi Cox told Ms. McClure to let her know when she arrived and they would review the video.

When Ms. McClure arrived at the administrative office, Kristi Cox had the video on when she walked in. Together they watched "maybe ten minutes[54]." They were talking while they were watching it. The teacher's tone was "very sharp." Ms. McClure recalls thinking, "Oh my goodness." She recalls keying in on the use of the phone by Donna Jan.  Phones are a violation of all kinds of district policies. Her phone was very much out. "We were looking for her choking someone[55]." Ms. McClure recalls Kristie Cox then stating something like, "Ashley

---

[54] Ms. McClure admittedly did not watch the time-at-issue in which Ms. McAllister could have been complaining. Ms. McAllister was not in the room during the video seen by McClure.  She gave no reasoning as to why she didn't look at that time on the video.

[55] Ms. McClure used her hands to indicate she was looking for Januchowski taking her two hands and wrapping them around a child's neck.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **28** of **77**

---

McAllister thinks everyone is choking." Kristi Cox said something like, "Ashley writes up everything." It was Ms. Cox's idea, "watch this and see" if Ashley McAllister was telling the truth. Ms. McClure recalls Ms. Januchowski on the floor trying to get a child to sleep. She was lying down. The child was kicking off his blanket. She put her leg over him[56], and Ms. McClure questioned, "Is she holding him down[57]?" Kristi Cox responded, "He's kicking the heck out of her." She recalls Kristi Cox then stating, "It looks like she's trying to do a safe-hold she doesn't know how to do." Ms. McClure recalls yelling in a sharp tone of voice and stating things such as "shut up."

It was evident to Ms. McClure and Ms. Cox that they needed to do something. Ms. McClure was concerned about the teacher having her phone out. Ms. Cox was concerned about her tone. They both saw her grab a shirt. Kristi Cox stated, "Yeah, but she's trying to keep him from running around the room and not knock over a chair[58]." Ms. McClure did not say anything in response to this. When asked whether Kristi Cox was trying to defend Donna Januchowski, Ms. McClure neither confirmed nor denied. However, Lorrie McClure stated that because Kristi Cox has more education and experience in the field, she absolutely deferred to her on both what was appropriate by Ms. Januchowski and how to handle the situation.

Ms. McClure elected not to call the hotline at this or any time[59]. She explained that she has in the past had parents who placed cigarette burns on children, and after a hotline call, the relevant investigators come to a conclusion of "no finding." This has been frustrating for her, and therefore, it did not "dawn on" her there would be a need for a hotline call. Further, she has never thought about the need to "hotline" in the classroom setting[60]. She was also looking for choking in the video, and she did not see choking.

---

[56] Ark. Code Ann. § 6-18-2405 (d): "Supine restrain shall not be used unless the school personnel administering the supine restraint has been trained by a person who is certified by a training program that meets the criteria specified in §6-18-1409; and A person who is certified by a training program that meets the criteria specified in §6-18-1409 determines that supine restraint is required to provide safety for the student and others.

[57] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 8 b. If children do not fall asleep, they shall be allowed to participate in a quiet activity either on their cots, in the area, or in another room under direct supervision."

[58] Ark. Code Ann. § 6-18-2405 (g)(2)(ix): "Physical restraint of a student shall not be used to prevent property damage unless the act of damaging property committed by the student poses an imminent danger or serious physical harm to the student and others."

[59] Batesville School Policy 8.34 "If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions...the duty... is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm, or substantiate..."

[60] Ms. McClure typically works at home visits where the need for a hotline report would occur.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **29** of **77**

---

Ms. McClure asked Ms. Cox what Ms. Januchowski was attempting to do in the classroom during that nap hour on January 23. Kristi Cox responded that she is, "trying to keep him from running around the room[61]." Further, Kristi Cox decided that "I think she's overwhelmed." Again, the most obvious two concerns to Ms. McClure were the focus on the phone[62] and the tone of voice[63].

Kristi Cox was aware that Donna Januchowski's room was "hard." Ms. Cox stated, "This is what happens when you have these kids in one room." There were questions about Ms. Shaw's rigid lunch schedule for paraprofessionals, and whether it was wise to allow assistant teachers to leave the room when kids were not yet asleep.

Together, after Kristi Cox and Lorrie McClure watched the video on January 23, 2026, they elected to "bring the teacher in, and do a formal write-up." Ms. McClure called Dr. McDonald and "said that." Ms. McClure indicated that she believed Ms. Januchowski needed to be terminated, but she simply did not have the support to follow up with that. Ms. McClure states she said, "If she were my staff, I would have her terminated based on her tone alone."

Ms. McClure reiterated there was only approximately ten minutes of video she and Kristi Cox watched together on January 23, 2026. Ms. McClure did not see Ms. Januchowski "choking" anyone. When asked if Ms. McClure watched until the time Ashley McAllister entered the room, she expressly stated that she did not. When asked why she would not watch the video at the time that the alleged interaction occurred[64], Ms. McClure did not have a response, but instead pivoted the topic. This question was asked multiple times, and a response was never given.

Lorrie McClure never considered calling the DHS hotline. She has never called or notified DHS about this matter. She did not consider calling licensing, and advised that she does not know about preschool licensing[65]. She has never

---

[61] Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others."

[62] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 17. Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian."

[63] Ark. Code Ann. § 6-18-2405(f)(3): "When using physical restraint on a student, school personnel shall not verbally abuse, ridicule, humiliate, taunt, or engage in any other similar action towards the student."

[64] The logic behind this question is this: if a fight occurs in 5th period, it makes little sense to look at 5th period and not look for the fight, and assume no fight happened because it didn't occur during a arbitrary 10 minutes watched of a 50 minute class.

[65] Kristi Cox in her interview recalled that the two looked at the Minimum Licensing Requirements together after this event.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **30** of **77**

---

called licensing about this incident. Kristi Cox told Ms. McClure, "I don't see intentional harm. I don't see her intentionally harming kids." Ms. McClure agreed with this assessment, and deemed it not necessary to notify the hotline.

However, Ms. McClure agreed that something needed to be done about Ms. Januchowski, and they decided to "call her in." It was in her mind to talk to her on January 23, 2026, make a formal write-up thereafter, and speak to her with the write-up on another day. *Other than following up with Ms. Januchowski, there were no other duties Ms. McClure claimed she was responsible for.*

Ms. McClure is unfamiliar with the safety holds. She is not trained in "handle with care[66]." She recalls Kristi Cox saying, "It looks like she's doing a safe hold[67]." However, Ms. McClure did not know about safe holds herself. Ms. McClure believed the safe hold was utilized because the students were up and running around the room.

Ms. McClure does not believe she watched the entire video. Further, as she watched the video later with her counsel, she denied she ever watched the "up close video."[68]

On January 23, 2026, when Kristi Cox and Lorrie McClure spoke with Donna Januchowski, Ms. McClure told Ms. Januchowski, "If you were my staff I would terminate you based on tone alone." Ms. Januchowski responded by saying she had been asking for help all year long, and the only help she received was Kristi Cox moving a child out of her room[69]. Ms. Januchowski did apologize for her behavior in the classroom. Ms. McClure does not recall whether or not it was discussed with Januchowski that it was reported by a source that Ms. Januchowski choked a child. During this meeting, Kristi Cox indicated she would write her up and stated the reasons. These reasons are listed in the write-up, EXHIBIT 13. Kristi Cox did most of the talking during this meeting.

---

[66] *See* Handlewithcare.com

[67] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(a) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury)"

[68] This may have been confirmed by Ms. Cox's interview. Ms. McClure claims to have seen the equivalent of EXHIBIT 5, for 10 minutes. She did not ask to see any other angles or length of time.

[69] This is understood to be preschool child Landyn Tignor. Tignor was no longer in Ms. Januchowski's class on January 23, 2026, and so student Tignor is outside of the scope of this investigation. It should be noted that on or about March 5, 2026, David Campbell returned a call from Sierra Thomas, Tignor's mother, alleging inappropriate actions towards Tignor by Januchowski. Campbell made a hotline report on that date.

## CONFIDENTIAL

Mr. David Campbell
April 2, 2026
Page **31** of **77**

---

Per McClure, there were issues with "random" persons watching the videos. "In our district, they're super strict with cameras[70]. That's not only Dr. McDonald." Kristi Cox did not like that persons in the preschool office looked at the video footage. Kristi Cox said, "That is not their duty to do." When asked why this would matter to Kristi Cox, it was stated, "I don't know."

Lorrie McClure understood Kristi Cox and Matt Baxter chose which part of the videos were provided. Ms. Cox and Ms. McClure did not discuss which times to pull or which angle of the camera to save.

On January 23, 2026, Dr. McDonald called Lorrie McClure while she was driving home. Dr. McDonald asked her, "Did everything go okay with the preschool?" Ms. McClure indicated she talked to Ms. Januchowski, and she will get a write-up. Ms. McClure advised Dr. McDonald she was appalled with the teacher's behavior. Ms. McClure does not recall whether or not she told Dr. McDonald she believed Donna Januchowski should be terminated. Ms. McClure did state, "If was terrible," and "I do not like being at the preschool."

The week following January 23, 2026, was a snow week. On that Tuesday, Ms. McClure went into the office to work, although no students were at school. On January 28, 2026, although no one was at the school, the district office was working, and she received a text from Mindy Shaw. This text is attached hereto as EXHIBIT 14. Ms. McClure immediately showed the text to Dr. Ginni Mc Donald and Kristi Cox. She did not know what to do with this. At this point, they elected to watch the video. However, Lorrie McClure does not believe they watched 40 minutes of video. And, again, later with her attorney, she claimed she only saw the video from the far-out angle, for 10 minutes.

Ms. McClure was present when Dr. McDonald watched the video and heard Ms. Januchowski's tone. Dr. McDonald then said, "Is she trying to restrain him?" Kristi Cox responds, "No, I think she's trying to do a safe hold." Then, Kristi Cox says, "I don't see intent for child abuse." Dr. McDonald then stated something such as, "I don't see her trying to intentionally harm, but that is not good."

Ms. McClure recalls Dr. McDonald then asking "HR" if they could dismiss her. HR then asked about prior write-ups. Then, Dr. McDonald called Ms. Mindy Shaw, and Dr. McDonald stated, "Look, I see all kinds of bad, but I don't see her trying to harm." Shaw then stated, "I would like to dismiss her." Ms. McClure recalls Ms. Shaw stating, "I told her (McClure) to fire her." Then Kristi Cox said,

---

[70] Batesville Preschool Child Care Emergency and Crisis/ Risk Management Plan - Unwanted Intruder Policy, 2 "After notification from the office by intercom – Intruder in Building – Lock Down office 205 is utilized as a safe room for video surveillance." EXHIBIT 8.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **32** of **77**

---

"I don't have authority to fire her." That's when they started asking about past write-ups. Dr. McDonald asked Ms. Shaw, "Have you written her up?" Dr. McDonald said, "Have you done your job and written her up?" It became clear that Dr. McDonald was not happy with Ms. Shaw. Mindy Shaw stated on speaker phone to the room, "I told Lorrie to fire her," and Dr. McDonald said, "We cannot justify firing her."

Dr. McDonald then asked Ms. Shaw when she saw the video. She then asked, "When you saw the video, did you hotline it?" Ms. Shaw stated, "No, I did not." She then stated she's on FMLA which is the reason that she did not call it in. Dr. McDonald replied, "That doesn't negative your responsibility." Dr. McDonald said something to the effect of, "I don't see intentional child abuse, but I would like this teacher not in our preschool." At this point in time, Ms. McClure left the room, and Dr. McDonald and Kristi Cox remained to determine if Ms. Januchowski could be terminated.

On Monday, February 2, 2026, all students were back at school. On the following date, Tuesday, February 3[71], 2026, licensing appeared at the preschool advising there had been a complaint. Kristi Cox called Lorrie McClure and she went to the preschool. It was determined by licensing Ms. Donna Januchowski could "not work around kids" during the investigation. Ms. McClure signed "things" from licensing, and Dr. McDonald asked her to come to her office. This time, in the office was Dr. Ginni McDonald, Mr. David Campbell, Ms. Jeramie Jeffrey, Ms. Kristi Cox and herself. Again, they called Mindy Shaw and put her on speaker phone. It was asked, "Are you aware there was a hotline call made from your school?" Initially, Ms. Shaw said no, but then she changed her words. Ms. Shaw eventually stated, "Well, I hotlined." Dr. McDonald was confused because she thought she had been told there was no need to hotline, and Ms. Shaw stated, "I hotlined because you told me to." Dr. McDonald stated, "I never told you to" hotline. When Dr. McDonald ended the call, she was "very mad." It was then decided that "we need to get rid of the teacher." It was determined that Kristi Cox would discuss the matter with the teacher. Thereafter, Donna Januchowski turned in her resignation as a retirement.

Ms. McClure explains, "I think I told Dr. McDonald about the recording of the choking. Dr. McDonald did not see that either. She said she didn't see intent to harm." Dr. McDonald was angry because Mindy Shaw hotlined the situation.

---

[71] This was 6 days after the conference with Shaw over speaker phone, after Shaw texted that she saw "abuse" on the video, and she should be fired. This was 11 days after the event.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **33** of **77**

_____

It was Ms. McClure's understanding that when "licensing" came to the preschool, the persons in the preschool immediately showed licensing the video. Ms. McClure was unaware whether or not that was protocol. However, "that didn't sit well with McDonald." Dr. McDonald thought there was a need to subpoena the video. There was also concern from Kristi Cox that the front office staff had made a phone recording and then passed it around the community. However, there was no real backing behind that, to her knowledge.

Ms. McClure explained that when the preschool was back in session after snow, the people in the front office who were loyal to Ms. Shaw did not think any adverse consequence had occurred to Ms. Januchowski. There is a perception around the preschool that Kristi Cox has a preference for Ms. Januchowski. Lorrie McClure did not know whether or not that was true. However, she stated at that time, that "nothing" happened to Ms. Januchowski is incorrect, because she did receive a write-up. Ms. McClure also explained, "There's a lot brewing because McDonald, Shaw, and Ms. Cox don't always get along."

Lorrie McClure admitted that Mindy Shaw told her there was "abuse" in the text to her on January 28, 2026, EXHIBIT 14. Donna Januchowski had hard kids because Mindy Shaw believed Ms. Januchowski was capable. However, even after the utilization of the word "abuse" in a text message, Ms. McClure did not think it appropriate to hotline.

Batesville PD Investigator Brenda Bittle showed up at the preschool to obtain the video. Dr. Ginni McDonald indicated they needed a subpoena, and that was relayed to Investigator Bittle. Batesville PD came back with a subpoena and obtained the video. Later, Brenda Bittle called Ms. McClure and said, "Lorrie, I need more video."[72] Lorrie McClure responded that would need to be addressed with Matt Baxter.

The decision to not hotline was a decision made in part with Dr. McDonald when Dr. McDonald came to the conclusion that Donna Januchowski's action(s) "was not intentional," as in "she doesn't harm kids." In Ms. McClure's mind, "my use of the hotline is not in the classroom setting. It didn't compute that a hotline should be called because that's not normally what I do." There was a discussion as to whether or not to hotline for child abuse, even after Mindy Shaw put the word "abuse" in a text message. After Dr. McDonald determined this was not intentional child abuse, "we fell in line." Ms. McClure stated that *she looked for choking and did not find it. However, she admittedly did not go looking for it through the entirety of the video, and she did not attempt to look at all angles of the video.*

_____

[72] It was implied by Officer Bittle that she was aware that all of the video had not been produced to her.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **34** of **77**

---

Ms. McClure explained that it is standard to take an accused out of the classroom by licensure so that they cannot interact with children. Therefore, she was not surprised that licensure elected to remove Ms. Januchowski from the classroom.

Ms. McClure wrote a formal statement in her own words with the help of her counsel as a summary of this meeting. This statement is attached hereto as EXHIBIT 18.

### f. INTERVIEW WITH MINDY SHAW

On March 3, 2026, this investigator met with Mindy Shaw, the preschool director for the 2025-2026 school year. Ms. Shaw is a certified employee. She was out on FMLA leave from January 9, 2026 to February 26, 2026 at 1 PM. Therefore, Mindy Shaw was on FMLA leave due to a surgery during the key dates at issue.

While Mindy Shaw was on FMLA leave, there were emails that came to her as preschool director that she must disburse to the correct persons. Specifically, if persons were trying to get vouchers to get childcare, those emails only went to Mindy Shaw and she would forward them to other persons. As a result, Ms. Shaw was checking her emails somewhat regularly while on FMLA leave.[73]

On January 23, 2026, Mindy Shaw did not know anything about the incident at issue. On Monday, January 26, 2026, it was during the snow and Ms. Shaw received an email from a child's mother. This parent was making reference about her child, ▮▮▮s behavior. This email was looked at by Ms. Shaw for the first time on January 28, 2026[74]. ▮▮▮▮▮▮▮n was a child who did not typically have bad behavior, although he did not nap well. The child's mother was concerned about his behavior at home, and Mindy Shaw referenced that she simply had a concern, and she was at the school on the snow day on January 28, 2026, and she elected to look at the cameras to see what happened.

When Mindy Shaw reviewed the video footage on January 28, she immediately was visibly shaking and upset about the footage she saw. She saw a child being picked up by the back of his shirt and carried. She saw Ms. Donna

---

[73] A system should have legally been put in place so that someone was checking these emails for Ms. Shaw. She should not have had to check emails while on FMLA leave. However, this investigator acknowledges it appears to have been hard to keep Ms. Shaw away from her job duties during this time. Further, this investigator was not hired to review the district's human resources practices.

[74] This email dated January 26, 2026 from Gigi ▮▮▮▮, DC, ▮▮▮s mother, is attached hereto as EXHIBIT 12.

## CONFIDENTIAL

Januchowski place her hand over the child's mouth. She saw Ms. Januchowski jerk children by the t-shirts. She saw Ms. Januchowski's leg over a child when the child said, "I can't breathe[75]." All of this occurred while Donna Januchowski was videoing the incidents on her phone. Ms. Shaw was "shaking after she saw the footage." Ms. Shaw immediately texted Lorrie McClure and said, "She needs to be let go immediately." EXHIBIT 14. Ms. McClure told Ms. Shaw to send an email to Ms. McClure and Kristi Cox, and to also forward the email from the parent. Ms. Shaw sent the emails quickly, EXHIBIT 15. Also attached as EXHIBIT 19 are the text messages exchanged between Mindy Shaw and Lorrie McClure on that date. Ms. Shaw then received a return email wherein she was told, "they had taken care of it on Friday" (January 23, 2026). Ms. Shaw was *not* told there was a mandatory report made or that licensing has been contacted.

On January 28, 2026, Mindy Shaw called the office staff and said, "Hey, what's going on?" They (Hernandez, Walls, Treadway) told her what happened. Because they were out all week with snow, they elected to see if licensing would come in on Monday, February 2, 2026. It was determined that the office staff would "put reports into licensing if they did not come in on Monday." By Tuesday, February 3, 2026, licensing still had not arrived, and the staff elected to call licensing. On that date, Ms. Shaw also called Ms. Amanda McCullough[76] directly, "and I said I had emailed Lorrie and Kristi and the email they had taken care of everything, but not contacted licensure." Amanda McCullough advised for Mindy Shaw to go into the portal, "You can call the hotline through the portal." *It was Ms. McCullough's explanation to Ms. Shaw that the hotline could be called by phone or through the portal.* It was Ms. Shaw's understanding that the hotline could be contacted through the *licensure* portal. Ms. McCullough advised to put in the licensing portal that she is out on FMLA leave. Ms. Shaw put in the portal as much as she could about the investigation of the two cases.

On February 4, 2026, Ms. Shaw received a call from superintendent Dr. Ginni McDonald. The call seemed to be a group call with Dr. McDonald, Kristi Cox, and Lorrie McClure. They were concerned because there had been a licensing complaint called in about the preschool. Mindy Shaw responded that, "Yes, the teacher should have been fired the day it happened. I would have fired her." After she stated that, the three administrators "turned against me." Ms. Shaw explained what she saw on the video was "blatant child abuse." The three administrators stated, "we don't see it in the same light." Later, on February 5, 2026, there was a phone call with Kristi Cox, Lorrie McClure, David Campbell, and Ms. Jeramie Jeffery. Dr. McDonald said it had been brought to her attention that Aspen Treadway put a report into licensure and she was going to turn Ms.

---

[75] "I can't talk" seems to be the actual words used.
[76] Ms. McCullough is the Independence County licensure contact for the Arkansas Department of Education child care center program.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **36** of **77**

---

Treadway's name into the board for causing problems. Ms. Shaw responded, "You can take her name off and make it mine, because I am who did a follow-up report." Dr. McDonald was unhappy stating, "I'm bringing attention to the school board, causing problems for the school district with money issues, and why would you do this?" It was then relayed to Ms. Shaw there was no need for a preschool, and the preschool drains the district's resources, and it was something we "didn't have to have." Ms. Shaw understood this as a threat that if she continued to properly report wrongful acts, then the preschool would be done away with. Dr. McDonald further stated that she would write-up Ms. Shaw and Ms. Treadway, and perhaps others for breach of confidentiality, and breach of the use of cameras. At this point Ms. Jeffery indicated the persons had never been trained on who can and cannot access videos[77].

On the February 4 conversation, Dr. McDonald continued saying to Mindy Shaw that using a phone is the only licensing violation. Ms. Shaw responded, "No, there's a leg in the crotch, a leg over a student, there's videoing, there's 'I can't breathe.' These things you would all get arrested for doing. You don't do any of these things." Ms. Shaw indicated she was shaking, and if she was there she would have called licensing, she would have called the superintendent, and the employee would have been immediately fired.

It angered Mindy Shaw that later on a separate date February 23, 2026, the district indicated to parents that "it was reported to them that day" that there is alleged physical abuse being investigated[78]. However, it was actually reported a month prior, and the administration did not take the appropriate actions. It was the school who was not taking responsibility, and the notification that went out to parents was incorrect and inaccurate.

Dr. McDonald continued to ask Mindy Shaw when she was coming back. She had a doctor's appointment the morning of February 26, 2026, and was back at work the afternoon of that same day. She was aware she would continue to lose employees if she stayed out of the position.

Donna Januchowski and Kristi Cox are friends from years prior.

Ms. Shaw was aware that the entirety of the video program was removed from Halli Walls' computer. However, Ms. Walls saved a copy of the video footage.

Multiple parents have removed their children from the preschool at the Batesville School District as a result of these allegations.

---

[77] Shaw understood that Ms. Jeffery was being helpful to her, indicating no violation of video policy was done, because there is no video policy.

[78] EXHIBIT 9.

**CONFIDENTIAL**

It was Ms. Shaw's belief at one point that she and the employees at the preschool with knowledge of the event were going to lose their jobs. She believes she was expressly threatened by Dr. Ginni McDonald, that McDonald believed that she should not have talked to licensure, and that McDonald believed Shaw acted inappropriately under the circumstances and without authority.

Ms. Shaw has taught early childhood program administration from 1997 to 2022. She taught mandatory reporting training in every class she taught. This was at the University of Arkansas Community College at Batesville. Further, she taught in the Elementary Education Department at Lyon College from 1996-2019.

The three students involved in this matter: ███ █████, ███ ████ and ████ █ were all fine children. They were not the type to misbehave all the time. "These were not hard kids." They do not have Individualized Education Plans.

The superintendent has since told Mindy Shaw no one was allowed to come into the preschool building without speaking with the district office first. However, Mindy Shaw was aware that licensing could come in and look at the preschool at any time they wish. Therefore, the superintendent told Ms. Shaw to contact them if someone did come visit.

Ms. Shaw explained there were multiple licensing violations in the video, including:

- you cannot hit a child
- you cannot restrain a child
- you cannot put your hands over a child's mouth
- you cannot make a video of a child with a phone

Ms. Shaw was unaware of Donna Januchowski acting in this way prior. There had been an email in the past complaining about Ms. Januchowski but the allegations were not similar to this allegation. She had never seen Ms. Januchowski act in this way.

Ms. Januchowski only left the classroom because the licensing person Amanda McCullough said, she [Januchowski] "cannot come back." Ms. Januchowski elected to tell others she could not come because she was injured.

Ms. Shaw explained she has been "sick to her stomach" ever since she watched the video on February 28, 2026. The ball was put in motion to take steps after she spoke with Amanda McCullough. However, since that time, she

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **38** of **77**

___

felt as though she would soon be retaliated against by Dr. McDonald and the others, because of the words expressly told to her.

### g. INTERVIEW WITH HALLI WALLS

On March 3, 2026, this investigator met with Halli Walls, preschool bookkeeper, regarding her memories associated with this matter. Ms. Walls' office is #205. She has one of the only internal offices with no windows. In the preschool, a crisis plan was created in the event there is an intruder. There is a U-Bolt on Halli Walls' door, and she was given camera access so Ms. Walls could watch the building in real time if the school was on lockdown. This information is found in the Crisis Manual.[79]

On January 23, 2026, Mindy Shaw was on FMLA leave. At the time of the incident, Ms. Walls was on her lunch break. She received a text from Aspen Treadway. Ms. Treadway told her, "There's a situation we may need to look at cameras when you get back." Ms. Walls was also advised that Lorrie McClure may watch it with her. Ms. Walls asked if it was serious and asked, "Do I need to come in now?" Ms. Walls came into the office a little after 1:00 PM, "We pulled the video." They forwarded it through the full two hours until they saw activity with Ms. Donna Januchowski. It started around 12:15 or 12:20 PM and they watched from there. Ms. Walls explained, "I've never seen anything like it."

Ms. Walls was first concerned that Ms. Januchowski grabbed ▋▋▋ ▋▋▋▋▋ his shirt collar and dragged him across the floor. "We were stunned." Aspen Treadway then called Lorrie McClure and said, "It's bad come over here." Ms. McClure responded with, "Is it really that bad?" and Aspen Treadway responded, "Yes." After that, Kristi Cox called and asked, "What time do I need to start watching?" Halli Walls told them the start time (which was 12:30 or so). Ms. Walls heard nothing again about the matter until later that evening.

Ms. Walls explained that in the video, there was a steady, constant series of events for around 45 minutes. When asked what was included and whether it was bad, Ms. Walls explained, "I can't form words to tell you." She explained, "We watched it with our hands on our faces -- it was horrible."

Ms. Walls explained there is a way to handle certain students in emergent situations called "handle with care." "Handle with care" is a restraint. However, because these children are preschoolers, they cannot be physically restrained. "We are not allowed to do that per our licensing. There is no physical restraint or physical punishment." This can be found in writing in the ADE's website, and perhaps on the Office of Early Childhood Education and Licensing. The person

___

[79] EXHIBIT 8 Crisis Manual.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **39** of **77**

---

who is responsible for Independence County licensing is Amanda McCullough. Amanda McCullough asked Ms. Walls for the video. This occurred after the snow, February 4 or so. Ms. Walls gave Ms. McCullough two, 40-minute videos. It was so large she had to break it down into 10-minute increment videos. Other copies of the video she was unclear as to how the copies were obtained. "I just assumed they would send what I had." Ms. Walls was unaware there were two different copies of the videos circulating.

Ms. Walls did interact with administration about this matter. On January 23, 2026, there was a call once with Kristi Cox and Lorrie McClure, and "it was pretty obvious they weren't going to do anything. They let her go back to the classroom. There was no urgency or concern from them." As a result, Ms. Walls, Aspen Treadway, and Enelyn Hernandez elected to report the matter themselves. Ms. Hernandez made the call. This was done on speaker in Ms. Walls' office. Ms. Treadway was on the phone as well. This call was made on the 23rd.

"They" [Lorrie McClure and Kristi Cox] chose to send Donna Januchowski back to the classroom on January 23, 2026. Ms. Walls believed there was no concern or worry from them about what happened. "I don't think they were affected by what they saw. I didn't think they were taking it seriously. We were really disappointed. We were concerned why they weren't taking it seriously. We wanted a sense of urgency. That's what made us call."

After Messes. Hernandez, Treadway, and Walls called the hotline,[80] the area received two feet of snow and the preschool was closed for a week. School was back in session on February 2, 2026, and on that date, nothing happened. Donna Januchowski was in the classroom. They waited all day Monday, and no one investigated. Thereafter, on Tuesday (February 3, 2026) they called Amanda McCullough directly. That occurred the morning of February 3, 2026. Ms. McCullough appeared at the district immediately. She interviewed Aspen Treadway and Enelyn Hernandez. She watched the video footage in Halli Walls' office. She had a "visceral" response. She would gasp. She was clearly upset. "She said it was justified for us to report it. We were concerned because we didn't want to blow things out of proportion."

Ms. McCullough instructed Ms. Walls to save the footage. Ms. Walls, Ms. Hernandez, and Ms. Treadway were concerned about retaliation. Ms. Walls specifically had concern that she had access to the video, and it would disappear.

---

[80] The wrong hotline was called on this date.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **40** of **77**

---

On February 4 or 5, 2026, "They took the camera software off my computer[81]." However, even with this software gone, Ms. Walls had already hid the video footage at issue in a different folder. "I was afraid that would disappear." She was nervous and wanted it to be preserved.

Kristi Cox and Lorrie McClure "had attitude" that a report had been made to licensure, they had concern "we had spoken to licensing," and they wanted to know why they had not been "informed of anything." Ms. Walls recalled responding, "We don't have to inform you when me make a call." Ms. Walls was familiar with trainings about contacting licensure and DHS, and she was aware that she could make these phone calls without any retaliation. She took mandatory training through the Arkansas Registry, and she has also taken ethics training.

Dr. Ginni McDonald did not interact with Ms. Walls at all, this was only Kristi Cox and Lorrie McClure. Ms. Walls did not directly receive indication of retaliation, but indirectly it was relayed to her through Aspen Treadway and Mindy Shaw. Mindy Shaw had spoken with Dr. McDonald about threats of write-ups that "we had become involved at all."

Regarding whether Donna Januchowski had done this before, Ms. Walls did not believe so. She got the sense Donna Januchowski had run out of patience with the students. Often Ms. Januchowski had co-teachers in the classroom. Ms. Walls explained that Kristi Cox is friends with Donna Jacuchowski, and she believes that Ms. Januchowski thought Ms. Cox would "cover for her and they did." Ms. Walls believes Ms. Januchowski was on a slippery slope of "I can get away with it now." Of importance, Ms. Walls explained *if Ms. Januchowski did not have control of the classroom, there are resources of what was to be done. For example, Ms. Januchowski could have called for help and she did not. She had access to a cell phone, she had access to the room phone, and there were multiple people who were available to come to her classroom during that time.*

The incident at issue was first known because Annah Campbell Smith called the office (Ms. Annah has a room adjacent to Donna Januchowski's room), and she stated, "Someone is screaming in the next classroom, and it's waking my kids." Ms. Walls, therefore, sent Ashley McAllister who "went in and broke everything up." Ms. Walls does not know how long this treatment might have continued. Ashley McAllister removed two children and settled them elsewhere. She then informed Lorrie McClure, who was present, that "something is going on in there." She said she saw a teacher with their leg over the back of ███████. Ms. Treadway then said, "Hey, something's going on, we need to look at the cameras."

---

[81] Ms. Walls went to look for the software, and it had been removed (by Baxter) without her knowing.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **41** of **77**

---

It was clear to Ms. Walls that statements were being made that she should not have looked at the video. Ms. Walls has never been told not to look at video of the preschool. She had never been trained on, "these are the only circumstances you can watch video." However, notwithstanding, administration elected to remove the software to allow real-time video watching from her computer, despite the crisis management plan.

Licensing has come to the preschool multiple times, and continues to visit. Over the last few years, when licensing appears at the preschool, administration is not notified. It was relayed to Ms. Walls that error was made by failing to advise administration that licensing was present at the preschool. However, "licensing can go into any classroom and do anything they want when they are there." The staff has never been trained to notify an administrator when licensing was present. Administration had never cared before that licensing was present. However, after licensing appeared for the Donna Januchowski event, administration told the preschool office, "Well, if they come back, you better call us." All of this was relayed from Kristi Cox and from Lorrie McClure.

#### h. INTERVIEW WITH MATT BAXTER

Matt Baxter is the Director of I.T. at the district and has met repeatedly with this investigator every time she was at the district, and he has worked with the investigator over the phone as well.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **42** of **77**

---

Mr. Baxter related that he was asked by Kristi Cox to extract video from the far-off camera in Ms. Januchowski's room. It was requested by Cox to extract 18 minutes of footage from the far off camera[82] only. This request is the only request made to Baxter to remove footage off of the server- and it was done via text (EXHIBIT 6). (Footage rolls off of the server and is no longer kept after 14 days.) The below screenshot, EXHIBIT 6, was sent to Baxter from Cox on Thursday, February 5, 2026, at 2:22 pm. Baxter admittedly made an error and only extracted 6 minutes and 4 seconds of this video. EXHIBIT 3, was extracted by Baxter at the request of Cox, for 13 minutes shorter than requested.

Matt Baxter unilaterally, and without request, also extracted video from Camera 1[83] of Ms. Januchowski's room. EXHIBIT 2 would not exist but for Matt Baxter electing to save both angles of the time at issue. Baxter extracted the close-up Camera 1 from 12:20 to 12:30. (He did not extract to 12:39 as initially requested by Cox.)

When asked why he did not extract the full 18 minutes requested, Mr. Baxter advised that he thought he had done so. When asked why he extracted the additional video, he advised that he did so because there were two cameras in her room, so there was no reason not to.



[82] The far-off camera is "Camera 2" and is with this view:



[83] The close-up camera is "Camera 1 and is with this view:



**CONFIDENTIAL**

*SUMMARY: Cox did not request the video extracted from the room that showed the majority of the actions at issue; she only wanted the video of the far-distance extracted. Baxter extracted both views, but he mistakenly only extracted a portion of the time requested.*

### i. INTERVIEW WITH JERAMIE JEFFREY

On March 10, 2026, this investigator met with Jeramie Jeffrey, who is the head HR at Batesville School District. Ms. Jeffrey did not have knowledge of the January 23, 2026 incident until February 3, 2026. Ms. Jeffrey had no history about the matter, but she was asked by Dr. Ginni McDonald to watch a video to "get my opinion." Ms. Jeffrey did not know there was an incident. She watched a total of "less than five" minutes, from a far away angle. She recalls seeing a video of Ms. Donna Januchowski videoing a child, and multiple kids "scuffling" with Ms. Januchowski. She stated, "There were no obvious signs of abuse." She did not see any indication during the five minutes she reviewed the video that any child was being restrained or held down. In fact, the children were running around the classroom at that time.

When asked why Dr. McDonald wanted Ms. Jeffrey to review the video, she was unsure. She "assumed that I saw it all." While Ms. Jeffrey was in the room with Dr. McDonald, and Dr. McDonald was watching the video, it was discussed what should be done regarding Ms. Donna Januchowski. It was determined that Ms. Januchowski would be terminated, and Ms. Jeffrey agreed with this decision. The video itself stood on its own to back up termination of Ms. Donna Januchowski. *The decision to terminate was made on February 3, 2026, and the letter was hand-delivered to Donna Januchowski on February 4, 2026.*

Ms. Jeffrey explained that Dr. McDonald was concerned that there were persons who "had no business watching the video" who were watching it, and that was at a point that Dr. McDonald herself had not seen the video. This anger was generally at the preschool, and aimed at Ms. Mindy Shaw, Enelyn Hernandez, Aspen Treadway, and Halli Walls. However, there was no anger by Dr. McDonald that anyone had reported. The anger was only limited to showing "the videos," and "not being aware an investigator was there."

After February 3, 2026, Ms. Jeffrey never saw the video again. She did not report to the hotline or licensure.

### j. INTERVIEW WITH DAVID CAMPBELL

This investigator met with Mr. David Campbell multiple times during this investigation. Mr. Campbell reviewed the video the first time in the presence of this investigator.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **44** of **77**

---

### k. INTERVIEW WITH BRENDA BITTLE

Brenda Bittle is an investigator at the Batesville Police Department. The Batesville Police Department has obtained four hotline reports associated with the matter at issue. All four reports are attached hereto as EXHIBIT 20. The first three reports were submitted by Amanda McCullough, and they involve three students: ███████████ (5 years old), ███████████ (5 years old), and ███████ (4 years old). The fourth report was submitted by Enelyn Hernandez on March 4, 2026. Mr. Campbell made a later report involving Ms. Januchowski, but that involves a different student prior to January 23, 2026.

### l. INTERVIEW WITH GINNI MCDONALD

On March 30, 2026, this investigator met with superintendent Dr. Ginni McDonald. Dr. McDonald was represented by Stuart Berger, attorney, who was also present during this conversation. It took some effort to put this meeting on the calendar, presumably because Mr. Berger lives out-of-state and he had to fly in for the appointment. Dr. McDonald was congenial, pleasant, straightforward, and seemingly honest. Her counsel was cooperative and helpful. A summary of the interview, in Dr McDonald's own words, is attached hereto as EXHIBIT 21 and fully incorporated herein.

Dr. McDonald has been with the district since June 1, 2025. She was told on January 23, 2026 that, "There was an issue in Donna J's classroom" by Ms. McClure via phone. McClure advised that McAllister had approached Ms. McClure in "front of the dryers" and that "she said the teacher had a leg over her [sic.] throat." Dr. McDonald recalled saying, "That seems bizarre" and that in her experience "bizarre is true." She asked about the child, who Ms. McAllister had in-hand, and the "kid looked fine." This initial phone call was around lunch.

Dr. McDonald explained that she had memory of Ms. McAllister writing a note to a child's parent because a child had been "choked" in the classroom by another child, and when they looked at the video, it was simply one child pulling the glasses strap of another child, and the result was the strap tugging against the child's neck. There was no actual "choking" occurring[84].

---

[84] It was indicated to this investigator that perhaps Ms. McAllister overreacts to things, and this was an example of the overreaction.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 45 of 77

---

The second phone call was prior to 5:30 pm but late in the afternoon on January 23. This call was from both Ms. Cox and Ms. McClure[85]. When they called back, they indicated they watched the video and that the "actions didn't exactly match what was reported, but they watched the video and there were no injuries, but she held a child by the clothing and there was a 'tone of voice' and loss of classroom management." Ms. Cox and Ms. McClure then indicated that they would create a "plan of action for DonnaJ" and they would "lay out the expectations of what needed to be seen in the classroom." Their intention was to place it so that Ms. Donna J would not be alone. According to McClure, the teacher can only be alone in the classroom when children are asleep, these children weren't asleep, so she should not have been alone.

This investigator asked point blank if Dr McDonald asked if there was a leg over a kid's throat (as they had been told by Ms. McAllister.) Dr McDonald said she was told, "no, that's now what they have seen over the video" and that "what was described did not match the video." McDonald explained that she had "no reason not to trust them. They have experience and they'd never lied to me, so I assumed what they said was correct." She admitted that it "would've alarmed me if I had seen a leg over a throat."

Ms. Cox and Ms. McClure both spoke with Ms. Januchowski on January 23. Dr. McDonald wanted them to "write this up before they left". I.E. Dr. McDonald wanted an immediate write-up of the January 23 events to go into Ms. Januchowski's file. The write-up, EXHIBIT 13, includes areas of concern as listed, "(p)hysically prevent students from getting off their cots to prevent them from running around the classroom at rest time" and "(h)olding students with her arms, by their clothing, and in her lap to prevent them from running around the classroom at rest time". Dr. McDonald does not recall reviewing this write-up until a later date; she entrusted the write-up to Cox and McClure.

Dr. McDonald did not look at any related video on January 23, 2026.

Wednesday, January 28, there were no students attending classes that entire week due to snow. Dr. McDonald worked that week. Dr. McDonald was contacted by Ms. McClure because Ms. McClure received a text from Ms. Shaw. Dr. McDonald does not recall seeing this text, but she does not deny that Ms. McClure showed it to her. The text stated (EXHIBIT 14):

Hey we have a problem with Donna Jan's room. I received an email from a parent and went back and looked at video from her classroom from last

---

[85] Dr. McDonald had placed both Mrs. Cox and McClure, "together to be Shaw." It was McDonald's understanding that Mrs. Cox and Mrs. McClure both had the ability to make all decisions at the preschool while Ms. Shaw was on FMLA leave.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **46** of **77**

___

week and it was bad at nap on Friday. There were only 8 kids and she totally lost control and **was abusing children** and videoing with her phone she never called for help either from her phone or classroom phone she had plenty of time to ask for help, **carry them by their clothes putting her hand over their mouths** when they called for help and **jerking them by their shirts** and **holding them down by putting her foot over their necks** they were saying **you are hurting me and I can't breathe**. I'm sick to my stomach at what I saw. She can't be back in the classroom, this needs immediate action. You need to look at the video and she needs to be let go. I'm shaking I'm so upset.

*Emphasis added.*

Dr. McDonald did not look at any related video on January 28, 2026.

She did not call Ms. Shaw for clarification on January 28, 2026.

Dr. McDonald, on January 28, met with Ms. McClure and Ms. Cox. She did ask whether the letter of write-up would be ready when Ms. Januchowski was back at work, and they advised that it is ready. She did not review it.

On February 3, eleven (11) days after January 23, Mr. Chris Milum, school board member, contacted Dr. McDonald. He said a parent had called him and was concerned "about the employee being there." Mr. Milum asked if she (McDonald) had seen the video, and at that point she had not. "Had Milum not called me, I wouldn't have seen it.⁸⁶" Dr. McDonald explained that, "I needed to be able to say, I've looked at the video and this is what they've seen."

Dr. McDonald on February 3, 2026, reviewed a portion of the video for the first time. Dr. McDonald explained that she did not know how to access video. She does not have a sign-in or password to review video. She is unaware that her computer has the software system to review video. If she needs to look at video, she has Matt Baxter extract it for her, or she asks another person with access to show it to her.

Dr. McDonald then walked to Kristi Cox's office and asked Ms. Cox to pull up the video. While the video was up, she carried on conversations with other persons in the room. She did not ask about how long the video is; she did not ask about how many angles of the room there are; she did not ask for Ms. Cox to expressly show her what Ms. Shaw had referenced in the text message (abuse,

___

[86] Of interest, the morning of February 3, Amanda McCullough with licensing first appeared at the preschool and told the administration there that Ms. Januchowski was no longer allowed to be near children during the licensure investigation.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **47** of **77**

---

jerking, holding down, etc.) She *does* ask Ms. Cox to "show me the video." Dr. McDonald then admittedly *watched 2-3 minutes of the video, and only from the far-off angle*[87]. She denied that she was aware that there was a closer-up angle. She denied watching any more of any video until February 20. However, Dr. McDonald did not go so far as to expressly state that Ms. Cox was "lying by omission" by failing to show her the relevant footage.

During this time, Dr. McDonald called Ms. Shaw on speaker phone and asked her why she thought they should fire "DonnaJ" and Shaw replied, "I fire people for way less." McDonald then asked Ms. Shaw, "did you report to hotline and did you report to licensing" and per McDonald, "she said 'No, I'm on FMLA and you told me I couldn't work' and that made me mad." Ms. Shaw relayed to Dr. McDonald that she was at the school feeding chickens, saw the video, thought it was bad, and then sent the text message about her concern. Dr. McDonald told her that FMLA does not make is to she is not a mandated reporter, "and so I told her she would need to call it in." She then looked at Ms. McClure and Ms. Cox and asked if they reported, "they said they didn't" and she explained that they concluded that the actions didn't warrant reporting. "I told Jeffrey, mandated reporting aside, what I had seen violated district's policies enough to be done with this."

After Dr. McDonald reviewed the 2-3 minutes of the video from the far-off angle, Dr. McDonald determined that there was enough in the video to seek the termination of Ms. Januchowski[88]. Dr. McDonald wanted to terminate Ms. Januchowski, and she only included in the termination letter[89] the concerns that were objective, so that the termination would be clean. "The letter didn't include everything that she did wrong, but, it did include everything that was provable easily, and I felt that was enough to get terminated." She elected not to "argue with them on whether they thought it was endangerment, because there were so many policies I felt she violated."

On February 4, Ms. Cox was to hand-deliver the letter to Ms. Januchowski. On that date, licensing reported to the facility, and the secretaries didn't notify administration of their presence. Dr. McDonald spoke with Ms. Shaw via speakerphone that afternoon in the presence of Ms. Cox, Ms. McClure, and Mr.

---

[87] 14 days had not yet passed at this point, and therefore, one could look at the video from all angles for all relevant times through the software system. The far-off angle can be seen in EXHIBITS 3 and 5. Because no video had been edited or deleted, Ms. Cox and Dr. McDonald would have had access to the entirety of the video available in EXHIBITS 4 and 5.

[88] Dr. McDonald did not indicate that she had a change-of-heart because of the presence of licensing who had sent Ms. Januchowski home, instead, she indicated she her intent was to recommend termination because she saw the video and it changed the recommendation.

[89] EXHIBIT 16

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **48** of **77**

---

Campbell. Shaw initially denied that she knew licensing was present at the preschool facility. Dr. McDonald explained to Ms. Shaw that Ms. Shaw needed to report the matter, and she should not ask someone else to report it.

On February 20, Dr. McDonald "Sent the video to an attorney to ask if we did what we were supposed to do." This is what led her to see what Matt Baxter had extracted and to review the entirety of the footage kept by Baxter[90]. On this date she reviewed the close-up video for the first time, EXHIBIT 2. "I was appalled. I was appalled when I saw the close-up. You could see and hear things you can't see and hear on the far-off video." When asked what she saw and heard that was disturbing, she stated, "the way the children were, her tone of voice, her actions, I thought she was rough with the kids. I felt even though the kids weren't running from her... it's not a room that I would want in the school district I'm supervising. ... she was hitting/patting the back. It kind of sounded like hitting to me. I didn't like it at all." Dr. McDonald explained that, *it made more sense now what had been happening. I understood why licensing (was present)*.

Dr. McDonald was very concerned about the emails and text message she obtained regarding Ms. Januchowski during a prior school year. Those correspondences are attached to her formal statement, EXHIBIT 21.

Dr. McDonald denied threatening anyone or retaliation against any district employee. She did state that, "I told Ms. Shaw ... if she felt that she needed to call in that she should. That's the only thing I directed."

Dr. McDonald requested for Halli Walls to have her video software removed from her computer. She wanted only persons who "you could hold accountable" to have access to the cameras/ footage. There is no known training in the district for video footage review.

Dr. McDonald never made a hotline contact and never called licensure. When expressly asked about that, she stated that "when in doubt – do it" and that was her thought on February 3 when she first watched the video, but, she didn't have the kids' names, and "I'm like 'third away'" and therefore she talked to Ms. Shaw, because it was Ms. Shaw who needed to call it in. "That was the extent of what was discussed."

---

[90] Dr. McDonald did not request for Baxter to keep certain video, although she always informed the persons with the district to provide to BPD those records and things they legally requested.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **49** of **77**

---

Regarding the Brightwheel message on February 23, 2026, EXHIBIT 9, that appears to be signed by McDonald and states, "(e)arlier tonight we were made aware of allegations against a former teacher at the Batesville School District Preschool," Dr McDonald denies she wrote the message. She explained there was a new publicist, Ms. Morrow, who wrote the message on her behalf. The "earlier tonight" in hindsight may appear misleading, but at the time it meant that they had just learned of the possible involvement of the Batesville Police Department and/or criminal allegations.

### m. RELEVANT VIDEO EXTRACTS

Below are extracts from the videos that appear to show or indicate acts that are inconsistent with known statute, rules, or policy. This does not include all acts in the long videos, instead, this is a representative portion thereof.



*Photo A: EXHIBIT 4* - Januchowski went to ▮▮▮▮▮▮▮, grabbed his shirt, and drug him[91] around the classroom (child was swinging by shirt) 12:18:27 PM -

---

[91] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(a) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury)"
Batesville School Policy 8.34 "If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions...the duty... is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm, or substantiate..."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **50** of **77**

---

12:18:35 PM. Eight (8) seconds in total. Ms. Januchowski does not have training on restraint use, because it is inapplicable in the preschool. (A preschool can lose its licensing if restraints are used.)



*Photo B: EXHIBIT 4* – Ms. Januchowski covered the mouth[92] of ███████████ with her left hand in response to his behavior. 12:21:09 PM – 12:21:12 PM. A total of three (3) seconds.

---

Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others".

Ark. Code Ann. § 6-18-2405 (a)(1): "Physical restraint of a student shall be used only be a member of school personnel who is appropriately trained to administer physical restraint except in the case of a clearly unavoidable emergency situation in which a trained member of school personnel is not immediately available due to the unforeseeable nature of the emergency situation."

Ark. Code Ann. § 6-18-2405 (b)(1): "School personnel shall use the least restrictive technique necessary to end imminent danger or serious physical harm to a student and others."

Ark. Code Ann. § 6-18-2405 (g)(2)(ix): "Physical restraint of a student shall not be used to prevent property damage unless the act of damaging property committed by the student poses an imminent danger or serious physical harm to the student and others."

Ark. Code Ann. § 6-18-2405(f)(): "When using physical restraint on a student, school personnel shall use the safest method available and appropriate to the situation"

Ark. Code Ann. § 6-18-2405 (g)(2)(B): "Physical restraint of a student shall not be used unless the behavior of the student poses an imminent danger of serious physical harm to the student or others".

[92] Ark. Code Ann. § 6-18-2405 (b)(2): "The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by school personnel will not prevent imminent danger of serious physical harm to the student or others."

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(c) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: taping or obstructing a child's mouth".

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **51** of **77**



*Photo C: EXHIBIT 4* – Ms. Januchowski's hand was again placed over ███ e
███'s face[93]. 12:21:19 PM – 12:21:26 PM. A total of seven (7) seconds.

---

[93] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(o) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: covering the faces of children with blankets or similar items."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **52** of **77**

---



PHOTO D Zoomed in

*Photo D: EXHIBIT 4* – Januchowski pulled ████████, who was on his cot, up from his cot by his shirt; the child's head seemingly whipped[94].  12:20:51 PM – 12:21:14 PM. Twenty-three (23) seconds in total.

---

[94]Ark. Code Ann. § 6-18-2405 (k) : The use of a technique that is abusive shall be reported to the Child Abuse Hotline and law enforcement.

Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others."

Ark. Code Ann. § 6-18-2405 (g)(2)(B): "Physical restraint of a student shall not be used unless the behavior of the student poses an imminent danger of serious physical harm to the student or others".

Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 8 b. If children do not fall asleep, they shall be allowed to participate in a quiet activity either on their cots, in the area, or in another room under direct supervision."

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(k) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children.  These include, but are not limited to the following: associating punishment with rest..."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **53** of **77**



PHOTO E Zoomed in

*Photo E: EXHIBIT 4* – Januchowski continued to hold and control the child ▮▮▮
▮▮▮▮, and held both hands, with his arms crossed[95] in front of his body. This
is a continued restraint from the prior 12:20 time. 12:21:03 PM.

---

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(i): "Physical restraint of a student shall not be used
in the following manner:  to punish or discipline the student."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(ii): "Physical restraint of a student shall not be used
in the following manner:  to coerce the student."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iii): "Physical restraint of a student shall not be
used in the following manner:  to force the student to comply."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iv): "Physical restraint of a student shall not be used
in the following manner:  to retaliate against the student."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(v): "Physical restraint of a student shall not be used
in the following manner:  to replace the use of an appropriate educational or behavioral support."

[95] Minimum Licensing Requirements for Child Care Centers in Arkansas:  501(5)(a) "The
following activities or threats of such activities are unacceptable as behavior guidance measures
and shall not be used for children.  These include, but are not limited to the following:  a.
Restraints (Restraining a child briefly by holding the child is allowed when the child's actions
place the child or others at risk of injury)"

**CONFIDENTIAL**

Ms. Januchowski stated, "you liar, you lie to me all the time[96]" to ▮▮▮▮▮▮▮ at 12:22:09 PM




PHOTO F Zoomed in

---

[96] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(n) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: shaming, humiliating, frightening, labeling, physically, or mentally harming children".

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(i) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: Yelling (this does not include a raised voice level to gain a child's attention to protect the child from risk of harm.)"

Ark. Code Ann. § 6-18-2405(f)(3): "When using physical restraint on a student, school personnel shall not verbally abuse, ridicule, humiliate, taunt, or engage in any other similar action towards the student."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 55 of 77

Photo F: EXHIBIT 5 – ███████████ n was dragged by the collar[97] of his shirt.
12:23:42 PM – 12:23:46 PM. A total of four (4) seconds.



Photo G: EXHIBIT 4 – This is a different angle of ██ e dragged by the shirt collar.
12:23:44 PM.



Photo H: EXHIBIT 4 – Januchowski controlled ███ s movement by physically
placing him over her left leg and forcing him to lay down[98]. 12:24:19 PM –
12:24:23 PM. This lasted a total of four (4) seconds.

---

[97] Ark. Code Ann. § 6-18-2405 (g)(2)(B): "Physical restraint of a student shall not be used
unless the behavior of the student poses an imminent danger of serious physical harm to the
student or others".

[98] Ark. Code Ann. § 6-18-2405 (d): "Supine restrain shall not be used unless the school
personnel administering the supine restraint has been trained by a person who is certified by a
training program that meets the criteria specified in §6-18-1409; and A person who is certified
by a training program that meets the criteria specified in §6-18-1409 determines that supine
restraint is required to provide safety for the student and others.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **56** of **77**

---



Photo I at 12:25:08                    Photo I at 12:25:09 (child face down)

*Photo I: EXHIBIT 4 –* ▮▮ ▮▮▮▮ s head was forced down with Ms. Januchowski's hand (see top picture, right hand). The child was placed by force into the ground and adjacent to Januchowski's crotch[99], and a blanket was placed over the entirety of the child[100]. From 12:25:00 PM – 12:26:10 PM. This instance of physical restraint lasted for a total of one (1) minute and ten (10) seconds. The child stated, "Help me, help me, somebody help me[101]."

---

[99] The same response should be made of a male child forced adjacent to a female's crotch as would be made if a female child was forced adjacent to a male crotch.

[100] Ark. Code Ann. § 6-18-2405 (h)(5) : "School personnel shall not use the following on a student: prone restraint or restraint that restricts the breathing of a student."

Ark. Code Ann. § 6-18-2405 (k) : "The use of a technique that is abusive shall be reported to the Child Abuse Hotline and law enforcement."

Ark. Code Ann. § 6-18-2405 (b)(2): "The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by school personnel will not prevent imminent danger of serious physical harm to the student or others."

Ark. Code Ann. § 6-18-2405 (f)(): "When using physical restraint on a student, school personnel shall use the safest method available and appropriate to the situation"

[101] Ark. Code Ann. § 6-18-2405 (g)(2)(D)(i) : "Physical restraint of a student shall not be used in the following manner: to punish or discipline the student."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(ii) : "Physical restraint of a student shall not be used in the following manner: to coerce the student."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iii) : "Physical restraint of a student shall not be used in the following manner: to force the student to comply."

Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iv) : "Physical restraint of a student shall not be used in the following manner: to retaliate against the student."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **57** of **77**



*Photo J: EXHIBIT 5 -* ███ is seen at another angle, upside down, and he stated "help me, help me, somebody help me[102]." 12:25:23 PM.

---

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(k) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: associating punishment with rest..."

[102] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(o) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: covering the faces of children with blankets or similar items."

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(c) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: taping or obstructing a child's mouth".

Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 8 b. If children do not fall asleep, they shall be allowed to participate in a quiet activity either on their cots, in the area, or in another room under direct supervision."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **58** of **77**



*Photo K: EXHIBIT 4* – Ms Januchowski grabbed ▮▮▮▮▮ n by the face[103].
12:26:09 PM.



*Photo L: EXHIBIT 4* – Ms Januchowski held ▮▮▮▮▮ n by his clothes to prevent him from leaving her side[104].12:26:35 PM – 12:28:05 PM. This time lasted for a total of one (1) minute and thirty-five (35) seconds.

---

[103] Ark. Code Ann. § 6-18-2405 (b)(2): "The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by school personnel will not prevent imminent danger of serious physical harm to the student or others."

[104] Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **59** of **77**



*Photo M: EXHIBIT 4*- Ms. Januchowski seemingly recorded ▮▮ with her phone[105]. 12:27:05 PM. She held him in place, incapable of leaving her hold, in a supine position.



*Photo N: EXHIBIT 4* – Ms. Januchowski grabbed ▮▮ ▮▮ by the face. 12:30:19 PM – 12:30:20 PM. This instance lasted for a total of one (1) second.

---

[105] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 17. Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian."

Ark. Code Ann. § 6-18-2405 (d): "Supine restrain shall not be used unless the school personnel administering the supine restraint has been trained by a person who is certified by a training program that meets the criteria specified in §6-18-1409; and A person who is certified by a training program that meets the criteria specified in §6-18-1409 determines that supine restraint is required to provide safety for the student and others.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **60** of **77**

---



*Photo O: EXHIBIT 4* – Ms. Januchowski placed her left leg over ████ ; he was face-down[106], and she attempted to record him. 12:28:05 PM – 12:30:32 PM. A total of two (2) minutes and twenty-seven (27) seconds was held in this position.



*Photo P: EXHIBIT 4* – Ms. Januchowski continued to have her left leg over ████ . He was face down[107]. She held his shirt, his right hand, and sometimes his hand and leg. He could not roll over or escape her hold. 12:29:58 PM – 12:30:04 PM. A total of six (6) seconds she was holding his shirt (note the action in the photo of the child trying to leave her hold, and she held to the neck of his shirt.)

---

[106] Ark. Code Ann. § 6-18-2405 (h)(5) : "School personnel shall not use the following on a student: prone restraint or restraint that restricts the breathing of a student."
Ark. Code Ann. § 6-18-2403(22) "'Prone restraint' means restraining a student in a face-down position on the floor or another surface and applying physical pressure to the body of the student to keep the student in the prone position".
Ark. Code Ann. § 6-18-2405 (k) : The use of a technique that is abusive shall be reported to the Child Abuse Hotline and law enforcement.

[107] Batesville School Policy 8.34 "If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions...the duty... is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm, or substantiate..."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **61** of **77**



*Photo Q: EXHIBIT 4 – Ms.* Januchowski held to her both ▮▮ ▮ ▮ (4yo) and ▮ n ▮ n (5yo), together[108]. 12:30:45 PM – 12:34:20 PM. A total of three (3) minutes and thirty-five (35) seconds.



*Photo R: EXHIBIT 4 –* While the other two are still under restraint, the third boy, ▮▮ x ▮▮ s (5yo), was grabbed and restrained[109]. Note how she holds the children through the clothes. All three boys were under restraint from 12:34:38 PM – 12:36:38 PM. A total of two (2) minutes.

Beginning at 12:37:53 PM

- ▮▮ : "we won't get caught."
- Ms. Januchowski: "You're gonna cut me?"
- ▮▮ : "No."
- Ms. Januchowski: "Is that what you said?"
- ▮▮ : "No."
- Ms. Januchowski "I think that's what he said."
- ▮▮ : "he did."

---

[108] Ark. Code Ann. § 6-18-2405 (g)(2)(ix): "Physical restraint of a student shall not be used to prevent property damage unless the act of damaging property committed by the student poses an imminent danger or serious physical harm to the student and others."

[109] Ark. Code Ann. § 6-18-2405(f)(2): "When using physical restraint on a student, school personnel shall use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **62** of **77**

---

- Ms. Januchowski: "He said he was gonna cut me."
- ███████: "No he didn't he said he wasn't gonna get caught"
- Ms. Januchowski "Good. Yeah, you did. You said you were going to cut me. I am going to call the police officer, and you all can all go to jail[110]."
- Ms. Januchowski: "███ just said he was gonna cut me with a knife" 12:38:31 PM



*Photo S: EXHIBIT 4* – Ms. Januchowski placed her leg on the back and neck[111] of ████ █ ████ (5yo) (moving the leg location on the child between back and neck). 12:38:39 PM – 12:39:59 PM. The child was face-down, and stated twice, "I can't

---

[110] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(n) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: shaming, humiliating, frightening, labeling, physically, or mentally harming children".

[111] Ark. Code Ann. § 6-18-2405 (h)(5) : "School personnel shall not use the following on a student: prone restraint or restraint that restricts the breathing of a student."
Ark. Code Ann. § 6-18-2405 (b)(2): "The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by school personnel will not prevent imminent danger of serious physical harm to the student or others."
Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(a) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury)"
Batesville School Policy 8.34 "If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions...the duty... is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm, or substantiate..."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **63** of **77**

---

talk" at both 12:39:22 and 12:39:42. This hold lasted for a total of one (1) minute and twenty (20) seconds.



*Photo T: EXHIBIT 4* – Ms. Januchowski physically laid next to, and partially on top of, ██ e ████ n[112] from 12:40:13 PM – 12:40:16 PM. A total of three (3) seconds.

---

[112] Ark. Code Ann. § 6-18-2405 (d): "Supine restrain shall not be used unless the school personnel administering the supine restraint has been trained by a person who is certified by a training program that meets the criteria specified in §6-18-1409; and A person who is certified by a training program that meets the criteria specified in §6-18-1409 determines that supine restraint is required to provide safety for the student and others.

Ark. Code Ann. § 6-18-2405 (a)(1): "Physical restraint of a student shall be used only be a member of school personnel who is appropriately trained to administer physical restraint except in the case of a clearly unavoidable emergency situation in which a trained member of school personnel is not immediately available due to the unforeseeable nature of the emergency situation."

Ark. Code Ann. § 6-18-2405 (b)(1): "School personnel shall use the least restrictive technique necessary to end imminent danger or serious physical harm to a student and others."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **64** of **77**

---



*Photo U: EXHIBIT 4* – Ms. Januchowski laid beside ▇ ▇ and again physically held him in place from 12:41:37 PM – 12:41:50 PM. A total of thirteen (13) seconds. ▇ was face-down.



*Photo V: EXHIBIT 4* – Ms. Januchowski laid next to ▇ ▇ and placed her right leg over him[113], affecting his ability to move[114].   12:42:36 PM – 12:44:20 PM. A total of one (1) minute and forty-four (44) seconds.

---

[113] The same expectation of a female teacher and a male student should be expected as that of a male teacher with female student.
[114] Ark. Code Ann. § 6-18-2405 (g)(2)(D)(iii) : "Physical restraint of a student shall not be used in the following manner: to force the student to comply."
Ark. Code Ann. § 6-18-2405 (g)(2)(D)(viii) : "Physical restraint of a student shall not be used in the following manner: as a as a convenience for school personnel"

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **65** of **77**



*Photo W: EXHIBIT 4* – Ms. Januchowski placed her hand over ███ ████'s mouth. 12:43:24 PM – 12:43:26 PM. A total of two (2) seconds.



*Photo X: EXHIBIT 5* – Ms. Januchowski, while holding her phone[115], placed her right leg on ████ ████ from 12:48:13 PM - 12:49:46 PM. A total of one (1) minute and forty-three (43) seconds.

---

[115] Minimum Licensing Requirements for Child Care Centers in Arkansas: "400 Program 17. Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian."

Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(k) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: associating punishment with rest..."

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **66** of **77**



*Photo Y: EXHIBIT 5* – Ms. Januchowski held ████, and pulled him by his clothing back into the cot[116]. 12:53:39 PM - 12:53:40 PM. A total of one (1) second.

---

[116] Minimum Licensing Requirements for Child Care Centers in Arkansas: 501(5)(a) "The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following: a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury)"

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **67** of **77**



*Photo Z: EXHIBIT 5* – Ms. Januchowski again  to placed her right leg on top of ▮▮ n from 12:58:09 PM – 12:58:29 PM. A total of twenty (20) seconds.

### IV.    TIMELINE OF FACTS

**January 9, 2026** — Mindy Shaw, preschool director, begins FMLA leave due to surgery. Dr. Ginni McDonald asks Kristi Cox and Lorrie McClure to supervise the preschool in Shaw's absence.

**January 22, 2026** — A student named Landyn is moved out of Donna Januchowski's classroom due to behavioral concerns. Landyn is not in attendance on January 23.

**January 23, 2026, ~12:15–1:00 PM (naptime)** — Donna Januchowski, a lead preschool teacher, engages in a series of inappropriate actions toward students ▮▮ ▮▮, ▮▮ x ▮▮, and ▮▮ n ▮▮ n during naptime. Her conduct includes grabbing children by their shirts, dragging a child across the floor, placing her leg/foot on a child's neck, covering a child's mouth, using a loud and harsh tone, threatening to spank children, and filming children on her personal cell phone. (The child's exact words when Januchowski's foot was on his neck are disputed: Ashley McAllister reported hearing "I can't breathe" however, the close-up video at 12:39 appears to show the child stating "I can't talk.")

**January 23, 2026, during the incident** — Teacher Annah Campbell Smith, in the adjacent room, calls the office because screaming is waking her students. Ashley McAllister is sent to check on the classroom.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **68** of **77**

---

**January 23, 2026, ~12:45–1:00 PM** — McAllister enters the room, sees Januchowski with her foot on ███ █ ████ s neck, and hears ██████ k cry out. She removes ██████ k and ███ from the classroom and reports what she saw to Lorrie McClure.

**January 23, 2026, ~1:00 PM** — Halli Walls returns from lunch. She and Aspen Treadway review the full video footage on Walls' computer and are visibly disturbed. They call Lorrie McClure and Kristi Cox.

**January 23, 2026, afternoon** — Kristi Cox and Lorrie McClure review portions of the video at the district office. (The amount of video reviewed is disputed: McClure consistently stated they watched approximately 10 minutes from the far-off camera angle only; Cox stated they watched 10–16 minutes and that she toggled between both camera angles. Both claim to not have watched through to the point when McAllister entered the room, but Cox also references the actions while McAllister is in the room, so the information is inconsistent.)

**January 23, 2026, ~3:45 PM** — Cox and McClure meet with Januchowski at the preschool. They discuss her conduct — yelling, sarcasm, holding children by clothing, using her leg to restrain students, and phone use — but allow her to return to the classroom. No formal write-up is issued that day, no hotline call is made, and no licensure report is filed. (Whether termination was discussed is disputed: Cox stated there was no discussion of termination on January 23 McClure stated she told Januchowski "If you were my staff I would terminate you based on tone alone" and believed Januchowski should be terminated but lacked support to follow through.

Enelyn Hernandez watches the video.

**January 23, 2026, ~4:40 PM** — Upset that Januchowski was allowed to return to the classroom, Enelyn Hernandez calls what she believes is the child abuse hotline (actually "Save the Children" in Washington, D.C., not the Arkansas Child Abuse Hotline). Aspen Treadway and Halli Walls are present for the call, and also believe they have "hotlined" as a result.

**January 23, 2026, ~10:40 PM** — Hernandez calls the hotline a second time to add notes she had written after re-watching the video. She spent the day crying due to concern over what she saw.

**January 23, 2026, evening** — Dr. McDonald calls Lorrie McClure while she is driving home and asks if things went okay at the preschool. McClure advises that Januchowski was spoken to and would receive a write-up.

**January 26–30, 2026** — School is closed for the entire week due to a major snowstorm. Administrative staff continue to work at the district office. Januchowski does not return to the classroom during this time.

**January 26, 2026** — An email from Gigi Dawson ███ █ ████ s mother) expressing concerns about her child's behavior is sent; Mindy Shaw later sees it.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page 69 of 77

**January 28, 2026** — Mindy Shaw, while on FMLA, physically goes to the empty preschool and reviews the video footage after seeing Gigi Dawson's email. She is visibly shaking and upset. She texts Lorrie McClure stating Januchowski "needs to be let go immediately" and emails both McClure and Kristi Cox.

**January 28, 2026** — Cox responds to Shaw that the situation was "taken care of" on January 23 via a write-up and a plan of action. Shaw is not informed of any mandatory report or licensure contact.

**January 28, 2026** — Dr. McDonald is contacted by "Save the Children" in Washington, D.C. (the entity Hernandez had unknowingly called), which relays information and indicates it will call the Child Maltreatment Hotline. McDonald pushes back, arguing Save the Children had no direct information.

**February 2, 2026** — First day back from inclement weather. All students return to school, including students in Januchowski's classroom. Januchowski returns to the classroom. Cox and McClure meet with Januchowski at 7:30 AM and deliver a formal written write-up based on the January 23 conversation. It is believed that administration thinks the matter is now finalized.

**February 2, 2026** — Preschool staff notice that licensing has not appeared and no DHS follow-up has occurred. They realize the January 23 hotline call went to the wrong number.

**February 3, 2026, morning** — Aspen Treadway and Mindy Shaw independently contact Amanda McCullough (the Independence County licensure contact) directly. McCullough tells Treadway that no DHS report had been received. Shaw also submits a report through the licensure portal that she believes is equivalent to submitting through the Maltreatment/DHS portal.

**February 3, 2026** — Amanda McCullough arrives at the preschool. She interviews Aspen Treadway and Enelyn Hernandez and reviews the full video footage (~40 minutes, both angles) in Halli Walls' office. She is alleged to have had a "visceral, horrified" reaction. McCullough orders that Januchowski can no longer work with children while the investigation is ongoing.

**February 3, 2026, afternoon** — Januchowski leaves the preschool and does not return. She elects to take sick days, citing a recent fall on ice.

**February 3, 2026** — Cox and McClure meet with Dr. McDonald to debrief. Dr. McDonald views the video footage for the first time. She states she does not see "intentional child abuse" but says the teacher should not be in their preschool. Jeramie Jeffrey also views a portion of the video (~5 minutes) and agrees termination is warranted. Jeffrey prepares two letters: one for paid administrative leave, one recommending termination. Dr. McDonald pulls up the child maltreatment regulations on her phone and concludes no hotline call is warranted because "no children were injured." No mandatory hotline report is made by any administrator.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **70** of **77**

---

**February 4, 2026** — Dr. McDonald decides to recommend Januchowski's termination to the school board.

**February 4, 2026, ~6:30 PM** — Kristi Cox drives to Januchowski's home and hand-delivers the termination recommendation letter. Januchowski asks if she can retire instead; Cox refers her to Jeramie Jeffrey. Januchowski subsequently submits her resignation as a retirement.

**February 4, 2026** — DHS hotline reports are formally generated for investigations involving all three children — ██: ████, ██ █ ████ h, and ██ k ██ — with Amanda McCullough listed as the reporter. These are assigned to Arkansas State Police investigators and submitted to the Batesville Police Department.

**February 4 or 5, 2026** — The camera software is removed from Halli Walls' computer at the direction of Dr. McDonald (executed by Matt Baxter), citing a philosophy that "the fewer people possible" should have video access. Walls had already hidden copies of the video footage in a separate folder on her computer as "Training Video".

**February 5, 2026, 2:22 PM** — Kristi Cox texts Matt Baxter requesting extraction of 18 minutes of video from the far-off camera. Baxter erroneously extracts only ~6 minutes and 4 seconds. He independently also extracts footage from the close-up camera angle. (Cox did not request the close-up camera angle, which contained the key image of Januchowski's leg on the child's neck.)

**February 5, 2026** — Kyle Williford from Batesville Police Department comes to the preschool and asks about the video footage. Cox and McClure are not present and instruct staff to "wait on them to do or say anything."

**February 5, 2026** — A phone call occurs with Dr. McDonald, Cox, McClure, David Campbell, and Jeramie Jeffrey. It is alleged by preschool staff that Dr. McDonald threatens to report Aspen Treadway to the board for "causing problems" by contacting licensure. Mindy Shaw defends Treadway, and Dr. McDonald threatens write-ups for breach of confidentiality and camera use. However, it is explained by those present in the room that this retaliation portion of the conversation did not occur.

**February 6, 2026** — State police visit the preschool, observe one of the children involved, and obtain parent contact information. They recommend that I.T. download the video footage.

**February 9, 2026** — Batesville Police Department Investigator Brenda Bittle arrives at the preschool with a search warrant for the video footage. The video is procured from Matt Baxter.

**February 23, 2026, ~7:16 PM** — Dr. McDonald sends a message to preschool parents via Brightwheel stating the district "earlier tonight" was "made aware of allegations against a former teacher" and that the district is cooperating with

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **71** of **77**

---

investigating authorities. The message suggests the district only recently learned of the matter.

**February 26, 2026** — Mindy Shaw returns from FMLA leave at 1:00 PM.

## IV. Analysis

As indicated in the preceding sections of this report, Ms. Januchowski objectively broke multiple rules during nap time of her class on January 23, 2026. There are no restraints allowed per the Minimum Licensing Requirements for Child Care Centers in Arkansas. Under Arkansas statute, restraints are only allowed under limited circumstances, if trained, in certain forms, and only if there's a concern for imminent danger of serious physical harm to the student or others. It cannot be used to prevent property damage, or to act as a means to coerce a student. *Prone restraints, and restraints that restrict breathing are disallowed under all circumstances.*

Ms. Januchowski is not trained in restraints, and cannot legally restrain a child unless absolutely emergent, and even then, she cannot cover a child's head, restrain in the prone position, or affect a child's breathing. Further, there was nothing emergent that occurred during nap time on January 23, 2026.

Ms. Januchowski repeatedly violated statute, violated policy, and violated licensure standards. She dragged children and yanked children by their clothing. She held her lower extremity over a child in the prone restraint, causing him to state, "I can't talk" twice. She spoke sharply with the children, threatening to "call the police officer," and "you all can go to jail." She laid with her leg over a child, and held that same child in an upside down (prone) position, with a leg over him, a hand holding his hands, and a hand holding his right leg. There are no legal circumstances in which this "hold" can occur in a public preschool in Arkansas. There are multiple additional wrongful acts, and many have been pointed out via footnote throughout this report.

The actions of Ms. Januchowski on this date can put the entirety of the preschool in jeopardy of losing its license. Further, because there were statutory violations, and there are possible criminal ramifications to the actions by Ms. Januchowski.

Ms. Januchowski violated statute, violated licensure requirements, and violated policy, but because the inappropriate actions were captured on the classroom's two cameras, the incident itself is not questioned. Instead, the investigator must consider whether the persons adjacent to Ms. Januchowski acted appropriate under the circumstances. The investigator must consider the

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **72** of **77**

---

district and its employees and determine whether further steps should be taken as a result of this investigation.

This report is associated with employees only, and not the superintendent.

### a. KRISTI COX

Ms. Kristi Cox has a copy of the preschool licensure handbook on her desk. She was aware that Ms. Januchowski was unfamiliar with restraints and had not been trained in restraints. She watched the video multiple times from both angles, toggling between the two videos. She knew what was happening in Ms. Januchowski's classroom on January 23. She knew what was expected of Ms. Januchowski. She knew that the person present in the classroom, Ashley McAllister, made the complaint that, "Donna had her leg across a student's neck, choking him[117]."

Ms. Cox, in effort to protect the preschool program at Batesville School District, should have erred on the side of safety and called licensure about this incident.

Ms. Cox, knowing that Ms. Januchowski repeatedly placed more than one child in a 'hold' or 'restraint' on January 23, 2026, should have notified the school district to follow Ark. Code Ann. § 6-18-2407, entitled "Documentation--Notification—Debriefing[118]." This statute requires a written report about every restraint of a child – the report must be made within 24 hours. There is notification to the parent of the student involved, a debriefing meeting within two (2) school days, placing the relevant information in the child's student record, and mailing the report to the parent of the student (among other detailed steps.) None of these steps were taken by Ms. Cox; she did not request for others to take these steps; she did not follow-up with the parents of the children involved.

Policy 3.40 of the Licensed Personnel Duties as Mandated Reporters requires if an employee "has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions to the Arkansas Child Abuse Hotline: by calling 1-800-482-5964 or by submitting a report through the online reporting system. Failure to report suspected child abuse, maltreatment, or neglect through the Hotline can lead to criminal prosecution and individual civil liability of the person who has this duty." It goes on to state, "(t)he duty of mandated reporters to report suspected

---

[117] *See* Cox's interview

[118] This investigator prompted Mindy Shaw to complete these steps after she was back from FMLA leave.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **73** of **77**

---

child abuse or maltreatment ... is a direct and personal duty, and cannot be assigned or delegated to another person."

It is clear from interviewing Ms. Cox that she knows Ms. Januchowski, trusts her, and believes the children were safe at all relevant times. Ms. Cox was seemingly a lovely and knowledgeable person, and this investigator does not doubt that Ms. Cox's experiences with Ms. Januchowski were as stated.

However, Ms. McAllister was physically in the room with a child and Ms. Januchowski, and Ms. McAllister suspected that a child was choked from her in-room experience. She relayed this verbally to Ms. Cox. The video confirms that Ms. Januchowski held a child down in a prone[119] position, with Ms. Januchowski's leg over the child's neck. The child stated, "I can't talk[120]." Notwithstanding the other issues (dragging children by their clothes, performing literally illegal holds,) this one event is enough to rise to the level of *suspicion* to report to the Arkansas Child Abuse Hotline. The Arkansas Child Abuse Hotline does not necessarily have to be confirmed abuse, but only suspicion of abuse. This is the definition of suspicion. Ms. Cox should have reported to the Arkansas Child Abuse Hotline, but she did not.

Ms. Cox only attempted to retain the far-off video that does not show that video of Januchowski's leg over the child's neck while in prone position. A question can be asked whether it was Ms. Cox's intent to cover-up the actions of her friend, Ms. Januchowski, by only seeking to retain the less informative of the two available videos. Dr. McDonald indicated the only video she was shown by Ms. Cox was the "far-off" video, and she questioned whether Ms. Cox was aware of the close-up video[121].

Ms. Cox must follow standards per the Code of Ethics for Arkansas Educators. These are minimum standards of ethical conduct. The relevant standards to Ms. Cox are as follows: Standard 2, "(a)n educator maintains competence regarding his or her professional practice, inclusive of professional and ethical behavior, skills, knowledge, dispositions, and responsibilities relating to his or her organizational position." Standard 3 states, "(a)n educator honestly fulfills reporting obligations associated with professional practices." Ms. Cox was seemingly not competent with relation to how to handle Ms. Januchowski's behaviors. Further she did not complete the basic reporting requirements. In this investigator's opinion standards 2 and 3 were not followed by this educator.

---

[119] All prone holds are per-se illegal in all circumstances.

[120] This is indicative of concern of airway.

[121] Ms. Cox admitted to this investigator that she toggled between the two videos when she watched it.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **74** of **77**

---

Considering these circumstances, it is appropriate to terminate Ms. Cox from her position with the district. An ethics complaint should also be submitted with relation to these concerns of Ms. Cox.

**b.  LORRIE McCLURE**

Lorrie McClure's facts align largely with Ms. Cox's facts, above.  Ms. McClure is not a licensed educator, and therefore she is not responsible to follow the Code of Ethics for Arkansas Educators.  Ms. McClure recalls that Ms. McAllister told her, "I think I saw Ms. Donna Jan choke someone."  However, she did not watch the video to the point where Ms. McAllister would have seen something during nap time on January 23, 2026.  It is difficult for this investigator to understand Ms. McClure's thought process in this regard, because if there had been a fight during nap time, it would not be reasonable to watch the first 10 minutes of class on video and assume that no fight occurred later during the class.  Ms. McClure did not report to the Arkansas Child Abuse Hotline, in violation of statute and school policy.

Notwithstanding, it is unnecessary for this investigator to make recommendations regarding Ms. McClure, because Ms. McClure has elected to take another job and has left her employment in the district.

**c. OTHER STAFF**

Multiple errors were made associated with 'mandatory reporting' at the district.  In Arkansas, mandatory reporters (also called mandated reporters) are certain professionals required by law (under the Arkansas Child Maltreatment Act, primarily Arkansas Code § 12-18-402) to report suspected child maltreatment. This includes abuse, neglect, sexual abuse, sexual exploitation, or abandonment.  All employees of school districts are mandatory reporters.

If a mandatory reporter has reasonable cause to suspect that a child has been subjected to child maltreatment, or if they observe a child being subjected to conditions or circumstances that would reasonably result in child maltreatment, they must immediately notify the Arkansas Child Abuse Hotline. Mandated reporters in Arkansas may either (1) call the Arkansas Child Abuse Hotline 1-800-482-5964, or (2) submit reports online through the secure Arkansas Mandated Reporter Portal at mandatedreporter.arkansas.gov. Anonymous reports are not accepted.  In order to comply with the law, the mandated reporter must _herself_ report immediately to one of the two options provided above.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **75** of **77**

Based on interviews of March 3, 2026, Enelyn Hernandez, Aspen Treadway, and Halli Walls believed they were compliant with the Arkansas Child Maltreatment Act and school policy because they "called the hotline." The hotline that was called was the "Save the Children" hotline from a poster in the school; it had a phone number of 1-844-287-1892. This phone number is not associated with the child abuse hotline, does not forward to law enforcement, and it does not submit information to Arkansas Department of Education licensing. Further these three people entered the information as "anonymous." An "anonymous" report to the hotline is historically considered noncompliant with the Child Maltreatment Act. Thus, Hernandez[122], Treadway, and Walls were of the information and belief that they correctly "called the hotline" when they did not.

Ms. Mindy Shaw indicated she notified "licensing" through the "portal" to report the January 23, 2026, incident. The licensing portal is associated with the Arkansas Department of Education and goes to Child Care Centers Licensing (now associated with the Arkansas Department of Education.) The licensing portal is *not* the DHS Hotline portal (per Amanda McCullough who is the licensing compliance officer for the Department of Education Licensing for Child Care Centers in Independence County, Arkansas.) Thus, technically, in order to be compliant with the statute, one must report directly to the DHS Hotline through one of the two options referenced above, and not the "licensing portal[123]." Ms. McCullough indicated that the DHS and ADE do share information, but that information is not *always* shared.

Ashley McAllister was of the understanding and belief that she "reported" because she told Lorrie McClure of the incident, and she was of the assumption that Ms. McClure reported on her behalf[124].

This investigator obtained four total DHS reports from Batesville Police Department. These were emailed to this investigator by Brenda Bittle and attached hereto as EXHIBIT 20. Three of the four reports were "reported[125]" by Amanda McCullough, as "Child Advocacy/Child Safety Center Employee".

---

[122] Hernandez later made a report on March, 4, 2026, see EXHIBIT 20.

[123] As we know from the documents received from Investigator Bittle, if one reports through the licensing portal, then the licensing employee who reviews the information reports to DHS. The documentation in the report received by Batesville Police Department is that Amanda McCullough reported the incident and not Mindy Shaw who reported to McCullough. Shaw's name is not found in the DHS report entered by McCullough.

[124] It is important to note that, per the statute, asking someone else to report to DHS is not compliant with the law.

[125] The "reporter information" line-item on the document states the reporter was Amanda McCullough, although both Shaw and Treadway deem themselves the reporter, because they gave the information to McCullough for the purpose of reporting to the hotline.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **76** of **77**

---

McCullough turned in one report for each child involved: ████ x ████; ████ n; ████ ████. Enelyn Hernandez reported through the hotline on March 4, 2026. Lawfully, there should be one or more reports submitted to DHS from each person who has knowledge of the incident(s). In other words, there should be a DHS report form submitted by every substantive witness interviewed in this case including but not limited to: Hernandez[126], Treadway, Walls, Shaw, McAllister, Cox, McClure, and McDonald.

It is this investigator's opinion that the persons at the district, with knowledge of the matter, fall into two categories. There is a category of persons who thought they reported appropriately, wanted the matter reported and investigated, but seemed to fall short as to the technicalities of reporting. This category consists of Mindy Shaw, Halli Walls, Aspen Treadway, and Ashley McAllister[127].

The second category of persons are those who believe that reporting was not appropriate under the circumstances. The second category consists of Ginni McDonald, Lorrie McClure, and Kristi Cox. Ms. Cox and Ms. McClure are addressed above. Dr. McDonald will be addressed in a separate document.

Mindy Shaw, Halli Walls, Aspen Treadway, and Ashley McAllister should be written up for failing to *appropriately* follow the Mandatory Reporting Statute, and failing to *correctly* follow the district policy. This investigator understands that this failure was due to mistake, however, it occurred and their employment file should reflect this. This investigator also suggests that these persons should also be praised for attempting to do the right thing. It would have been the easier choice by these persons to not report; they had concerns of retaliation as a result, and these persons should be reassured that retaliation is not legal and will not be supported by the district.

## V. Additional Recommendations

This investigator believes it necessary to remove the "Save the Children" posters and any other posters that refer to an abuse hotline that is not the Arkansas Child Abuse Hotline. These posters were confusing. It would also be wise to place the correct hotline number in the places where an employee under

---

[126] Hernandez is the only district employee who *correctly* reported. This was on March 4, 2026.

[127] Enelyn Hernandez did report. David Campbell and Jeramie Jeffrey did not have enough information one way or the other to make a decision about reporting. Campbell reviewed the footage the first time with this investigator; Jeffrey watched the footage for a few minutes before she went to prepare the H.R. letters associated with Januchowski's second round of discipline.

**CONFIDENTIAL**

Mr. David Campbell
April 2, 2026
Page **77** of **77**

_____

stress or duress could make a phone call without having to research the correct number.

Serious and considerable education should be completed in this district about the correct way to notify the Child Abuse Hotline, and under what circumstances the hotline should be notified. *Specifically, this is a non-delegable duty, and only ONE number may be called, and ONE portal may be used.* Here there was repeated failure in application. Specifically, Ashley McAllister's statement that she was a mandatory reporter, and therefore she only needed to tell Ms. McClure, is objectively wrong and may well be mirrored by many other employees of the district.

It would be wise of the district to place the software associated with viewing live camera footage back into office 205 of the preschool, so that the Crisis and Risk Management Plan in the preschool can be followed. If the district wants to limit access to archived camera footage to only certain circumstances, then the district should prepare policies and training in that regard.

This investigator praises the district, and Mr. David Campbell, for their willingness to objectively investigate, follow-up by taking difficult steps as a result of this investigation, and pivot to improve the district as a result of this occurrence. Doing the right thing is never easy.

Respectfully submitted,

Mary Carole Young

MCY/cmc
Attachments

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 1


**EXHIBIT 1- Report to Campbell**

**I.    Relevant Rules**

**A.  STATUTORY**

**The Child Maltreatment Act** identifies Mandatory Reporters in Section 12-18-402.  It states in part:

Ark. Code Ann. § 12-18-402:

(a) An individual listed as a mandated reporter under subsection (b) of this section shall immediately notify the Child Abuse Hotline if he or she:

(1) Has reasonable cause to suspect that a child has:
  (A) Been subjected to child maltreatment[1];
  (B) Died as a result of child maltreatment; or
  (C) Died suddenly and unexpectedly; or

(2) Observes a child being subjected to conditions or circumstances that would reasonably result in child maltreatment.

(b) The following individuals are mandated reporters under this chapter: ...
(22) A full-time or part-time employee of a public school or private school, including without limitation:
  (A) A school counselor;
  (B) A school official;
  (C) A teacher;
  (D) A coach or director of a public or private athletic organization, team, or club; and
  (E) A coach or director of a public or private nonathletic organization, team, or club;
 (23) A person who is at least twenty-one (21) years of age and volunteers in a public school or private school:
  (A) As a coach or director of a public or private athletic organization, team, or club; or

---

[1] The term "child maltreatment" is defined in Ark, Code Ann. §12-18-103 "Definitions."  It states "'child maltreatment' means abuse, sexual abuse, neglect, sexual exploitation, or abandonment".

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 2

(B) As a coach or director of a public or private nonathletic organization, team, or club;

(c)(1) A privilege or contract shall not prevent a person from reporting child maltreatment when he or she is a mandated reporter and required to report under this section.

(2) An employer or supervisor of an employee identified as a mandated reporter shall not prohibit an employee or a volunteer from directly reporting child maltreatment to the Child Abuse Hotline.

(3) An employer or supervisor of an employee identified as a mandated reporter shall not require an employee or a volunteer to obtain permission or notify any person, including an employee or a supervisor, before reporting child maltreatment to the Child Abuse Hotline.

(d) A mandated reporter who in good faith notifies the Child Abuse Hotline in accordance with subsection (a) of this section is immune from civil and criminal liability.

Ark. Code Ann. § 12-18-103:

(3)(A) "Abuse" means any of the following acts or omissions by a parent, guardian, custodian, foster parent, person eighteen (18) years of age or older living in the home with a child whether related or unrelated to the child, or any person who is entrusted with the child's care by a parent, guardian, custodian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, childcare facility, public or private school, a significant other of the child's parent, or any person legally responsible for the child's welfare, but excluding the spouse of a minor:

(i) Extreme or repeated cruelty to a child;

(ii) Engaging in conduct creating a realistic and serious threat of death, permanent or temporary disfigurement, or impairment of any bodily organ;

(iii) Injury to a child's intellectual, emotional, or psychological development as evidenced by observable and substantial impairment of the child's ability to function within the child's normal range of performance and behavior;

(iv) Any injury that is at variance with the history given;

(v) Any nonaccidental physical injury;

(vi) Any of the following intentional or knowing acts, with physical injury and without justifiable cause:

(a) Throwing, kicking, burning, biting, or cutting a child;

(b) Striking a child with a closed fist;

(c) Shaking a child; or

(d) Striking a child on the face or head;

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 3

(vii) Any of the following intentional or knowing acts, with or without physical injury:

    (a) Striking a child six (6) years of age or younger on the face or head;

    (b) Shaking a child three (3) years of age or younger;

    (c) Interfering with a child's breathing;

    (d) Pinching, biting, or striking a child in the genital area;

    (e) Tying a child to a fixed or heavy object or binding or tying a child's limbs together;

...

    (B)(i) The list in subdivision (3)(A) of this section is illustrative of unreasonable action and is not intended to be exclusive.

    (ii) No unreasonable action shall be construed to permit a finding of abuse without having established the elements of abuse.

(C)(i) "Abuse" does not include physical discipline of a child when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining or correcting the child.

    (ii) "Abuse" does not include when a child suffers transient pain or minor temporary marks as the result of an appropriate restraint if:

    (a) The person exercising the restraint is:

        (1) An employee of a child welfare agency licensed or exempted from licensure under the Child Welfare Agency Licensing Act, § 9-28-401 et seq.; and

        (2) Acting in his or her official capacity while on duty at a child welfare agency licensed or exempted from licensure under the Child Welfare Agency Licensing Act, § 9-28-401 et seq.;

        (b) The child welfare agency has policy and procedures regarding restraints;

        (c) No other alternative exists to control the child except for a restraint;

        (d) The child is in danger or hurting himself or herself or others;

        (e) The person exercising the restraint has been trained in properly restraining children, de-escalation, and conflict resolution techniques;

        (f) The restraint is for a reasonable period of time; and

        (g) The restraint is in conformity with training and child welfare agency policy and procedures.

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 4

(iii) Reasonable and moderate physical discipline inflicted by a parent or guardian does not include any act that is likely to cause and which does cause injury more serious than transient pain or minor temporary marks.
(iv) The age, size, and condition of the child and the location of the injury and the frequency or recurrence of injuries shall be considered when determining whether the physical discipline is reasonable or moderate;

The statute associated with **Student Restraints in Public Schools or Education Settings,** Title 6 Chapter 18 is stated in part below.

Arkansas Code Annotated  6-18-2405

Physical restraint

(a)(1) Physical restraint of a student shall be used only by a member of school personnel who is appropriately trained to administer physical restraint except in the case of a clearly unavoidable emergency situation in which a trained member of school personnel is not immediately available due to the unforeseeable nature of the emergency situation.

(2) If an incident occurs in which a trained member of school personnel is not immediately available due to the unforeseeable nature of the emergency situation, a school district shall:

(A) Reevaluate the training needs of school personnel in the school district;

(B) Reevaluate the physical restraint policy and practices of the school district; and

(C) Develop a plan to prevent a future incident.

...

(b)(1) School personnel shall use the least restrictive technique necessary to end imminent danger or serious physical harm to a student and others.

(2) The ability of a student to communicate shall not be restricted unless the use of a less restrictive technique by

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 5

school personnel will not prevent imminent danger of serious physical harm to the student or others.

(c)    When using a crisis intervention procedure or technique, school personnel shall consider the health and safety of a student, including without limitation whether the student has an existing medical condition that makes the use of physical restraint inadvisable.

(d)    Supine restraint shall not be used unless:

(1) The school personnel administering the supine restraint has been trained by a person who is certified by a training program that meets the criteria specified in 5 6-18-2409; and

(2) A person who is certified by a training program that meets the criteria specified in $ 6-18-2409 determines that supine restraint is required to provide safety for the student and others.

(e)  If physical restraint is used on a student, the student shall be continuously and visually observed and monitored while he or she is under physical restraint.

(f)  When using physical restraint on a student, school personnel shall:

(1) Use the safest method available and appropriate to the situation;

(2) Use the amount of force that is reasonably necessary to protect a student or others from imminent danger of serious physical harm to the student or others; and

(3) Not verbally abuse, ridicule, humiliate, taunt, or engage in any other similar action towards the student.

(g)  Physical restraint of a student shall:

(1) Be used for a limited period of time; and

(2) Not be used:

EXHIBIT 1
Batesville School District
Report to Campbell
April 2, 2026
Page 6

    (A) When imminent danger or serious physical harm to the student or others dissipates or a medical condition occurs that puts the student at risk of harm;

    (B) Unless the behavior of the student poses an imminent danger of serious physical harm to the student or others;

    (C) After the threat of imminent danger of serious physical harm to the student or others dissipates; or

    (D) In the following manner:

        (i) To punish or discipline the student;

        (ii) To coerce the student;

        (iii) To force the student to comply;

        (iv) To retaliate against the student;

        (v) To replace the use of an appropriate educational or behavioral support;

        (vi) As a routine safety measure;

        (vii) As a planned behavioral intervention in response to behavior of the student that does not pose an imminent danger of serious physical harm to the student or others;

        (viii) As a convenience for school personnel; or

        (ix) To prevent property damage unless the act of damaging property committed by the student poses an imminent danger or serious physical harm to the student and others.

  (h) School personnel shall not use the following on a student:

...

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 7

(5) Prone restraint or other restraint that restricts the breathing of a student.

...

(j) A functional behavior assessment shall be conducted following the first incident of physical restraint used on a student unless a previous functional behavior assessment was conducted for the same behavior that was at issue when the physical restraint was used.

(k) The use of a technique that is abusive shall be reported to the Child Abuse Hotline and law enforcement.

§ 6-18-2407. Documentation--Notification--Debriefing

After the occurrence of an incident involving physical restraint of a student, school personnel involved in the incident shall:

(1)(A) Document the incident in a written report within twenty-four (24) hours after the incident occurred.

(B) A written report of the incident shall:

(i) Include all information contained in the Physical Restraint or Seclusion Incident Record and Debriefing Report provided by the Division of Elementary and Secondary Education; and

(ii) Be maintained in the education record of the student on whom physical restraint was used.

(C) A copy of the report shall be provided to the parent of the student on whom physical restraint was used within one (1) school day of the completion of the report;

(2) Notify the:

(A) Principal of the school or another designated building administrator of the incident as soon as possible but no later

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 8

than the end of the school day on which the incident occurred;

(B)(i) Parent of the student on whom physical restraint was used via verbal or electronic communication as soon as possible but no later than the end of the school day on which the incident occurred.

(ii) If the parent of the student on whom physical restraint was used cannot be notified via verbal or electronic communication within twenty-four (24) hours after the incident occurred, the parent shall be mailed written notification of the incident within forty-eight (48) hours after the incident occurred; and

(3)(A) Hold a debriefing meeting within two (2) school days after the incident occurred.

(B) The following school personnel shall be present at a debriefing meeting:

(i) A member of school personnel who was present during the incident;

(ii) A member of school personnel who was in the proximity of the student on whom physical restraint was used immediately before and during the time of the incident;

(iii) A school administrator; and

(iv) Any other member of school personnel determined to be appropriate by the school district.

(C) The purpose of the debriefing meeting shall be to:

(i) Determine whether the procedures used during the incident were necessary;

(ii) Evaluate the use of any behavioral supports and de-escalation techniques by school personnel before and during the incident; and

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 9

(iii) Evaluate the school district's behavioral intervention procedures and prevention techniques in order to minimize future use of physical restraint.

(D) At a debriefing meeting, school personnel shall:

(i) Consider relevant information in the education record of the student on whom physical restraint was used, including without limitation the concerns of the parent of the student and the student's social and medical history, functional behavior assessment, and behavior intervention plan;

(ii) Consider relevant information from the teachers, parents, and other professionals employed with the school district;

(iii) Discuss whether behavioral intervention procedures adopted by the school district were appropriately implemented;

(iv) Discuss the duration and frequency of the use of physical restraint on the student;

(v) Discuss appropriate action that may be taken to prevent and reduce the need for physical restraint;

(vi) Consider whether additional intervention and support is necessary for the student on whom physical restraint was used;

(vii) Consider whether additional intervention and support is necessary for school personnel; and

(viii) Consider how and when to debrief a person who was not present at the debriefing meeting, including without limitation the student on whom physical restraint was used, the parent of the student on whom physical restraint was used, and any witnessed the incident.

EXHIBIT 1
Batesville School District
Report to Campbell
April 2, 2026
Page 10

(E)(i) The Physical Restraint or Seclusion Incident Record and Debriefing Report provided by the division or an alternative report that includes the same information as in the Physical Restraint or Seclusion Incident Record and Debriefing Report shall be completed during the debriefing meeting and filed with a designated administrator of the school district.

(ii) A copy of the report completed under subdivision (3)(E)(i) of this section shall be mailed to the parent of the student on whom physical restraint was used within two (2) days of the date on which the debriefing meeting was held.

(F) All documentation used during the debriefing meeting shall be maintained as part of the education record of the student on whom physical restraint was used.

Arkansas Code Annotated § 6-18-2403.

Definitions as used in this subchapter:

...

(6) "Crisis" means a situation in which a student engages in a behavior that threatens the health and safety of the student or others and includes without limitation a situation in which the student becomes aggressive or violent at school and is unable to regain self-control without posing a danger of injury to himself or herself or others;

(7) "Crisis intervention" means the implementation of a service, support, or strategy to:

(A) Immediately stabilize a crisis; and

(B) Prevent the crisis from reoccurring after the crisis ends;

(8) "Crisis Intervention Training Program" means a program that:

(A) Provides training using effective evidence-based practices in:

(i) The prevention of the use of physical restraint on a student;

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 11

    (ii)    Keeping school personnel and students safe when using physical restraint on a student in accordance with the law;

    (iii)    The use of data-based decision-making, evidence-based positive behavioral intervention and support, safe physical escort, conflict prevention, behavioral antecedents, a functional behavior assessment, challenging behavior de-escalation, and conflict management; and

    (iv)    First aid, including without limitation recognizing the signs of medical distress and administering cardiopulmonary resuscitation; and

...

(9)(A) "Dangerous behavior" means the behavior of a student that presents an imminent danger of serious physical harm to the student or others.

  (B) "Dangerous behavior" does not include the following types of inappropriate behavior:

    (i)    Disrespect;

    (ii)    Noncompliance;

    (iii)    Insubordination; or
    (iv)    Destruction of property that does not create an imminent danger;

...

(11)    "De-escalation" means the use of a behavior management technique that helps a student increase his or her control over his or her emotions and behavior and results in a reduction of a present or potential level of danger that in turn reduces the level of imminent danger of serious physical harm to the student or others;

...

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 12

(14) "Imminent danger" means an existing dangerous situation that could reasonably be expected to immediately cause death or serious physical harm;

(15) "Incident" means an event or occurrence;

(16) "Individualized Education Program" means a written plan for a student with a disability that is developed, reviewed, and revised in accordance with federal and state laws and regulations;

...

(20) "Physical escort" means a temporary touching or holding of the hand, wrist, arm, shoulder, or back of a student for the purpose of redirecting or inducing the student to move to a safe location;

(21)(A) "Physical restraint" means a personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arm, leg, or head freely.

(B) "Physical restraint" does not include a physical escort;

(22) "Prone restraint" means restraining a student in a face-down position on the floor or another surface and applying physical pressure to the body of the student to keep the student in the prone position;

(23) "Punishment" means an action that:

(A) May follow an inappropriate behavior of a student;

(B) Is taken with the goal of decreasing, stopping, or eliminating the future reoccurrence of the inappropriate behavior of the student;

...

(25) "Serious physical harm" means bodily injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty;

...

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 13

(28)  "Supine restraint" means the restraint of a student in a face-up position on his or her back on the floor or another surface and with physical pressure applied to the body of the student to keep the student in the supine position.

## B.  LICENSING

Preschool centers in Arkansas public schools must follow the **Minimum Licensing Requirements for Child Care Centers** as adopted by the Arkansas Department of Education and drafted by the Arkansas Department of Human Services.  Licensing requirements provide in part the following.

### 400 PROGRAM
### 401 Program Requirements for all ages

...

17.  Photos or video recordings shall not be made of any child without prior written permission from the child's parent or guardian.

### 500 BEHAVIOR GUIDANCE
### 501 Behavior Guidance Requirements

1.  Behavior guidance shall be:

    a.  Individualized and consistent for each child;
    b.  Appropriate to the child's level of understanding;
    c.  Directed toward teaching the child acceptable behavior and self- control. See Division website for recommended behavior guidance training.

2.  Physical punishment shall not be administered to children.

...

5.  The following activities or threats of such activities are unacceptable as behavior guidance measures and shall not be used for children. These include, but are not limited to the following:

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 14

a. Restraints (Restraining a child briefly by holding the child is allowed when the child's actions place the child or others at risk of injury);

...

c. Taping or obstructing a child's mouth;

...

e. Profane or abusive language;

...

i. Yelling (This does not include a raised voice level to gain a child's attention to protect the child from risk of harm);

...

k. Associating punishment with rest, toilet training, or illness;

...

n. Shaming, humiliating, frightening, labeling, physically, or mentally harming children; and

o. Covering the faces of children with blankets or similar items.

## C. INTRA-DISTRICT POLICIES

Batesville School District has policies for its employees. Two key policies are provided below.

### 3.40 LICENSED PERSONNEL DUTIES AS MANDATED REPORTERS

It is the statutory duty of school district employees to:

If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions to the Arkansas Child Abuse Hotline: by calling 1-800-482-5964 or by submitting a report through the online reporting system. Failure to report suspected child abuse, maltreatment, or neglect through the Hotline can lead to criminal prosecution and individual civil liability of the person who has this duty.

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 15

Notification of local or state law enforcement does not satisfy the duty to report; only notification by means of the Child Abuse Hotline discharges this duty.

...

The duty of mandated reporters to report suspected child abuse or maltreatment or serious and imminent threats to the public is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm or substantiate statements a student may have made which form the basis of the reasonable cause to believe that the student may have been abused or subjected to maltreatment by another person or that form the basis of the serious and imminent threat to the public; however, a person with a duty to report may find it helpful to make a limited inquiry to assist in the formation of a belief that child abuse, maltreatment, or neglect has occurred,; that a serious and imminent threat to the public exists; or to rule out such a belief. Employees and volunteers who notify the Child Abuse Hotline or who report serious and imminent threats to the public to law enforcement in good faith are immune from civil liability and criminal prosecution.

By law, no school district or school district employee may prohibit or restrict an employee or volunteer from directly reporting suspected child abuse, or maltreatment, or a serious and imminent threat to the public, or require that any person notify or seek permission from any person before making a report to the Child Abuse Hotline or law enforcement.

Last Revised: June 19, 2023

### 8.34 CLASSIFIED PERSONNEL DUTIES AS MANDATED REPORTERS

It is the statutory duty of school district employees to:

If the employee has reasonable cause to suspect child abuse or maltreatment, then the employee shall directly and personally report these suspicions to the Arkansas Child Abuse Hotline: by calling 1-800-482-5964 or by submitting a report through the online reporting system. Failure to report suspected child abuse,

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 16

maltreatment, or neglect through the Hotline can lead to criminal prosecution and individual civil liability of the person who has this duty. Notification of local or state law enforcement does not satisfy the duty to report; only notification by means of the Child Abuse Hotline discharges this duty.

...

The duty of mandated reporters to report suspected child abuse or maltreatment or serious and imminent threats to the public is a direct and personal duty, and cannot be assigned or delegated to another person. There is no duty to investigate, confirm or substantiate statements a student may have made which form the basis of the reasonable cause to believe that the student may have been abused or subjected to maltreatment by another person or that form the basis of the serious and imminent threat to the public; however, a person with a duty to report may find it helpful to make a limited inquiry to assist in the formation of a belief that child abuse, maltreatment, or neglect has occurred; that a serious and imminent threat to the public exists; or to rule out such a belief.

Employees and volunteers who notify the Child Abuse Hotline or who report serious and imminent threats to the public to law enforcement in good faith are immune from civil liability and criminal prosecution.

By law, no school district or school district employee may prohibit or restrict an employee or volunteer who is a mandated reporter from directly reporting suspected child abuse, maltreatment, or a serious and imminent threat to the public, or require that any person notify or seek permission from any person before making a report to the Child Abuse Hotline or law enforcement.

Last Revised: June 19, 2023

**EXHIBIT 1**
Batesville School District
Report to Campbell
April 2, 2026
Page 17

### D. CODE OF ETHICS FOR ARKANSAS EDUCATORS

The Code of Ethics for Arkansas Educators defines minimum standards of ethical conduct for all of the district's certified employees.

#### Standard 2
An educator maintains competence regarding his or her professional practice, inclusive of professional and ethical behavior, skills, knowledge, dispositions, and responsibilities relating to his or her organizational position.

#### Standard 3
An educator honestly fulfills reporting obligations associated with professional practices.

## 30 Month Classroom Incident 5/15/25

janell_1996@icloud.com Janell Scribner                   Thursday, May 15, 2025 at 8:40:07 AM Central Daylight Time
To: tkjames@gobsd1.org
Cc: mshaw@gobsd1.org

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

tkjames@gobsd1.org Dr. Kenneth James                    Thursday, May 15, 2025 at 8:43:21 AM Central Daylight Time
To: janell_1996@icloud.com Janell Scribner
Cc: mshaw@gobsd1.org

Ms. Scribner: Thank you so much for your note and for bringing this to my attention. I will follow-up with Ms. Shaw.

Ken James

On Thu, May 15, 2025 at 8:40 AM Janell Scribner <janell_1996@icloud.com> wrote:
Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

tkjames@gobsd1.org Dr. Kenneth James                    Thursday, May 15, 2025 at 8:44:02 AM Central Daylight Time
To: mshaw@gobsd1.org Mindy Shaw

EXHIBIT A

Mndy: Please keep me posted., I am hearing too much on this individual.

Ken

————— Forwarded message ————
From: Janell Scribner <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM
Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

**mshaw@gobsd1.org Mindy Shaw**                    Thursday, May 15, 2025 at 8:49:08 AM Central Daylight Time
To: tkjames@gobsd1.org Dr. Kenneth James

I will pull cameras and let you know what I find.

Mindy



**Mindy Shaw**
Batesville and Sulphur Rock
Director

☎ (870) 793-0630 ext. 5010
✉ mshaw@gobsd1 org
🌐 batesvilleschools com

On Thu, May 15, 2025 at 8:44 AM Dr. Kenneth James <tkjames@gobsd1.org> wrote:
  Mndy: Please keep me posted., I am hearing too much on this individual.

  Ken

---------- Forwarded message ----------
From: **Janell Scribner** <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM
Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where It was coming from, to which I found was In fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unaccceptable and unprofessional towards children, parents, and staff.

**tkjames@gobsd1.org Dr. Kenneth James**              Thursday, May 15, 2025 at 8:50:07 AM Central Daylight Time
To: mshaw@gobsd1.org Mindy Shaw

Thanks

On Thu, May 15, 2025 at 8:49 AM Mindy Shaw <mshaw@gobsd1.org> wrote:
I will pull cameras and let you know what I find.

Mindy



**Mindy Shaw**
Batesville and Sulphur Rock
Director

☎ (870) 793-0630 ext. 5010
✉ mshaw@gobsd1.org
🌐 batesvilleschools com

On Thu, May 15, 2025 at 8:44 AM Dr. Kenneth James <tkjames@gobsd1.org> wrote:
Mndy: Please keep me posted , I am hearing too much on this individual.

Ken

---------- Forwarded message ----------
From: **Janell Scribner** <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM

Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**mshaw@gobsd1.org Mindy Shaw**                        Thursday, May 15, 2025 at 5:23:43 PM Central Daylight Time
To: janell_1996@icloud.com Janell Scribner, tkjames@gobsd1.org Dr. Kenneth James

Thank you for bringing this to my attention, this has been taken care of and will not happen again. In the future please let me know about incidents as I cannot fix what I don't know.

Thank you!
Mindy Shaw



**Mindy Shaw**
Batesville and Sulphur Rock
Director

☎ (870) 793-0630 ext. 5010
✉ mshaw@gobsd1.org
🌐 batesvilleschools.com

On Thu, May 15, 2025 at 8:40 AM Janell Scribner <janell_1996@icloud.com> wrote:
Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.

Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

**10:10**    .ıl 5G 72



Janell ›
Newark, AR

Can you send Dr James
email and Mindy

tkjames@gobsd1.org
mshaw@gobsd1.org

There was an incident this morning that I feel you
need to be made aware of. My daughter is in the 30
month classroom and as I was walking her into her
classroom at approximately 8:00 am this morning I
heard yelling as we approached the door. I waited
just a moment to see where it was coming from, to
which I found was in fact my daughters classroom. I
heard Ms. Donna Januchowski yelling at a child and
telling Ms. Jovi Cox she "has told him to quit crying
three times and he is being HIDEOUS." I opened the
door and Ms. Donna turned around to us. She
greeted us with "good morning" as if she hadn't
been yelling just seconds ago. She mentioned she
"had to get breakfast". The young boy (2 years old)
that she had been yelling at was sitting on the floor,
still someonewhat crying. Ms. Jovi Cox assited him
into a chair. I believe I heard him crying for his
mama but I cannot say for certain. Once Donna
exited the room I asked preschool teacher, Jovi Cox,
(who was in the room through the entire incident) if
Donna always ta... st a moment to see where it was coming from, to
which I found was in fact my daughters classroom. I

received from
C.S.
2/5/26

EXHIBIT B

WAIT, ALWAYS. Another witness



heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.

Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have



iMessage

## 30 Month Classroom Incident 5/15/25

**janell_1996@icloud.com Janell Scribner**        Thursday, May 15, 2025 at 8:40:07 AM Central Daylight Time
To: tkjames@gobsd1.org
Cc: mshaw@gobsd1.org

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**tkjames@gobsd1.org Dr. Kenneth James**        Thursday, May 15, 2025 at 8:43:21 AM Central Daylight Time
To: janell_1996@icloud.com Janell Scribner
Cc: mshaw@gobsd1.org

Ms. Scribner: Thank you so much for your note and for bringing this to my attention. I will follow-up with Ms. Shaw.

Ken James

On Thu, May 15, 2025 at 8:40 AM Janell Scribner <janell_1996@icloud.com> wrote:
Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**tkjames@gobsd1.org Dr. Kenneth James**        Thursday, May 15, 2025 at 8:44:02 AM Central Daylight Time
To: mshaw@gobsd1.org Mindy Shaw

EXHIBIT A

Mndy: Please keep me posted., I am hearing too much on this individual.

Ken

————— Forwarded message ———
From: **Janell Scribner** <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM
Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**mshaw@gobsd1.org Mindy Shaw**                          Thursday, May 15, 2025 at 8:49:08 AM Central Daylight Time
To: tkjames@gobsd1.org Dr. Kenneth James

I will pull cameras and let you know what I find.

Mindy



# Mindy Shaw

Batesville and Sulphur Rock
Director

☏ (870) 793-0630 ext. 5010
✉ mshaw@gobsd1.org
🌐 batesvilleschools.com

"Every child can learn just not on the
same day or in the same way"
—George Evans

On Thu, May 15, 2025 at 8:44 AM Dr. Kenneth James <tkjames@gobsd1.org> wrote:
  Mndy: Please keep me posted., I am hearing too much on this individual.

  Ken

---------- Forwarded message ---------
From: **Janell Scribner** <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM
Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**tkjames@gobsd1.org Dr. Kenneth James**
To: mshaw@gobsd1.org Mindy Shaw

Thursday, May 15, 2025 at 8:50:07 AM Central Daylight Time

Thanks.

On Thu, May 15, 2025 at 8:49 AM Mindy Shaw <mshaw@gobsd1.org> wrote:
I will pull cameras and let you know what I find.

Mindy



## Mindy Shaw
Batesville and Sulphur Rock Director

☎ (870) 793-0630 ext. 5010
✉ mshaw@gobsd1.org
⊕ batesvilleschools.com

"Every child can learn just not on the same day or in the same way"
—George Evans

On Thu, May 15, 2025 at 8:44 AM Dr. Kenneth James <tkjames@gobsd1.org> wrote:
Mndy: Please keep me posted., I am hearing too much on this individual.

Ken

---------- Forwarded message ---------
From: **Janell Scribner** <janell_1996@icloud.com>
Date: Thu, May 15, 2025 at 8:40 AM

Subject: 30 Month Classroom Incident 5/15/25
To: <tkjames@gobsd1.org>
Cc: <mshaw@gobsd1.org>

Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.
Another witness to this was Willsub employee Ms. Jackie Somers. She was also in the room throughout the entire incident.

I'd like to report this behavior, as I have seen her speak extremely rudely on several different occasions however today was the first day I have contemplated walking back out with my child. I do not want my child yelled at nor name called. Please be aware her behavior is unacceptable and unprofessional towards children, parents, and staff.

---

**mshaw@gobsd1.org Mindy Shaw**                    Thursday, May 15, 2025 at 5:23:43 PM Central Daylight Time
To: janell_1996@icloud.com Janell Scribner, tkjames@gobsd1.org Dr. Kenneth James

Thank you for bringing this to my attention, this has been taken care of and will not happen again. In the future please let me know about incidents as I cannot fix what I don't know.

Thank you!
Mindy Shaw



# Mindy Shaw

Batesville and Sulphur Rock
Director

📞 (870) 793-0630 ext. 5010
✉ mshaw@gobsd1.org
🌐 batesvilleschools.com

"Every childoen learn just not on the
same day dt in the same woy
-George Evens

On Thu, May 15, 2025 at 8:40 AM Janell Scribner <janell_1996@icloud.com> wrote:
Dr. James,
My name is Janell Snow. I have two children who attend Sulphur Rock Preschool.
There was an incident this morning that I feel you need to be made aware of. My daughter is in the 30 month classroom and as I was walking her to her classroom at approximately 8:00 am this morning I heard yelling as we approached the door. I waited just a moment to see where it was coming from, to which I found was in fact my daughters classroom. I heard Ms. Donna Januchowski yelling at a child and telling Ms. Jovi Cox she "has told him to quit crying three times and he is being HIDEOUS." I opened the door and Ms. Donna turned around to us. She greeted us with "good morning" as if she hadn't been yelling just seconds ago. She mentioned she "had to get breakfast". The young boy (2 years old) that she had been yelling at was sitting on the floor, still someonewhat crying. Ms. Jovi Cox assited him into a chair. I believe I heard him crying for his mama but I cannot say for certain. Once Donna exited the room I asked preschool teacher, Jovi Cox, (who was in the room through the entire incident) if Donna always talks like that? To which she replied with, ALWAYS.

**Subject:** Fwd: Camera User Audits

**Date:** Wednesday, July 29, 2026 at 8:44:56 PM Central Daylight Time

**From:** Matt Baxter <albaxter@gobsd1.org>

**To:** Jay Bequette <jbequette@bbpalaw.com>

**CC:** David Campbell <dcampbell@gobsd1.org>

~~
Have a blessed day!

Matt Baxter
Batesville School District
Technology Department

---------- Forwarded message ---------
From: **Dr. Ginni McDonald** <gmcdonald@gobsd1.org>
Date: Tue, Feb 24, 2026 at 1:35 PM
Subject: Re: Camera User Audits
To: Matt Baxter <albaxter@gobsd1.org>

Thank you so much for your diligence in establishing strong systems. Please let me know your progress with setting up a system.

Thank you again,
GM



Dr. Ginni McDonald
Superintendent

📞 (870) 793-6831 x 1010
✉ gmcdonald@gobsd1.org
🌐 batesvilleschools.com

A Pioneer never quits.    SUPERINTENDENTS TO WATCH

On Tue, Feb 24, 2026 at 9:22 AM Matt Baxter <albaxter@gobsd1.org> wrote:
    Jody and I did some digging into our system and it has the capability of having User Audits
    which will pull what we are looking for. Unfortunately we have never had this set up before, so
    we are working to get it set and put into practice. We are also reworking all camera
    accounts and who can log into the system and what cameras are available for each person to

1 of 2

view only, look back, and download. These features are available independently per person which means we can work on getting specific use case accounts created for door access and door cameras combined with each other to work for secretaries at each campus to allow people in or not. I am also working with SRO Chris Martin to be able to create some Camera Control Procedures for those who are going to be using them for security purposes and discipline procedures. This will allow us to be able to set specific people that need to be in this position to know legally what is supposed to happen.
I hope this helps.

--
~~
Have a blessed day!

Matt Baxter
Batesville School District
Technology Department

IN THE DISTRICT COURT OF INDEPENDENCE COUNTY
BEFORE THE HONORABLE CHANEY TAYLOR

STATE OF ARKANSAS

**VS**

Any and all Batesville School District text messages (incoming and outgoing) for the accounts of Kristi Cox, Mindy Shaw, Lorrie McClure, Ginni McDonald, Matt Baxter. (Who are all mandated reporters), that are associated with correspondence about Batesville School District business and incidents from January 23rd, 2026 through February 14th, 2026.

### SEARCH WARRANT

The undersigned, being duly sworn, deposes and says: That they have reason to believe that there is now being concealed inside the cellular telephone known and described as: Any and all Batesville School District text messages (incoming and outgoing) for the accounts of Kristi Cox, Mindy Shaw, Lorrie McClure, Ginni McDonald, Matt Baxter. (Who are all mandated reporters), that are associated with correspondence about Batesville School District business and incidents from January 23rd, 2026 through February 14th, 2026.

**Directions to the text message accounts are as follows:** The physical address is 490 E College Street Suite 256 Batesville Arkansas 72501.

**Which Text messages are described as:** Any and all Batesville School District text messages (incoming and outgoing) for the accounts of Kristi Cox, Mindy Shaw, Lorrie McClure, Ginni McDonald, Matt Baxter. (Who are all mandated reporters), that are associated with correspondence about Batesville School District business and incidents from January 23rd, 2026 through February 14th, 2026.

In the City of Batesville, County of Independence, State of Arkansas, there is now being concealed certain information, namely: text messages, deleted archived or drafted network text messages or notes, associated with the crime of A.C.A 12-18-201 Failure to notify by a mandated reporter in the first degree. Having set forth specific and articulable facts showing that they have an ongoing criminal investigation of Kristi Cox, Mindy Shaw, Lorrie McClure, Ginni McDonald, and Matt Baxter and that the records or information they seek are relevant to this criminal investigation.

I am satisfied that there is Probable Cause to believe that the property so described is being concealed at Batesville School District above described and that the probable cause and the foregoing grounds for the issuance of this Search Warrant exists.

You are hereby commanded to search forthwith for the text messaged named herein for the property and/or information specified, serving this Search Warrant and making this search in the daytime and if such property and/or information be found there to seize it, prepare a summary of

INDEPENDENCE COUNTY, ARKANSAS
CIRCUIT CLERK GREG WALLIS
FILED FOR RECORD BY
JENNIFER NEAL D.C.
DATE: MARCH 19,2026
TIME:12:25:10

the search and a written inventory of the property and/or information seized and return this Search Warrant before me as required by law.

DATED THIS _16th_ DAY OF _March_ 2026, TIME _10:17_ (AM/PM)

_____
JUDGE